ORIGINAL

FILED
AUG 2 3 2004
U.S. COURT OF
FEDERAL CLAIMS

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SPECTRUM SCIENCES AND
SOFTWARE, INCORPORATED

v. No: 04-1366C

THE UNITED STATES

---

## COMPLAINT

COMES NOW, Spectrum Sciences and Software, Incorporated, by and through its undersigned attorney, and sues the United States, and as grounds therefore, hereby alleges:

### General Allegations

1. Spectrum Sciences & Software, Incorporated is a Florida corporation whose principal place of business is 91 Hill Avenue, Ft. Walton Beach, Florida 32548 ("Spectrum" or "Plaintiff").

2. The United States as represented by the Department of the Air Force, Air Armament Center, is located at Eglin Air Force Base, Florida ("USAF" or "Government").

3. Spectrum has a manufacturing capability that includes personnel with over 100 years experience manufacturing and maintaining munitions support equipment for the United States defense establishment.

4. Spectrum's staff and personnel include individuals with extensive expertise in munitions handling, design, development and deployment, as well as highly trained scientists, engineers and technicians whose background and experience are

relevant to the munitions handling and support equipment fields, including specifically the Munitions Assembly Conveyor ("MAC") (previously named "RAMS" for Rapid Assembly of Munitions System). This munitions handling and support equipment has recently been renamed by the Government to the Munitions Lift Assembly ("MLA"). However, for the purposes of this action, the munitions handling and loading support equipment shall be referred to as the Munitions Assembly Conveyor ("MAC") in these pleadings.

5. As a result of operational problems with the original MAC and the need to update the MAC to accommodate the larger ordinance being utilized by the USAF, the following elements of the original MAC were identified by Spectrum as needing improving and/or upgrading:

a. Gantry – The original MAC was built to handle MK-82, 500 lb bombs with conical fins. The stated bomb buildup rate of one bomb per minute in the Technical Order was based on this size bomb. No other size bombs could be built at that sustained rate. Newer, precision guided munitions were required, with some bomb and guidance kits weighing in excess of 2800 pounds each. The original MAC gantry could not support two of these bombs at once, and the hoist could not lift them.

b. Hoist Trolley – The original MAC had manual trolleys that had to be pulled into position up or down the gantry by hand. These manual trolleys were not only extremely tiring to use, but also dangerous.

c. Torque bar – The original requirement for the MAC was for 500 lb bombs with conical fins. This fin was attached with set-screws, and did not require that the bomb be held in place during tightening. However, modern ordinance rely heavily on laser guidance packages. These packages require installation of a collar (called the forward adapter) that must be tightened to a torque of 600-700 ft/lbs. The collar is radially aligned with the bomb, so the bomb has a tendency to rotate instead of tighten.

d. Lighting – The lighting provided with the original MAC was inadequate.

e. Hoist – After even moderate wear and tear, especially in cold weather, the original MAC's hoist could only lift one bomb at a time, slowing production rates. At temperatures below zero degrees Fahrenheit, the hoist developed ice crystals internally, and cut the seals causing catastrophic failure. The original hoist also used oil that is very hard to find and was very environmentally unfriendly.

f. Dolly Stops – The original MAC had a rudimentary stop to prevent bomb dollies from inadvertently rolling off the rail conveyor. It would prevent bombs from going over the edge at very slow speeds, but not when pushed with authority as often happened when the rail conveyor was not completely level.

g. Interface Control Board – The interface control board supplied with the original MAC needed modernizing to make it more useful, efficient and user friendly, both in the electrical and pneumatic systems.

**COUNT I - BREACH OF EXPRESS CONTRACT**

6. This is an action for damages for breach of an express contract between the Plaintiff and the United States, namely the Cooperative Research and Development Agreement dated October 14, 2000 ("CRADA").

7. The jurisdiction of the United States Court of Federal Claims is conferred by the Tucker Act, 28 U.S.C. Section 1491.

8. Spectrum realleges and reasserts paragraphs 1 through 5 as if fully set forth herein.

9. For over a period of approximately one year prior to the execution of the CRADA, Spectrum engaged in substantial design, development and manufacturing of a full scale, operational laboratory test MAC for the purpose of improving the original MAC.

10. Benefiting from its extensive experience and intellectual capital, and prior to the execution of the CRADA, Spectrum established and developed new replacement part procurement protocols for the original MAC.

11. Benefiting from its extensive experience and intellectual capital, and prior to the execution of the CRADA, Spectrum was uniquely involved in making major modifications and improvements to integral components of the original MAC, which modifications and improvements constituted trade secrets and the intellectual property of Spectrum at the time Spectrum and the USAF entered into the CRADA, including the following :

a. the MAC's gantry design was improved to provide higher weight capacity to the hoist component of the MAC for the newer, precision guided munitions which are substantially heavier than past munitions;

b. the MAC's powered hoist trolley system was automated to allow the MAC to be used more efficiently when the unit is in less than optimal settings and to reduce the strain on human operators by replacing them with automation;

c. a torque bar was designed and introduced to improve the Airmen's capability to add the necessary components for today's high technology munitions;

d. additional lighting was designed and added to the MAC to help illuminate the entire MAC area of operation to include not only the assembly area but also the staging area all around the MAC;

e. a more powerful, dependable, more easily repaired hoist was introduced to increase the MAC's loading capabilities for weight, speed, and number of munitions, and improved its operation in less than hospitable environments;

f. light shipping and storage containers were designed and manufactured for the MAC in order to properly and safely transport the new lighting described in (d.) above;

g. dolly stops were redesigned and added to the MAC's conveyor system to prevent falloff of munitions as they reached the terminal end of the system, especially when the unit was setup on uneven terrain; and,

h. the MAC's air handling system was upgraded including the interface control board to increase electrical power, and adding ¾ inch airlines throughout to improve the pneumatic operation of the entire system.

12. Spectrum expended substantial sums of money for research and development to modify and improve the MAC prior to entering into the CRADA.

13. Prior to entering into the CRADA, Spectrum installed a MAC laboratory demonstration area within its manufacturing facility to provide the capability to visualize and test improvements to the current munitions support systems as well as to demonstrate new concepts and designs for munitions handling and support equipment.

14. Prior to entering into the CRADA, Spectrum demonstrated the modifications and improvements that it made to the original MAC to USAF Air Armament Center personnel who visited Spectrum's laboratory to view and assess the improvements. This demonstration of the MAC modifications and improvements to the USAF, which included Spectrum's trade secrets and intellectual property, was made under circumstances where Spectrum and the USAF agreed and understood that such disclosure of Spectrum's prototype, trade secrets and intellectual property was made in strictest confidence.

15. As a direct and immediate result of the substantial research and development and the favorable improvements made by Spectrum on the original MAC, the USAF Air Armament Center requested Spectrum to enter into a Cooperative Research And Development Agreement ("CRADA"), which the parties did on or about October 17, 2000, a copy of which is attached hereto, and incorporated by reference

herein, as Exhibit "A", pursuant to 15 U.S.C. Section 3710a (as amended) and Air Force Instruction 61-302.

16. The purpose of the CRADA was to further refine the research, development, design, and testing of the important improvements to the MAC already substantially undertaken by Spectrum.

17. Paragraph 5.1.1 of Appendix A of the CRADA expressly acknowledges that prior to the CRADA Spectrum had engaged in substantial design and development of a product line of munitions handling equipment and that Spectrum specifically claimed intellectual property rights relating to Spectrum's existing product line and design work related to the MAC.

18. Spectrum's intellectual property expressly referenced in Paragraph 5.1.1 of Appendix A of the CRADA includes the following:

a. Modification of the gantry to 6,000 pounds load limit;

b. The braking system on the rail conveyor;

c. Improvements to the air handling system including the interface control board to increase electrical power, and ¾ inch airlines throughout to enhance pneumatic operations;

d. Modification to the rail conveyor for torque of guided bomb units (GBU's);

e. The development of an electric hoist with powered trolly;

f. The new lighting system; and

g. A working table utilizing the container lid.

19. Spectrum's intellectual property referenced in Paragraph 5.1.1 of Appendix A of the CRADA was developed by Spectrum prior to entering into the CRADA.

20. Paragraph 7.1 of the CRADA expressly provides that any proprietary information not developed under the CRADA shall not be disclosed by the parties except in connection with their duties under the CRADA, and then only upon express consent provided in a separate writing. No such separate writing was ever provided to the Government.

21. Pursuant to Section 7.1 of Appendix A of the CRADA, on or about August 15, 2002, Spectrum submitted to the USAF a Final Report of Completion for all the requirements identified in the CRADA.

22. During the performance of the CRADA as well as following Spectrum's submission of the Final Report of Completion of the CRADA, Spectrum presented its ideas and development progress for the MAC, including pictures and drawings, at USAF munitions conferences throughout the United States. These conferences, which included disclosure, description and assessment of intellectual property and proprietary information developed by Spectrum prior to entering into the CRADA, as well as further developments and technologies developed under the CRADA, were conducted by Spectrum with the express understanding that under Article Seven of the CRADA, such intellectual property and proprietary information would be protected by the Government.

23. Following submission of the Final Report of Completion of the CRADA, the USAF sought to purchase Spectrum's rights in the MAC, including a complete set of drawings of the redesigned MAC. Spectrum refused the USAF's overtures to purchase

Spectrum's rights in the redesigned MAC because the USAF offer was inadequate to compensate Spectrum for its total investment in redesigning the MAC and in light of potential licensing opportunities with other government military entities.

24. After the Government failed to purchase the rights to the redesigned MAC from Spectrum, the Government deliberately breached its obligations to Spectrum under the CRADA to safeguard and protect Spectrum's intellectual property and proprietary information by improperly disclosing and widely disseminating to third parties, including competitors of Spectrum, Spectrum's intellectual property and proprietary information in the draft Request for Proposal specifications (dated March 25, 2003) ("draft RFP") and the Final Request for Proposal (dated May 1, 2003) specifications, for the design and production of a Munitions Assembly Conveyor (MAC), Solicitation No. F08635-03-R-0077, issued by the USAF ("Final RFP"). Copies of the draft RFP specification and the Final RFP specification are attached hereto, and incorporated by reference herein, as Exhibits "B" and "C", which solicitations utilized specifications that included Spectrum's intellectual property and proprietary information relating to the redesigned MAC.

25. Although the Government did remove and alter several sections of the draft RFP following strenuous objections made by Spectrum to the USAF that such disclosure was improper and a breach of the CRADA that required the USAF to protect Spectrum's intellectual property and proprietary information relating to the redesigned MAC, the Government deliberately and knowingly again breached the CRADA by subsequently issuing the Final RFP that further improperly disclosed to third parties (including Spectrum's competitors) Spectrum's intellectual property and proprietary information relating to the redesigned MAC.

26. Without utilizing Spectrum's intellectual property and proprietary information relating to the redesigned MAC, the Government would have been unable to produce the specifications contained in the Draft RFP for the design and production of a Munitions Assembly Conveyor (MAC), Solicitation No. F08635-R-0077.

27. The Government further breached its obligations to Spectrum under the CRADA by failing to confer and consult with Spectrum before it published or otherwise publicly disclosed the results of the work as required by Paragraph 7.3 of the CRADA.

28. The Government further breached its obligations to Spectrum under the CRADA by improperly disclosing Spectrum's intellectual property and proprietary information in violation of the CRADA by allowing the contractor who ultimately won the bid on Solicitation No. F08635-R-0077 to physically view prototype products developed by Spectrum for the MAC, at AFCOMAC, Beale AFB, California, during the competition period under the Solicitation.

29. Section 7.2 of the CRADA further provides that any designs, technologies or integration of technologies developed solely by Spectrum under the CRADA is proprietary to Spectrum and solely owned by Spectrum.

30. By reason of the conduct of the Government alleged herein, the Government further knowingly and improperly disclosed proprietary information developed solely by, and solely owned by, Spectrum under the CRADA.

31. Spectrum attempted to resolve this dispute with the USAF arising under Section 8.4 of the CRADA by communicating with the USAF officials on several occasions, and upon failing to resolve this dispute, Spectrum requested that the UNIT (as defined in the CRADA) refer the dispute to the REVIEWING OFFICIAL (as defined in

the CRADA), but the UNIT refused to refer the dispute to the REVIEWING OFFICIAL, thereby frustrating and exhausting Spectrum's administrative remedies under the CRADA.

32. All of the foregoing breaches by the Government of its obligations under the CRADA have caused irreparable harm and severe financial damage to Spectrum in an amount not less than Three and One Half Million Dollars ($3,500,000.00).

WHEREAS, Plaintiff prays the Court to enter judgment in favor of Plaintiff for monetary damages against the United States in an amount not less than Three and One Half Million Dollars ($3,500,000.00), and to further award Plaintiff all costs, fees, expenses and attorney's fees as allowed by the Equal Access to Justice Act, 28 U.S.C. Sec. 2412, and other applicable law, and such other and further relief as the Court may deem appropriate.

**COUNT II – BREACH OF IMPLIED IN FACT CONTRACT**

33. This is an action for damages for breach of an implied in fact contract with United States.

34. The jurisdiction of the United States Court of Federal Claims is conferred by the Tucker Act, 28 U.S.C. Section 1491.

35. Spectrum realleges and reasserts paragraphs 1 through 5 and, 9 through 16, and 22 through 31, as if fully set forth herein.

36. Following the submittal by Spectrum of its Final Report on the design and development of the MAC under the CRADA, the USAF indicated its willingness to accept an unsolicited proposal from Spectrum for a 6,000 pound capacity MAC.

37. In response, on or about February 24, 2003, Spectrum submitted to the USAF an Unsolicited Proposal to build a Combat Munitions Assembly Conveyor ("C-MAC"), which proposal was dated February 19, 2003, a copy of which is attached hereto, and incorporated by reference herein, as Exhibit "D" ("Unsolicited Proposal").

38. Spectrum's Unsolicited Proposal disclosed numerous trade secrets and proprietary information of Spectrum, including trade secrets and proprietary information developed by Spectrum following the submittal of the Final Report under the CRADA. The Unsolicited Proposal also included a printed and prominent restrictive legend which prohibited the use or disclosure by the Government of Spectrum's trade secrets and proprietary information for any purpose other than the Government's evaluation of the Unsolicited Proposal.

39. An implied in fact contract was created when Spectrum submitted its Unsolicited Proposal to the Government, which imposed on the Government an obligation to maintain the confidentiality of Spectrum's trade secrets and proprietary information contained in the Unsolicited Proposal.

40. The Unsolicited Proposal contained the following trade secrets and proprietary information relating to the MAC that were developed by Spectrum before it entered into the CRADA with the Government:

a. Modification of the gantry to upgrade to a 6,000 pounds load limit;

b. The dolly brakes on the rail conveyor;

c. Improvements to the air handling system including the interface control board to increase electrical power, and ¾ inch airlines throughout to enhance pneumatic operations;;

d. Modification to the rail conveyor to allow proper torque of bombs;

e. The development of an electric hoist with powered trolley; and

f. A working table utilizing attachments to shipping container lid: and

g. A new lighting system.

41. The Unsolicited Proposal also contained the following trade secrets and proprietary information relating to the MAC that were developed by Spectrum after the completion of the CRADA:

a. Rail Conveyor Dolly; and

b. Tool holding tray

42. The USAF accepted and purported to review Spectrum's Unsolicited Proposal for the MAC for a full month while the USAF, without informing Spectrum of its true intentions and inclinations, was preparing to issue its own Request for Proposal for the manufacture of the MAC which ultimately, in the form of the draft RFP and the Final RFP as alleged above, improperly utilized and disclosed Spectrum's intellectual property and trade secrets.

43. On or about March 24, 2003, the USAF notified Spectrum that the USAF would not accept Spectrum's Unsolicited Proposal because the USAF had instituted an acquisition program to acquire a C-MAC. This was the first time that the Government informed Spectrum that it was preparing an acquisition program for a MAC or similar system.

44. The next day, on March 25, 2003, the USAF issued the draft RFP, followed by the Final RFP on or about May 1, 2003, for Solicitation No. F08635-03-R-0077 (Exhibits "B" and "C"). As alleged previously herein, by issuing both the draft RFP and the Final RFP the Government knowingly, deliberately and improperly disclosed to third parties (including to Spectrum's competitors) numerous trade secrets and intellectual property developed by Spectrum both before and after the CRADA, and that were contained in the Unsolicited Proposal.

45. The Government knowingly, deliberately and improperly breached its obligation to Spectrum to maintain the confidentiality of the trade secrets and intellectual property of Spectrum contained in its Unsolicited Proposal by releasing the draft RFP dated March 25, 2003, and the Final RFP dated May 1, 2003, for Solicitation No. F08635-03-R-0077 (Exhibits "B" and "C"), because these solicitations contained these trade secrets and intellectual property misappropriated by the Government from Spectrum's Unsolicited Proposal without the knowledge or approval of Spectrum.

46. The Government further breached its obligations to maintain the confidentiality of Spectrum's trade secrets contained in its Unsolicited Proposal by allowing the contractor who ultimately won the bid on Solicitation No. F08635-03-R-0077 to physically view prototype products developed by Spectrum for the MAC, as well as proprietary information relating thereto, at AFCOMAC, Beale AFB, California, during the competition period under the Solicitation.

47. As a direct and immediate result of the Government's breach of its obligations to maintain the confidentiality of the trade secrets and proprietary information contained in Spectrum's Unsolicited Proposal, the Government has irreparably harmed

Spectrum and caused severe financial damage to Spectrum in an amount not less than Three and One Half Million Dollars ($3,500,000.00).

WHEREAS, Plaintiff prays the Court to enter judgment in favor of Plaintiff for monetary damages against the United States in an amount not less than Three and One Half Million Dollars ($3,500,000.00) and to further award Plaintiff all costs, fees, expenses and attorney's fees as allowed by the Equal Access to Justice Act, 28 U.S.C. Sec. 2412, and other applicable law, and such other and further relief as the Court may deem appropriate.

**COUNT III – MISAPPROPRIATION OF TRADE SECRETS**

48. This is an action for misappropriation of trade secrets.

49. The jurisdiction of the United States Court of Federal Claims as conferred by the Tucker Act 28 U.S.C. § 1491.

50. Spectrum realleges and reasserts paragraphs 1 through 5, 9 through 32, and 36 through 47.

51. The Government knowingly, deliberately and improperly misappropriated Spectrum's trade secrets and proprietary information relating to the MAC, including the following:

a. Modification of the gantry to upgrade to a 6,000 pounds load limit;

b. The dolly brakes on the rail conveyor;

c. Improvements to the air handling system including the interface control board to increase electrical power, and ¾ inch airlines throughout to enhance pneumatic operations;

d. Modification to the rail conveyor to allow proper torque of bombs;

e. The development of an electric hoist with powered trolley;

f. New lighting system;

g. A working table utilizing attachments to shipping container lids;

h. Rail Conveyor Dolly; and

i. Tool holding tray

52. This action for misappropriation of trade secrets involve Government conduct arising out of and related to the express contract between Spectrum and the Government, namely the CRADA, and the implied in fact contract arising out of the Unsolicited Proposal, all as alleged above.

53. As a direct and immediate result of the Government's misappropriation of Spectrum's trade secrets, the Government has irreparably harmed Spectrum and caused severe financial damage to Spectrum in an amount not less than Three and One Half Million Dollars ($3,500,000.00).

WHEREAS, Plaintiff prays the Court to enter judgment in favor of Plaintiff for monetary damages against the United States in an amount not less than Three and One Half Million Dollars ($3,500,000.00), and to further award Plaintiff all costs, fees, expenses and attorney's fees as allowed by the Equal Access to Justice Act, 28 U.S.C. Sec. 2412, and other applicable law, and such other and further relief as the Court may deem appropriate.

Dated this 20th day of August, 2004.

Terrance R. Ketchel, Esq.
TERRANCE R. KETCHEL, P.A.
126 NE Eglin Parkway
Fort Walton Beach, FL 32548
Florida Bar No. 398152
Telephone No.: (850) 664-2705
Facsimile No.: (850) 664-7933

OF COUNSEL:

David A. Dopsovic, Esq.
LASA, MONROIG & VEVE, LLP
Suite 800
2121 K Street, N.W.
Washington, D.C.
D.C. Bar No. 391393
Telephone No.: (202) 261-3570
Facsimile No.: (202) 261-3523

# EXHIBIT A

## COOPERATIVE RESEARCH AND DEVELOPMENT AGREEMENT
## (“CRADA”)

## PAGES 18-34

USAF CRADA NUMBER 00-AAC-02

**COOPERATIVE RESEARCH AND DEVELOPMENT AGREEMENT**

**BETWEEN THE**

**USAF AIR ARMAMENT CENTER**

**AND**

**SPECTRUM SCIENCES AND SOFTWARE INC**

**FOR THE PURPOSE OF IMPROVING MUNITIONS SUPPORT EQUIPMENT**

**Article 1. Preamble**

WHEREAS: The parties hereto wish to cooperate in the development of a process, product, or technology for their mutual benefit; and

WHEREAS: The performance of the activities specified by this AGREEMENT are consistent with the mission of the UNIT; and

WHEREAS: Before entering into this AGREEMENT, UNIT has considered the preferences set forth in 15 U.S.C. 3710a.(c)(4);

Now, therefore this Cooperative Research and Development Agreement (AGREEMENT) for performing the work described in the Work Plan attached hereto as Appendix A is entered into pursuant to 15 U.S.C. §3710a (as amended) and Air Force Instruction 61-302 by and between Spectrum Sciences and Software, Incorporated, (hereinafter referred to as "COLLABORATOR"), located at 91 Hill Avenue, Fort Walton Beach, Florida 32549, and the United States of America as represented by the Department of the Air Force, Air Armament Center, (hereinafter referred to as "UNIT"), located at Eglin Air Force Base, Florida. The terms and conditions of this AGREEMENT are set forth as follows.

**Article 2. Definitions**

2.1 As used in this AGREEMENT, the following terms shall have the following meanings and such meanings shall be applicable to both the singular and plural forms of the terms:

2.2 "CREATED" in relation to any copyrightable work means when the work is fixed in any tangible medium of expression for the first time, as provided for at 17 U.S.C. § 101.

2.3 "EFFECTIVE DATE" means the earlier of: (a) the date of the last signature of the duly authorized representatives of the parties and the REVIEWING OFFICIAL; or (b) thirty (30) days after the receipt of a signed copy of this AGREEMENT by the REVIEWING OFFICIAL without that official taking any action thereon.

2.4 "GOVERNMENT" means the Government of the United States of America.

2.5 "GOVERNMENT PURPOSE LICENSE" or "GPL" means a license to the GOVERNMENT conveying a nonexclusive, irrevocable, worldwide, royalty-free license to practice and have practiced an INVENTION for or on behalf of the GOVERNMENT for government purposes and on behalf of any foreign government or international organization pursuant to any existing or future treaty or agreement with the United States, and conveying the right to use, duplicate or disclose copyrighted works or PROPRIETARY INFORMATION in whole or in part and in any manner, and to have or permit others to do so, for government purposes. Government purposes include competitive procurement, but do not include the right to have or permit others to practice an INVENTION or use, duplicate or disclose copyrighted works or PROPRIETARY INFORMATION for commercial purposes.

2.6 "INVENTION" means any invention or discovery which is or may be patentable or otherwise protected under Title 35 of the United States Code or any novel variety of plant which is or may be protectable under the Plant Variety Protection Act (7 U.S.C. § 7321 et seq.).

2.7 "MADE" in relation to any INVENTION means the conception or first actual reduction to practice of such INVENTION.

2.8 "ORTA" means the Office of Research and Technology Applications (ORTA) representative at UNIT or his successor (see paragraph 13.1.A).

2.9 "PROPRIETARY INFORMATION" means information which embodies trade secrets or which is confidential technical, business or financial information provided that such information:

i) is not generally known, or is not available from other sources without obligations concerning its confidentiality;

ii) has not been made available by the owners to others without obligation concerning its confidentiality;

iii) is not described in an issued patent or a published copyrighted work or is not otherwise available to the public without obligation concerning its confidentiality; or

iv) can be withheld from disclosure under 15 U.S.C. § 3710a(c)(7)(A) & (B) and the Freedom of Information Act, 5 U.S.C. § 552 et seq; and

v) is identified as such by labels or markings designating the information as proprietary.

2.10 "REVIEWING OFFICIAL" means the authorized representative of the Department of the Air Force who is identified on the signature page of this AGREEMENT.

2.11 "UNDER" as used in the phrase "UNDER this AGREEMENT" means within the scope of work performed under this AGREEMENT.

**Article 3. Work Plan**

3.1 The nature and scope of the work performed UNDER this AGREEMENT, including any equipment, maintenance and other support, and any associated reporting requirements are set forth in Appendix A and B.

**Article 4. Financial Obligations**

4.1 Services. It is not anticipated that any cash payments will be made by either party to the other for services under this AGREEMENT. It is expressly understood that COLLABORATOR assumes all responsibility for costs it incurs before or after the effective date, even if the UNIT fails to obtain approval of, breaches, or abandons, this AGREEMENT.

4.2 Patents. Royalty or other income from patents shall be payable in accordance with any patent license under Article 5.

4.3 Copyrights. No copyrightable material is expected to result from performance under this AGREEMENT. Should Article 6 be modified to include copyrightable works, provision for any negotiated payments will be reflected in this Article 4.3.

**Article 5. Patents**

5.1 Disclosure of INVENTIONS. Each party shall report to the other party, in writing, each INVENTION MADE UNDER this AGREEMENT, promptly after the existence of each such INVENTION, in the exercise of reasonable diligence, becomes known.

5.2 Rights in INVENTIONS. Each party shall separately own any INVENTION MADE solely by its respective employees UNDER this AGREEMENT. INVENTIONS MADE jointly by UNIT and COLLABORATOR employees shall be jointly owned by both parties. COLLABORATOR shall have an option under 15 U.S.C. 3710a(b)(2) to obtain an exclusive or non-exclusive license at a reasonable royalty rate, subject to the retention of a GPL by the GOVERNMENT, in any INVENTION MADE by UNIT employees UNDER this AGREEMENT. COLLABORATOR shall exercise the option to obtain a license by giving written notice thereof to UNIT within three (3) months after disclosure of the INVENTION under paragraph 5.1. The royalty rate and other terms and conditions of the

license shall be set forth in a separate license agreement and shall be negotiated promptly after notice is given. COLLABORATOR hereby grants to the GOVERNMENT, in advance, a GPL in any INVENTION MADE by COLLABORATOR employees UNDER this AGREEMENT.

5.3 Filing Patent Applications. COLLABORATOR shall have the first option to file a patent application on any INVENTION MADE UNDER this AGREEMENT, which option shall be exercised by giving notice in writing to UNIT within three (3) months after disclosure of the INVENTION under paragraph 5.1, and by filing a patent application in the U.S. Patent and Trademark Office within six (6) months after written notice is given. If COLLABORATOR elects not to file or not to continue prosecution of a patent application on any such INVENTION in any country or countries, COLLABORATOR shall notify UNIT thereof at least three (3) months prior to the expiration of any applicable filing or response deadline, priority period or statutory bar date. In any country in which COLLABORATOR does not file, or does not continue prosecution of, or make any required payment on, an application on any such INVENTION, UNIT may file, or continue prosecution of, or make any required payment on, an application, and COLLABORATOR agrees, upon request by UNIT, to assign to the GOVERNMENT all right, title and interest of COLLABORATOR in any such application and to cooperate with UNIT in executing all necessary documents and obtaining cooperation of its employees in executing such documents related to such application. The party filing an application shall provide a copy thereof to the other party. Any patent application filed on any INVENTION MADE UNDER this AGREEMENT shall include in the patent specification thereof the statement: "This invention was made in the performance of a Cooperative Research and Development Agreement with the Department of the Air Force. The invention may be manufactured and used by or for the Government of the United States for all government purposes without the payment of any royalty."

5.4 Patent Expenses. Unless otherwise agreed, the party filing an application shall pay all patent application preparation and filing expenses and issuance, post issuance and patent maintenance fees associated with that application.

**Article 6. Reserved**

6.1 It is not anticipated that any copyrightable works will be created under this AGREEMENT. Should any copyrightable works become a possibility during performance under this AGREEMENT, this Article will be modified using the model Air Force Cooperative Research and Development Agreement guidelines.

**Article 7. Proprietary Information**

7.1 Neither party to this AGREEMENT shall deliver to the other party any PROPRIETARY INFORMATION not developed UNDER this AGREEMENT, except with the written consent of the receiving party. Unless otherwise expressly provided in a separate document, such PROPRIETARY INFORMATION shall not be disclosed by the receiving

party except under a written agreement of confidentiality to employees and contractors of the receiving party who have a need for the information in connection with their duties UNDER this AGREEMENT.

7.2 PROPRIETARY INFORMATION developed UNDER this AGREEMENT shall be owned by the developing party, and any jointly developed PROPRIETARY INFORMATION shall be jointly owned. GOVERNMENT shall have a GPL to use, duplicate and disclose, in confidence, and to authorize others to use, duplicate and disclose, in confidence, for government purposes, any such PROPRIETARY INFORMATION developed solely by COLLABORATOR UNDER this AGREEMENT. COLLABORATOR may use, duplicate and disclose, in confidence, and authorize others on its behalf to use, duplicate and disclose, in confidence, any such PROPRIETARY INFORMATION developed solely by UNIT. PROPRIETARY INFORMATION developed UNDER this AGREEMENT shall be exempt from the Freedom of Information Act, 5 U.S.C. § 552 et seq, as provided at 15 U.S.C. § 3710a(c)(7)(A) & (B). The exemption for PROPRIETARY INFORMATION developed jointly by the parties or solely by UNIT shall expire not later than five years from the date of development of such PROPRIETARY INFORMATION.

7.3 The parties agree to confer and consult with each other prior to publication or other public disclosure of the results of work UNDER this AGREEMENT to ensure that no PROPRIETARY INFORMATION or military critical technology or other controlled information is released. Prior to submitting a manuscript for publication or before any other public disclosure, each party will offer the other party ample opportunity to review such proposed publication or disclosure, to submit objections, and to file applications for letters patent in a timely manner.

7.4 UNIT agrees that any designs, technologies, or the integration of technologies developed under COLLABORATOR funds are proprietary to COLLABORATOR.

**Article 8. Term, Modification, Extension, Termination, and Disputes**

8.1 Term and Extension. The term of this AGREEMENT is for a period of 36 months, commencing on the EFFECTIVE DATE of this AGREEMENT. This AGREEMENT shall expire at the end of this term unless both parties hereto agree in writing to extend it further. Expiration of this AGREEMENT shall not affect the rights and obligations of the parties accrued prior to expiration.

8.2 Modification. Any modifications shall be by mutual written agreement signed by the parties' representatives authorized to execute this AGREEMENT and attached hereto. A copy of any modifications will be forwarded to the REVIEWING OFFICIAL for information purposes.

8.3 Termination. Either party may terminate this AGREEMENT for any reason upon delivery of written notice to the other party at least one (1) month prior to such termination.

Termination of this AGREEMENT shall not affect the rights and obligations of the parties accrued prior to the date of termination of this AGREEMENT. In the event of termination by either party, each party shall be responsible for its own costs incurred through the date of termination, as well as its own costs incurred after the date of termination and which are related to the termination. If UNIT terminates this AGREEMENT, it shall not be liable to COLLABORATOR or its contractors or subcontractors for any costs resulting from or related to the termination, including, but not limited to, consequential damages or any other costs.

8.4 Disputes. All disputes arising out of, or related to, this AGREEMENT shall be resolved in accordance with this Article.

8.4.1 Resolution by Parties. The parties shall attempt to resolve disputes between themselves. Any dispute which is not disposed of by agreement of the parties shall be referred by the UNIT to the REVIEWING OFFICIAL for decision. The REVIEWING OFFICIAL shall meet with any level of management requested by the COLLABORATOR and consider any oral or written presentation from the COLLABORATOR prior to reaching a decision.

8.4.2 REVIEWING OFFICIAL. The REVIEWING OFFICIAL shall within sixty (60) days of the receipt of the dispute and any presentation by the COLLABORATOR, notify the parties of the decision. This decision shall be final and conclusive unless, within thirty (30) days from the date of receipt of such copy, either party submits to the REVIEWING OFFICIAL, a written appeal addressed to the Secretary of the Air Force.

8.4.3 Secretary of the Air Force. The decision of the Secretary of the Air Force, or his duly authorized representative, on the appeal shall be final and conclusive.

8.5 Continuation of Work. Pending the resolution of any such dispute, work under this AGREEMENT will continue as elsewhere provided herein.

## Article 9. Representations and Warranties

9.1 COLLABORATOR expressly represents and warrants to UNIT that COLLABORATOR is not a foreign-owned or a subsidiary of a foreign-owned entity and COLLABORATOR has the right to assignment of all INVENTIONS MADE and copyrightable works CREATED by its employees UNDER this AGREEMENT.

## Article 10. Property

10.1 Property. All property is to be furnished "as is" without any warranty, express or implied, as to serviceability, fitness for use, or other basis of warranty. Furthermore, the property is being made available on a non-interference basis with UNIT requirements and UNIT can request prompt return of the property without cost to UNIT. COLLABORATOR may inspect GOVERNMENT property identified in Appendix B prior to use.

10.2 Use of Property. The property provided by UNIT UNDER this AGREEMENT shall not be transferred, encumbered, or used for any purpose other than that stated in this AGREEMENT without the written consent of the UNIT.

10.3 Maintenance. The COLLABORATOR shall maintain the property during the term of this AGREEMENT in a safe and serviceable condition according to generally prescribed research practices and/or in accordance with any subsystem manufacturers recommended practices.

10.4 Loss of Property. The COLLABORATOR shall assume the risk of loss, damage, or destruction of the property provided UNDER this AGREEMENT. COLLABORATOR agrees to purchase or have existing insurance sufficient to cover the above said risk of loss, damage, or destruction; or with the UNIT's written approval, provide a plan for self-insurance on the depreciated value of the property. The COLLABORATOR shall provide to UNIT written evidence of the insurance or plan for self-insurance required by this AGREEMENT.

10.5 Return of Property. The COLLABORATOR shall return all property to UNIT at the address noted in article 12.1 in the same condition as furnished, except for fair wear and tear. COLLABORATOR shall receive written approval for any modifications to the property while conducting development UNDER this AGREEMENT. With UNIT's approval, COLLABORATOR may return the property in the "as modified" condition as a result of conducting development UNDER this AGREEMENT.

**Article 11. Liability**

11.1 COLLABORATOR Employees. COLLABORATOR agrees to indemnify and hold harmless and defend the GOVERNMENT, its employees and agents, against any liability or loss for any claim made by an employee or agent of COLLABORATOR, or persons claiming through them, for death, injury, loss or damage to their person or property arising in connection with this AGREEMENT, except to the extent that such death, injury, loss or damage arises solely from the negligence of UNIT or its employees.

11.2 NO WARRANTY. EXCEPT AS SPECIFICALLY STATED IN ARTICLE 9, OR IN A LATER AGREEMENT, THE PARTIES MAKE NO EXPRESS OR IMPLIED WARRANTY AS TO ANY MATTER WHATSOEVER, INCLUDING THE CONDITIONS OF THE RESEARCH OR ANY INVENTION OR PRODUCT, WHETHER TANGIBLE OR INTANGIBLE, MADE, OR DEVELOPED UNDER THIS AGREEMENT, OR THE MERCHANTABILITY, OR FITNESS FOR A PARTICULAR PURPOSE OF THE RESEARCH OR ANY INVENTION OR PRODUCT. THE PARTIES FURTHER MAKE NO WARRANTY THAT THE USE OF ANY INVENTION OR OTHER INTELLECTUAL PROPERTY OR PRODUCT CONTRIBUTED, MADE OR DEVELOPED UNDER THIS AGREEMENT WILL NOT INFRINGE ANY OTHER UNITED STATES OR FOREIGN PATENT OR OTHER INTELLECTUAL PROPERTY RIGHT. IN NO EVENT WILL ANY PARTY BE

LIABLE TO ANY OTHER PARTY FOR PUNITIVE, EXEMPLARY OR CONSEQUENTIAL DAMAGES.

11.3 Other Liability. The GOVERNMENT shall not be liable to any other party to this AGREEMENT, whether directly or by way of contribution or indemnity, for any claim made by any person or other entity for personal injury or death, or for property damage or loss, arising in any way from this AGREEMENT, including, but not limited to, the later use, sale or other disposition of research and technical developments, whether by resulting products or otherwise, whether made or developed UNDER this AGREEMENT, or whether contributed by either party pursuant to this AGREEMENT, except as provided under the Federal Tort Claims Act (28 U.S.C. §§ 2671 et seq.) or other Federal law where sovereign immunity has been waived.

**Article 12. General Terms and Provisions**

12.1 Relationship of the Parties. The parties to this AGREEMENT and their employees are independent contractors and are not agents of each other, joint ventures, partners or joint parties to a formal business organization of any kind. Neither party is authorized or empowered to act on behalf of the other with regard to any contract, warranty or representation as to any matter, and neither party will be bound by the acts or conduct of the other. Each party will maintain sole and exclusive control over its own personnel and operations.

12.2 Publicity/Use of Name Endorsement. Any public announcement of this AGREEMENT shall be coordinated between COLLABORATOR, UNIT and the public affairs office supporting UNIT. COLLABORATOR shall not use the name of UNIT or GOVERNMENT on any product or service which is directly or indirectly related to either this AGREEMENT or any patent license or assignment which implements this AGREEMENT without the prior written approval of UNIT. By entering into this AGREEMENT, UNIT or GOVERNMENT does not directly or indirectly endorse any product or service provided, or to be provided, by COLLABORATOR, its successors, assignees, or licensees. COLLABORATOR shall not in any way imply that this AGREEMENT is an endorsement of any such product or service.

12.3 No Benefits. No member of, or delegate to the United States Congress, or resident commissioner, shall be admitted to any share or part of this AGREEMENT, nor to any benefit that may arise therefrom; but this provision shall not be construed to extend to this AGREEMENT if made with a corporation for its general benefit.

12.4 Governing Law. The construction, validity, performance and effect of this AGREEMENT for all purposes shall be governed by federal law.

12.5 Waiver of Rights. Any waiver shall be in writing and provided to all other parties.

12.6 Severability. The illegality or invalidity of any provisions of this AGREEMENT shall not impair, affect or invalidate the other provisions of this AGREEMENT.

12.7 Assignment. Neither this AGREEMENT nor any rights or obligations of any party hereunder shall be assigned or otherwise transferred by any party without the prior written consent of all other parties.

12.8 Controlled Information. The parties understand that information and materials provided pursuant to or resulting from this AGREEMENT may be export controlled, classified, or unclassified sensitive and protected by law, executive order or regulation. Nothing in this AGREEMENT shall be construed to permit any disclosure in violation of those restrictions.

**Article 13. Notices**

13.1 Notices hereunder shall be deemed made if given and addressed as set forth below.

A. Send formal notices under this agreement by prepaid certified US mail and address them:

Air Armament Center: AAC/XPX
Attn: Mr. Jerry T. Jones (ORTA)
101West D Ave, Suite 131
Eglin AFB, FL 32542-6845

Spectrum Sciences and Software:
Attn: Mr. Donal Myrick
91 Hill Avenue
Ft Walton Beach, FL 32548

B. Send correspondence on technical matters by prepaid ordinary US mail and address them:

Air Armament Center: AAC/WMM
Attn: CMSgt James P. Shelingoski
207 West D Ave, Suite 319
Eglin AFB, FL 32542-6845

Spectrum Sciences and Software:
Attn: Mr. Dwight D. Howard
91 Hill Avenue
Ft Walton Beach, FL 32548

IN WITNESS WHEREOF, the Parties have executed this agreement in duplicate through their duly authorized representatives as follows:

| Spectrum Sciences & Software, Inc. | The Air Armament Center |
| --- | --- |
| Mr. Rodney Holt<br>Director of Contracts<br>Ft. Walton Beach, FL | L. Bruce Simpson, PhD<br>Deputy Armament Product Group Manager<br>Eglin AFB, FL |
| (Signature of Official) | (Signature of Official) |
| 12 September 2000<br>(Date Signed) | 14 Oct 2000<br>(Date Signed) |

REVIEWED AND APPROVED BY AIR FORCE REVIEWING OFFICIAL:

Major General Michael C. Kostelnik
Commander, Air Armament Center

(Signature)

17 Oct 00
(Date)

**Appendix A**
**Work Plan for Improving Munitions Support Equipment**

1.0 OBJECTIVE. The purpose of this Cooperative Research and Development Agreement (CRADA) is to provide a vehicle for the research, development, design, and fielding of improved munitions handling and loading support equipment and therefore improve the combat capability of the United States Air Force. Spectrum Sciences and Software, Inc. (herein referred to as Spectrum), being engaged in the support of fielded munitions handling and loading equipment, has installed a (Rapid Assembly of Munitions System (RAMS) laboratory demonstration area within its facility. This laboratory provides the capability to visualize improvements to current systems as well as demonstrate new concepts and designs for munitions handling and support equipment. The AAC Munitions Materiel Handling Equipment (MMHE) Focal Point (AAC/WMOM) has assigned Air Force personnel with a wide range of field experience, ideas, and concepts on how to improve munitions support equipment. This CRADA will allow the Air Force and Spectrum to share in the exchange of ideas and demonstrate the form, fit and function of newly designed and improved munitions related handling items. The collaborating party will provide a munition handling equipment laboratory that may be used by both WMOM munitions handling equipment experts and Spectrum personnel to enhance the combat capability of munitions support equipment.

2.0 BACKGROUND. Spectrum has recently acquired a manufacturing company that has manufactured and maintained munitions support equipment for the past 20 years. The data rights of the equipment designed and manufactured by the previous company are now the proprietary property of Spectrum. In addition, many of the personnel that came on board with Spectrum have years of experience in the development and manufacture of munitions support equipment. Spectrum's staff includes several former Air Force Personnel with extensive backgrounds in munitions handling, design, development and deployment, as well as highly trained scientists, engineers and technicians whose backgrounds and experience are relevant to the munitions handling and support equipment fields. In recognition of the potential benefits to be gained relative to their core business areas, Spectrum has committed facilities, equipment and resources to the development of a munitions support equipment laboratory for the purpose of demonstrating new concepts.

The MMHE Focal Point is responsible for researching and developing munitions support equipment and is accepted as the eyes and ears of the user in combat operations. The Focal Point is recognized as the expert in solving munitions handling problems for the warfighter. Spectrum further recognizes that mutual benefit may arise by making available to WMOM access to its laboratory to test concepts, share ideas and information, and collaborate on projects that may mutually benefit both Spectrum and the USAF. Recognition of the potential mutual benefits provides the basis for this CRADA. The Air Force activity will benefit by having access to the facilities and equipment to demonstrate new ideas located in close geographical proximity, a capability not now available.

3.0 TECHNICAL TASKS. The following goals and technical tasks form the basis of work under this CRADA:

3.1 GOALS. The parties agree UNDER this AGREEMENT to provide professional and technical resources to conduct the research, development, and testing of munitions support equipment to mature

the technology for commercial/military applications. In general the goals of this cooperative effort are to:

(a) Analyze and evaluate munition handling equipment system and subsystem components to determine their potential for improvement.

(b) Analyze, design, and fabricate various munition handling equipment system and subsystem components for testing.

(c) Conduct static and operational load tests to determine the ability of improved components to withstand the rigors of military operations.

(d) Document the results of the analysis, design, fabrication, and testing UNDER this AGREEMENT.

(e) Integrate the following specific improvements to the RAMS:

GANTRY

- Increasing weight capacity of gantry to 6,000 pounds.
- Method of marking gantry poles to facilitate assembly.

HOIST

- Increasing hoist capacity to 3-tons.
- Application of Commercial Off The Shelf (COTS) hoists which are more reliable and at least maintain the same speed as current hoist; improved speed would greatly benefit the user.
- Providing an electric hoist option in non-mobility (permanent) RAMS installations while keeping the pneumatic hoist capability for mobility.
- Providing motorized hoist trolleys for horizontal hoist I-Beam movement on the gantry.
- Providing sturdier air hose/electric line keeper trolleys.

INTERFACE CONTROL BOARD (ICB)

- Improving the ICB by increasing airflow through the unit and providing better commercial moisture separators, filters, regulators, and oilers.
- Incorporating more outlets in the electrical component of the ICB.

TOOLS

- Use of electric impact wrenches for feasibility in non-mobility operations.
- Providing an easy method of securing munitions to dollies/rail conveyor for high torquing of Guided Bomb Units (GBUs).

LIGHTING

- Improving lighting for night operations. Lights should cycle on/off without a lengthy warm up/cool down cycle, be commercially available, and run on commonly available power.

RAIL CONVEYOR/DOLLY

- Improving the bomb dollies/rail conveyor for easier munitions movement. Eliminate binding of the dollies during movement.

CONTAINERS

- Investigating container retrofitting to insure adequate protection for the new RAMS configuration.

ADD-ONS

- Providing a protective cover for the user. Cover should protect user from sun and light rain, but be easily removable in the event heavy wind occurs.
- Integrating a portable table for fuze/miscellaneous parts assembly.
- Alternative protective coatings for the RAMS that last longer and are more environmentally friendly than the paint in use today.

3.2 SPECTRUM SCIENCES AND SOFTWARE, INC. Spectrum will provide professional and technical resources to conduct development UNDER this AGREEMENT. Specifically, Spectrum will have the following responsibilities:

(a) Assist in the analysis and design of improved munitions handling system and subsystem components of mutual interest. Several different candidate designs may be processed using design data supplied by WMOM and taking into account the physical parameters of improved designs and materials.

(b) Provide all necessary raw materials and fabrication of the various system and subsystem improvements selected for test.

(c) Conduct testing on various system and subsystem improvements using the munition handling system laboratory located at Spectrum.

(d) Participate in the analysis and documentation of test results from testing of the various improved designs.

3.3 FOCAL POINT. WMOM will provide professional, technical, and analytical resources to conduct munition handling equipment development UNDER this AGREEMENT. Specifically, WMOM will have the following responsibilities:

(a) Use operational and maintenance experience and expertise to suggest improvements to munition handling equipment.

(b) Consult and contribute to system design and analysis of improvements to munition handling and support equipment developed UNDER this AGREEMENT.

(c) Provide certified inert munition items for use in form, fit, and function testing of improved munition handling equipment as well as the ground support equipment listed in Appendix B.

4.0 DELIVERABLES OR DESIRED BENEFITS. The following benefits will accrue to the collaborating parties:

4.1 BENEFITS TO SPECTRUM. Spectrum has expended considerable resources to develop munition handling and support equipment in support of Air Force operations. They have established a munition handling equipment laboratory where design improvements may be tested in support of the improvement process. Specifically, Spectrum will benefit by:

(a) Further development and refinement of munition handling equipment improvements to meet specific requirements of operational systems.

(b) Knowledge gained about munition handling equipment applications and the system design parameters for operational application.

(c) The addition to Spectrum's intellectual property portfolio of any inventions, either joint with WMOM, or singular by Spectrum, according to the terms of this AGREEMENT.

(d) The possible commercial application of the munition handling equipment improvements to various support equipment where the properties of the new designs enhance operational performance. It should be noted that performance UNDER this AGREEMENT does not constitute endorsement of any product or process and is not the basis for any contract that may incorporate the results of the effort.

4.2 BENEFITS TO THE GOVERNMENT. The Air Force has been researching improvements to munition handling and support equipment for some time. There are obvious payoffs for improved munition handling equipment in terms of enhanced operational effectiveness. Specifically, the government will benefit by:

(a) Access to design and performance parameters of improved munition handling equipment, particularly in their operational application.

(b) Possible additions to the government patent portfolio.

(c) Access to test results which will allow the government to optimize the future research and development of handling and support equipment for munitions.

(d) Access to Spectrum's munitions handling laboratory for the joint test and evaluation of handling and support equipment design improvements.

5.0 OTHER

5.1 INTELLECTUAL PROPERTY. WMOM and Spectrum have independently supported research and development in munitions handling and support equipment for various operational applications. Therefore, it is prudent to set out the intellectual property that is pertinent to this AGREEMENT as follows:

5.1.1 SPECTRUM. Spectrum has supported the development of a product line of munitions handling equipment prior to this AGREEMENT and specifically claims intellectual property rights particularly as related to their existing product line, and design work completed on the laboratory RAMS which includes modification of the gantry to 6000 lbs load limit, the braking system on the rail conveyor, the interface control board to make it electrical/pneumatic, modification to the rail conveyor for torque of GBU's, the development of a 5500 lb electric hoist with powered trolley, new lighting system and development of a working table with modification of container lid. WMOM will protect Spectrum's proprietary rights in accordance with Article 7 of this AGREEMENT.

5.1.2 FOCAL POINT. WMOM has supported the development of munitions handling equipment both in-house and through contracted efforts. The results of any contracted developments may only be used in performance UNDER this AGREEMENT for government purposes (not commercial). WMOM cannot provide proprietary position or license to Spectrum for any intellectual property not

owned by WMOM. Test components or designs not specifically owned by the government, but which the government is entitled to use for government purposes, may be provided under this AGREEMENT to further advance the technology. Spectrum may be required to enter into company-to-company agreements for the protection of such information as a condition of gaining access to it.

5.1.3 RESULTS OF COOPERATIVE EFFORT. It is anticipated that certain configurations and designs will be a result of the work carried out UNDER this AGREEMENT. The rights to any intellectual property generated as a result of work UNDER this AGREEMENT will be governed by the conditions set forth in this AGREEMENT. The possible intellectual property which may result is:

(a) Particular material designs which can withstand the rigors of the operational environment.

(b) Possible component designs which would enhance both the commercial and military application of the technology.

(c) Design parameters for advanced munitions handling and support equipment.

5.2 SAFETY AND SECURITY. While pursuing activities under this AGREEMENT at Spectrum facilities, such as the munitions handling demonstration laboratory, government personnel will adhere to Spectrum's work schedule, safety, and security practices and policies.

5.3 EXPORT CONTROL. Since technical data used or produced under this effort may contain or disclose performance characteristics of military systems or manufacturing technology critical to military production, it may be necessary to control both the release of the data and/or the sale of any items manufactured for sale using the data. Some technical data may be released to the COLLABORATOR under secondary distribution restrictions compatible with release to enterprises eligible to obtain export controlled technical data. Although selling or producing products for the commercial marketplace, foreign or domestic, is a legitimate use of this technical data, the COLLABORATOR understands that an export license must be obtained under the rules governing export in effect at the time of each sale. The UNIT does not control the issuance of such licenses nor does the UNIT make any representations regarding the availability of such licenses.

6.0 MILESTONES

The following dates are established as tentative milestones to promote timeliness for the completion of tasks by each party to this AGREEMENT.

| EVENT | COMPLETED BY |
|---|---|
| CRDA signed | Sep 2000 |
| Data Review and Design Parameters | Sep 2000 |
| Design Definition | Oct 2000 – May 2002 |
| Component Fabrication | Oct 2000 – May 2002 |
| Component Tests | Oct 2000 – May 2002 |

| | |
|---|---|
| Data Analysis | Oct 2000 – May 2002 |
| Component Redesign | Oct 2000 – May 2002 |
| Full Up Product Test Item Fabrication | Oct 2000 – May 2002 |
| Product Line Tests & Data Analysis | Jan 2002 – Jun 2002 |
| Final Report | Jul 2002 |

7.0 REPORTS

7.1 FINAL REPORT. Upon completion of the project, a final report will be written and jointly published. This report will be in mutually agreed upon format and will summarize the objectives, results, tests conducted, problems solved, conclusions, recommendations, and commercialization plans.

7.3 AIR FORCE CUSTOMER FEEDBACK. Within 30 days after the completion of the technical effort UNDER this AGREEMENT, Spectrum will complete and return to the ORTA a customer feedback questionnaire to be supplied by the AAC/XPP ORTA. The feedback questionnaire will be used only to help the Air Force to assess its technology transfer process.

8.0 RESOURCE ESTIMATES

8.1 Spectrum estimates its investment of resources at the following level for completion of effort UNDER this AGREEMENT:

| | | |
|---|---|---|
| Design & Analysis | (3,040) labor hours | $295,146.00 |
| Material & Component Costs | | $180,000.00 |
| Manufacturing Costs | | $ 50,000.00 |
| Administrative & Management (included in Design & Analysis) | | $ 0.00 |
| Shipping, Travel, Misc. | | $ 2,000.00 |
| | Total | $527,146.00 |

8.2 WMOM estimates its investment of resources to complete the effort UNDER this AGREEMENT at the following level:

| | | |
|---|---|---|
| Labor Hours | (891) labor hours | $31,826 |
| Material & Supplies | | $ 4,424 |
| Administrative & Management | (36) labor hours | $ 1,513 |
| Travel | | $ 2,000 |
| | Total | $39,763 |

## APPENDIX B

### MMHE EQUIPMENT PROVIDED FOR THE DEMONSTRATION OF IMPROVED MUNITIONS SUPPORT EQUIPMENT

1. The following equipment will be provided by UNIT to support work UNDER the AGREEMENT for the Purpose of Improving Munitions Support Equipment. COLLABORATOR assumes liability for loss of equipment provided by UNIT UNDER this AGREEMENT as outlined in Article 10 of the AGREEMENT.

| Manufacturer | Description | Model # | Serial # | Bar Code | Cost ($) New |
|---|---|---|---|---|---|
| | Air Compressor | MC-7 | | | 8,187.47 |
| | Floodlight | NF-2 | | | 12,000 |
| | Trailer | MHU-141 | | | 16,413.05 |
| | Trailer | MHU-110 | | | 15,160.98 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | TOTAL: | 51,761.50 |
| | | | | | |

**EXHIBIT B**

**DRAFT REQUEST FOR PROPOSAL**
**MARCH 25, 2003**

**PAGES 35-61**

**- Draft -**

Specification No. SP20038505
Code Ident. 18894
25 March 2003

**DEPARTMENT OF THE AIR FORCE**
**AIR ARMAMENT CENTER (AFMC)**
**EGLIN AIR FORCE BASE, FLORIDA**

# PERFORMANCE SPECIFICATION FOR

# CONVEYOR, MUNITIONS ASSEMBLY XXXX

APPROVED BY: ______________________________ DATE: ______________

AUTHENTICATED BY: __________________________ DATE: ______________

Distribution A.

Approved for public release: Distribution is unlimited.

This document is unclassified and has been cleared for public release by a competent authority IAW directive 5230.9.

- Draft -

Specification No. SP20038505
Code Ident. 18894
25 March 2003

# TABLE OF CONTENTS


1.0 SCOPE ........ 5
1.1 Background ........ 5
2.0 APPLICABLE DOCUMENTS ........ 5
2.1 Government Documents ........ 5
2.1.1 Specifications ........ 5
2.1.1.1 Military ........ 5
2.1.1.2 Federal ........ 5
2.2 Standards ........ 6
2.2.1 Federal ........ 6
2.2.2 Military Publications ........ 6
2.3 Other Publications ........ 6
2.3.1 Air Force Publications ........ 6
2.4 Non-Government Documents ........ 6
3.0 REQUIREMENTS ........ 6
3.1 MAC II Item Definition ........ 6
3.1.1 MAC Item Diagram ........ 7
*Figure 1. Functional Diagram ........ 8*
3.1.2 Interface Definition ........ 9
3.1.2.a Stores ........ 9
*TABLE 3.1.2.a Intended Munitions ........ 9*
3.1.2.b Transport Trailers/Tow Vehicles ........ 10
*TABLE 3.1.2.b Transport Trailers and Tow Vehicles ........ 10*
3.1.2.c Facilities ........ 10
3.1.2.d Electrical Power Source ........ 10
3.1.2.e Compressed Air Source ........ 11
3.1.2.f Mobility ........ 11
3.1.2.g Shipping and Storage ........ 11
*TABLE 3.1.2.g Shipping and Storage ........ 11*
3.2 Characteristics ........ 11
3.2.1 Performance ........ 11
3.2.1.1 Loading & Unloading System ........ 11
3.2.1.2 Assembly Conveyor ........ 12
3.2.1.3 MAC II Assembly/Disassembly ........ 12
3.2.1.4 Unimproved Surfaces & Leveling Devices ........ 12
3.2.1.5 Lighting ........ 13
3.2.1.6 Interface Control Board (ICB) ........ 13
3.2.1.7 Roller Conveyor Assembly ........ 13
3.2.1.8 Arming Wire Assembly ........ 13
3.2.1.9 Tool Trays ........ 13
3.2.1.10 Tubing Trolleys ........ 14
3.2.2 Physical Characteristics ........ 14
3.2.2.1 Weight ........ 14
3.2.3 Service Life ........ 14
3.2.3.1 Maintainability & Reliability ........ 14

3.2.4 **Environmental Operational Conditions** ........ 14
*TABLE 3.2.4 Environmental Condition Requirements* ........ *14*
3.2.5 **Proof Load** ........ 15
3.3 **Design and Construction** ........ 15
3.3.1 **Materials, Processes, and Corrosion Resistance** ........ 15
3.3.1.1 **Metals** ........ 15
3.3.1.2 **Dissimilar Metal** ........ 15
3.3.1.3 **Standard and Commercial Parts** ........ 15
3.3.1.4 **Nameplates and Product Marking** ........ 15
3.3.2 **Workmanship** ........ 16
3.3.3 **Interchangeability** ........ 16
3.3.4 **Safety** ........ 16
3.3.4.1 **Grounding** ........ 16
3.4 **Personnel** ........ 16
4.0 QUALITY ASSURANCE PROVISIONS ........ 16
4.1 **General** ........ 16
4.1.1 **Special Tests or Inspections** ........ 17
*TABLE 4.1 Requirements and Verifications Cross-Reference Index* ........ *17*
4.1.2 **Interfaces** ........ 18
4.1.2.a **Stores** ........ 18
4.1.2.b **Transport Trailers/Tow Vehicles** ........ 19
4.1.2.c **Facilities** ........ 19
4.1.2.d **Electrical Power Source** ........ 19
4.1.2.e **Compressed Air Source** ........ 19
4.1.2.f **Mobility** ........ 19
4.1.2.g **Shipping and Storage** ........ 19
4.2 **Characteristics** ........ 20
4.2.1 **Performance** ........ 20
4.2.1.1 **Loading & Unloading System** ........ 20
4.2.1.2 **Assembly Conveyor** ........ 20
4.2.1.3 **MAC II Assembly/Disassembly** ........ 20
4.2.1.4 **Unimproved Surfaces and Leveling Devices** ........ 20
4.2.1.5 **Lighting** ........ 20
4.2.1.6 **Interface Control Board** ........ 20
4.2.1.7 **Roller Conveyor Assembly** ........ 20
4.2.1.8 **Arming Wire Assembly** ........ 21
4.2.1.9 **Tool Trays** ........ 21
4.2.1.10 **Tubing Trolleys** ........ 21
4.2.2 **Physical Characteristics** ........ 21
4.2.2.1 **Weight** ........ 21
4.2.3 **Service Life** ........ 21
4.2.3.1 **Maintainability & Reliability** ........ 21
4.2.4 **Environmental Conditions** ........ 21
*TABLE 4.2.4 Environmental Tests Methods, Procedures and Parameters* ........ *22*
4.2.5 **Proof Load** ........ 22

4.3 **Design and Construction** ........ 22
4.3.1 **Materials, Processes, and Corrosion Resistance** ........ 22
4.3.1.1 **Metals** ........ 22
4.3.1.2 **Dissimilar Metals** ........ 22
4.3.1.3 **Standard and Commercial Parts** ........ 23
4.3.1.4 **Nameplates and Product Marking** ........ 23
4.3.2 **Workmanship** ........ 23
4.3.3 **Interchangeability** ........ 23
4.3.4 **Safety** ........ 23
4.3.4.1 **Grounding** ........ 23
4.4 **Personnel** ........ 23
5.0 PREPARATION FOR DELIVERY ........ 23
5.1 **Packaging and Preservation** ........ 23
5.2 **Markings** ........ 24
6.0 COST ........ 24

**1.0 SCOPE**

This specification establishes the performance and validation requirements for a Munition Assembly Conveyor II (MAC II), XXXX

**1.1 Background**

The original Munition Assembly Conveyor (MAC) is reaching the end of its service life. The introduction of new and improved munitions has resulted in new requirements, which this aging system does not meet. Air Combat Command and Munitions Material Handling Equipment (MMHE) focal point personnel validated these requirements. The original MAC has served the war-fighter well and has many excellent features. Consequently, a radical design departure that invalidates the familiarity and training AMMO personnel have with the current MAC will not be considered.

**2.0 APPLICABLE DOCUMENTS**

**2.1 Government Documents**

The following documents of the exact issue shown shall form a part of this specification to the extent specified herein. In the event of conflict between the documents referenced herein and the contents of this specification, this specification shall be considered a superseding requirement.

**2.1.1 Specifications**

**2.1.1.1 Military**

| | |
|---|---|
| MIL-HDBK-454A | Electronic Equipment, Ground, General Requirements for |
| MIL-HDBK-1791 | Air Transportability Requirements, General Specification For |
| MIL-S-8512D (2) | Support Equipment, Aeronautical, Special, General Specification for The Design Of |
| MIL-STD-1472 F | Human Engineering |

**2.1.1.2 Federal**

| | |
|---|---|
| ASTM-B633, FE/ZN 25, TYPE II, SC 4 | Coating, Zinc (Electrodeposited) |
| ASTM-A967-2001E1 | Passivation Treatments for Corrosion Resisting Steel |
| W-C-596G | Connector, Plug, Receptacle and Cable Outlet, Electrical Power |
| A-A-59553 | Coupling, Hose (Half), Pneumatic, Universal Type |

**2.2 Standards**

**2.2.1 Federal**

| | |
|---|---|
| FED-STD-595B | Color |

**2.2.2 Military Publications**

| | |
|---|---|
| MIL-STD-129 P | Marking for Shipment and Storage |
| MIL-STD-130K | Identification Marking of US Military Property |
| MIL-STD-190 | Standards and Specifications, Order of Precedence for the Selection of |
| MIL-STD-2073/1D | Part and Equipment, Procedures for Packaging and Packing of |
| MIL-STD-810F | Environmental Test Procedures |
| MIL-STD-882D | System Safety |
| MIL-STD-1365B | General Design Criteria for Handling Equipment Associated with Weapons and Related Items |
| MIL-HDBK-1587 | Material and Processes Requirements for Air Force Weapon Systems |
| MS-3314 | Lug, Suspension, (1000 lb Class) Airborne Equipment |

**2.3 Other Publications**

**2.3.1 Air Force Publications**

| | |
|---|---|
| AFMAN 91-201 | Explosive Safety Standards |
| AFMAN 36-2108 | Enlisted Classification |
| AFOSHSTD 91-501 | Air Force Consolidated Occupational Safety Standard |

**2.4 Non-Government Documents**

| | |
|---|---|
| ASTM B117 | Salt Spray (Fog) Apparatus, Operating |
| AWS D1.1/D1.1M-2002 | Welding Code, Structural, Steel |
| AWS D1.2-1997 | Welding Code, Structural, Aluminum |

(Copies of specifications, standards, drawings, and publications, required by suppliers in connection with specified procurement functions should be obtained from the procuring activity or as directed by the Contracting Officer.)

**3.0 REQUIREMENTS**

**3.1 MAC II Item Definition**

The MAC II shall allow personnel to load and unload unassembled and assembled munitions from trailers onto either a roller conveyor for temporary storage or

directly to a conveyor for assembly or disassembly in a continuous process. A portable compressor and portable electrical power source shall provide power for the MAC II. The compressor and electrical power source are current inventory items that will be supplied by the field unit. The MAC II system shall have an interface control system for these power systems (compressed air, electrical, and/or hydraulic). Interfaces are defined in section 3.1.2.

### 3.1.1 MAC Item Diagram

Figure 1 is a notional functional diagram of the original MAC system. This is provided as information only. The MAC II system may contain improvements that may result in a different way of assembling/disassembling weapons. However, any extreme design departure that would require extensive retraining of Air Force personnel must be avoided.

- Draft -



**Figure 1. Functional Diagram**




***NOTE: Generator and Compressor are field furnished and will be located no less than 25 feet from explosives. Fuzing, finning and arming wire stations may not necessarily be in the order shown.**

F08635-03-R-0077
Attachment 2
Page 8 of 24

**3.1.2 Interface Definition**

The MAC II shall be capable of interfacing with the following:

**3.1.2.a Stores**

The MAC II shall be capable of handling, assembling, and disassembling the munitions listed in Table 3.1.2.a.

**TABLE 3.1.2.a Intended Munitions**

| Munition | Description |
|---|---|
| MK-82 | General-purpose bomb with MAU-93, BSU-49, MK-15 fins, GBU-38 fins and strakes |
| GBU-32 w/MK-83 | Guided bomb with fins and strakes |
| MK-84 | General-purpose bombs with BSU-50 or conical fins |
| GBU-10, 12, 15, 17, 24 | Guided bombs |
| CBU-87, 89, 97, 103 to 105 | Cluster bombs |
| M-117 | General-purpose bombs with MAU-91 and MAU-103 fins |
| MK-37, M-117 | Destructors |
| M-129 | Leaflet bomb |
| SUU-64, 65, 66 | Dispensers* |
| GBU-31 w/BLU-109 | Penetration warhead with fins and strakes |

*Dispensers make up the CBU-87, 89, 97, 103 to 105.

**3.1.2.b Transport Trailers/Tow Vehicles**

The off-load and on load ends of the MAC II shall allow the transport trailers or tow vehicles in Table 3.1.2.b to pass through.

**TABLE 3.1.2.b Transport Trailers and Tow Vehicles**

| Item | Stacking Height (Feet) | Stacking Width (Feet) |
|---|---|---|
| 1. MHU-141/M Munitions Trailer | 7.87 | 6.89 |
| 2. MHU-12/M Munitions Trailer | 7.87 | 6.89 |
| 3. MHU-110/M Munitions Trailer | 7.87 | 7.55 |
| 4. MHU-85M Munitions Trailer | 8.53 | 7.87 |
| 5. 40-Foot Flatbed Truck | 8.53 | 7.87 |
| 6. Bobtail Tow Vehicle | 6.56 | 7.55 |
| 7. Commercial Tractor Tow Vehicles | 13.45 | 7.87 |
| 8. MB-4 Tow Vehicle | 8.202 | 7.87 |
| 9. MHU-226 Munitions Trailer | 7.87 | 7.25 |

**3.1.2.c Facilities**

The MAC II shall be capable of operating within a hardened facility (TAB VEE). The MAC II shall occupy a cube no larger than the following dimensions when assembled: Height-19.6 feet, Width-22.0 feet, and Length-65.6 feet. When the pallet conveyor is used, the width shall be no more than 26.2 feet.

**3.1.2.d Electrical Power Source**

The MAC II shall have it's own power cord and be capable of interfacing with the following power sources with a male plug (W-C-596G designation).

(1) NF-2 Light Cart
(2) TF-1 DC Flood Light Set
(3) FL-1D Floodlight

**3.1.2.e Compressed Air Source**

The MAC II shall be capable of interfacing with and powered by the MC-7 Air Compressor by using a ¾ inch pneumatic hose coupling, (A-A-59553 designation). The MAC II system shall have at least four fittings to power the pneumatic tools that will be used for assembling munitions.

**3.1.2.f Mobility**

The MAC II shall be capable of being Air Transportability Certified per MIL-HDBK-1791 on C-130, C-141, C-5, KC-10, or C-17 aircraft when loaded into containers and pallets on either one MHU-110 or one MHU-226 trailer.

**3.1.2.g Shipping and Storage**

The MAC II system shall be capable of being shipped and stored using the aluminum containers* and pallets* listed in Table 3.1.2.g below. Alternate long life reusable storage and shipping containers and/or pallets may be used for storage and shipment of the MAC II if cost effective. MIL-STD-2073 may be used as guidance in developing additional containers and/or pallets. See paragraph 3.2.1.3.

**TABLE 3.1.2.g Shipping and Storage**

| Container Name | Quantity | Approximate Internal Dimensions (Inches) | Tare Weight (Pounds) |
|---|---|---|---|
| Container 1, 2 | 2 | 47.0L x 26.0W x 24.0H | 150 |
| Container 3 | 1 | 83.0L x 36.0W x 24.0H | 295 |
| Container 4 | 1 | 157.5L x 46.0W x 19.0H | 600 |
| **Pallet Name** | **Quantity** | **Approximate External Dimensions (Inches)** | **Tare Weight (Pounds)** |
| Pallet 1 | 1 | 120.0L x 53.0W x 4.0H | 270 |
| Pallet 2 | 1 | 121.0L x 21.0W x 4.0H | 150 |

*Interface Control Drawings of the containers and pallets are available.

**3.2 Characteristics**

**3.2.1 Performance**

**3.2.1.1 Loading & Unloading System**

The MAC II shall be capable of loading and unloading the munitions listed in Table 3.1.2.a from trailers in Table 3.2.1.b to the conveyors. The MAC II shall have two hoist capabilities; one to lift up to three bomb bodies and another to lift up to 2 fully assembled munitions simultaneously as listed in 3.1.2.a. Load and unload hoists shall be of the same configuration and interchangeable. Hooks or attachment devices used for hoisting bombs shall incorporate safety features to preclude

accidental dropping of the munitions. All movement of munitions during lifting shall be powered. The MAC II loading and unloading system shall have a working strength of 6,000 lbs. The performance of the primary hoist shall be equivalent or greater than a HL3000K hoist. The MAC II shall have an ~~option for an electric~~ hoist that shall meet or exceed the capabilities of a HL3000K hoist. The MAC II shall have a manual brake release for lowering munitions in the event of a power failure.

3.2.1.2 Assembly Conveyor

The MAC II assembly conveyor shall be 10 feet in length and shall accommodate up to thirty 500-pound class munitions at one time. The conveyor shall include a means to secure munitions during ~~assembly/disassembly~~ and during movement along the conveyor but allow the munitions be rotated during assembly/disassembly. The conveyor shall allow easy movement of munitions along the conveyor. The conveyor shall prevent munitions from contacting each other during assembly. The conveyor shall provide four standard ¼ inch male quick-connect fittings for attachment to accessory equipment pneumatic hoses and shall be placed equidistantly along one side of the assembly conveyor. The MAC II shall have a method to safely secure the GBU-10, GBU-12, GBU-15, GBU-17, and GBU-24 bomb casing to allow for torquing of the forward adapter to 625 ± 25 ft-lb. The conveyor assembly shall have a working strength of 12,000 lbs per 10-foot section.

3.2.1.3 MAC II Assembly/Disassembly

The MAC II shall be capable of being assembled or disassembled and repackaged from transport trailers or tow vehicles in Table 3.1.2.b with a maximum of 15 Air Force personnel (AFSC 2W030/2W050 as described in AFMAN 36-2108) within 60 minutes using only a 6,000 lbs forklift, minimum hand tools, and no stand alone special tools. Special tooling for assembly may be integrated into piece parts of the MAC II system. Disassembly and repackaging shall use the existing containers to the maximum extend possible and still meet the mobility requirements stated in 3.2.1.f. See Table 3.1.2.g for a list of containers with dimensions. Alternate long life reusable storage and shipping containers and/or pallets may be used for storage and shipment of the MAC II if cost effective. MIL-STD-2073 may be used as guidance in developing additional containers and/or pallets. Alternate designed long life reusable containers and/or pallets will be supplied as part of the MAC II. See paragraph 6.0 Cost.

3.2.1.4 Unimproved Surfaces & Leveling Devices

The MAC II system, when loaded to its peak capacity shall not impose a pressure on any portion of the bearing surface upon which it is assembled, greater than 5,430 pounds per square foot. The MAC II shall be capable of being safely assembled

and used on improved as well as unimproved terrain consisting of a variation in surface height up to 5.25 inches. The MAC II shall not require anchors for stability.

**3.2.1.5 Lighting**

The MAC II system shall operate and maintain sufficient light to accomplish the loading and assembly. A lighting level of at least 75 foot-candles shall be maintained over the entire main assembly area at 3 feet above the ground. The lighting levels on either end of the loading and off-loading areas and under the lifting cranes shall be a minimum of 50 foot-candles 3 feet above the ground. The color of the light furnished shall be as near to the natural light as possible. The fixtures furnished shall not require more than 5 minutes of restart time when the light is turned off and back on again.

**3.2.1.6 Interface Control Board (ICB)**

The MAC II shall have an ICB for control and distribution of the electrical power and compressed air needed to operate MAC II subsystems. The ICB shall also have four 15 amp 110V receptacles to power miscellaneous electric devices not listed in this document. The electrical system shall conform to applicable AFOSHSTD 91-501 requirements.

**3.2.1.7 Roller Conveyor Assembly**

The MAC II system shall have a 20-foot long, 40 inches wide pallet roller conveyor for storage and movement prior to loading onto the conveyor. If used on uneven terrain, it shall not require support at intervals less than five feet and shall have a capacity of 1,000 pounds per foot.

**3.2.1.8 Arming Wire Assembly**

The MAC II shall have an arming wire dispenser that incorporates a wire straightener and an anti-backlash device, and can accommodate a spool of arming wire with an outer diameter of 9.00 inches, an inner diameter of 2.00 inches, and a width of 8.25 inches. The Arming Wire Assembly shall allow for easy dispensing.

**3.2.1.9 Tool Trays**

The MAC II shall incorporate at least four moveable tool trays, two or more on each side of the MAC II to allow technicians to place hand and air tools along the rail conveyor when not in use. The tray size shall be approximately 12 inches wide and 24 inches long. Hand and air tools shall consist of standard impact wrenches, torque wrenches, ratchets, speed handles, arming wire pliers, screwdrivers, and ratchet extensions. The tool tray placement and size shall not interfere with the technicians work environment and be of sufficient capacity to accommodate all tools.

3.2.1.10 Tubing Trolleys

The MAC II shall use durable effective tubing trolleys that keep overhead compressed air lines, wires, and/or hydraulic lines (as applicable) safely out of danger and prevent tangling. The tubing trolley shall capture and hold the tubing firmly and resist pulling and tugging.

3.2.2 Physical Characteristics

3.2.2.1 Weight

The MAC II shall be fabricated using lightweight material whenever possible to assist in personnel handling, minimizing the mobility footprint. The weight of the system including the containers shall not exceed 12,000 lbs. The weights of the containers and pallets are in Table 3.1.2.g.

3.2.3 Service Life

All structural and support members of the MAC II shall have an expected service life of not less than 30 years. The service life of commercial off the shelf items shall conform to industry standards.

3.2.3.1 Maintainability & Reliability

The MAC II shall have a high mean-time-between-failure (MTBF) and high mean-time-between-critical-failure (MTBCF). The MAC II shall have a low mean time to repair (MTTR). The mean time between maintenance (MTBM) shall be minimized. The MAC II's hoists and components shall be capable of continuous operation for 1,000 hours or more with little to no maintenance being required, minor maintenance is acceptable. The MAC II's dormant storage reliability shall be maximized when stored outside at a bare base for up to five years.

3.2.4 Environmental Operational Conditions

The MAC II shall be capable of operation and storage without damage when exposed to the environmental conditions listed in Table 3.2.4.

**TABLE 3.2.4 Environmental Condition Requirements**

| Environmental Condition | Requirement | |
|---|---|---|
| Low Temperature | Operating: | -50°F |
| | Storage: | -65°F |
| High Temperature | Operating: | +120°F with solar load |
| | Storage: | +160°F |
| Humidity | Relative Humidity | 3% to 95% |

| Environmental Condition | Requirement | |
|---|---|---|
| Salt Fog | See Doc.: ASTM B117, 96 hours | |
| Blowing Rain | Rainfall Rate:<br>Wind: | 2 inches per hour<br>40 miles per hour |
| Blowing Dust | Dust Concentration:<br>Wind: | 0.3 ± 0.2 g/ ft$^3$<br>35 miles per hour |
| Blowing Sand | Sand Concentration:<br>Wind: | 0.0623 ± 0.015 g/ft$^3$<br>35 miles per hour |
| Ice/ Freezing Rain | Water Delivery Rate:<br>Droplet Size: | 25mm/h<br>1.0 mm to 1.5 mm |

**3.2.5 Proof Load**

The MAC II shall meet MIL-STD-1365 proof load requirements.

**3.3 Design and Construction**

**3.3.1 Materials, Processes, and Corrosion Resistance**

Materials used shall be corrosion resistant when exposed to environments in Table 3.2.4. If paint is used, it shall be dark green, color number 34052 in accordance with FED-STD-595D. Painted surfaces shall be capable of being touched up without having to repaint affected areas. Hazardous and toxic materials and processes shall be avoided. The MAC II system shall not contain materials requiring special processes or treatment for disposal.

**3.3.1.1 Metals**

All metallic surfaces and joints shall be treated to resist corrosion due to fuels, salt fog, or atmospheric conditions likely to be met in storage or normal service.

**3.3.1.2 Dissimilar Metal**

Unless protected against corrosion, dissimilar metals shall not be used in direct contact with each other.

**3.3.1.3 Standard and Commercial Parts**

The MAC II shall use commercial off-the-shelf (COTS) parts whenever possible.

**3.3.1.4 Nameplates and Product Marking**

The MAC II piece parts, subassemblies, and assemblies shall be marked in accordance with MIL-STD-130K.

3.3.2 **Workmanship**

The MAC II shall be fabricated in a manner that will insure high quality appearance, fit, interchangeability and assembly. Particular attention shall be given to neatness and thoroughness of marking of parts and assemblies, plating, printing, riveting, machine screw assemblage and welding. The MAC II design shall not permit water accumulation in pockets, creases, fissures, or depressions, which could cause structural damage and or operational impairment upon freezing. Welded materials shall be IAW ANSI /AWS D1.2-1997 and or AWS D1.1-2002.

3.3.3 **Interchangeability**

All MAC II piece parts having the same part number shall be physically and functionally interchangeable without the need for modification.

3.3.4 **Safety**

The MAC II shall allow effective operations and maintenance without injury or damage to personnel and equipment.

3.3.4.1 **Grounding**

The MAC II shall incorporate capability to be externally grounded in accordance with AFMAN 91-201.

3.4 **Personnel**

The MAC II shall not require maintenance above the using base maintenance squadron. All operations of the system shall be carried out by a three-person team of 2W0XX personnel as defined by AFMAN 36-2108. No special training shall be required. The level of training required shall not exceed that which can be provided by on-the-job training on site.

4.0 **QUALITY ASSURANCE PROVISIONS**

4.1 **General**

This section defines the inspections, certifications, demonstrations, tests, and analyses necessary to verify the ability of the MAC II to meet the requirements prescribed in Section 3. These inspections, certifications, demonstrations, tests, and analyses will be performed on the prototype MAC II's.

The MAC II Integrated Development and Operational Test Plan contains the detailed procedures for the inspections, demonstrations, and tests required by this section.

Table 4.1 provides a cross-index of the Section 3 requirements, the Section 4 quality assurance provisions, and the associated organizational responsibilities. The verification methods listed in Table 4.1 are defined as follows:

- I – Inspection. Careful and critical examination, including measurements, where appropriate. Usually an unaided visual examination.
- C – Certification. A formal confirmation that a particular quality, feature, or characteristic meets a specified standard or that the results provided are true and accurate.
- D – Demonstration. An activity showing that a particular capability or function exists.
- T – Testing. Accomplish tests as defined in Section 3 and Section 4.
- A – Analysis. Perform analysis as defined in Section 3 and Section 4. This may consist of comparison to existing designs.
- NA – Not Applicable.
- G – Government.
- CONTR – Contractor.

The government reserves the right to witness and perform any of the tests or demonstrations required by this specification where the government deems such tests necessary to assure that the MAC II conforms to the specified requirements.

The government reserves the right to verify contractor certifications by independent analyses or testing.

### 4.1.1 Special Tests or Inspections

When inspections or tests not described or referenced herein are required, they shall be conducted in accordance with industry-approved standards acceptable to the government.

**TABLE 4.1 Requirements and Verifications Cross-Reference Index**

| REQUIREMENT | DESCRIPTION | METHOD | VERIFICATION | RESPONSIBILITY |
|---|---|---|---|---|
| 3. | Requirements | | N/A | N/A |
| 3.1 | MAC II Item Definition | | N/A | N/A |
| 3.1.1 | MAC II Item Diagram | | N/A | N/A |
| 3.1.2 | Interface Definition | | N/A | N/A |
| 3.1.2.a | Stores | I, D | 4.1.2.a | G |
| 3.1.2.b | Transport Trailers/Tow Vehicles | I, A, D | 4.1.2.b | G |
| 3.1.2.c | Facilities | I | 4.1.2.c | G |
| 3.1.2.d | Electrical Power Sources | I, D | 4.1.2.d | G |
| 3.1.2.e | Compressed Air Sources | T | 4.1.2.e | G |
| 3.1.2.f | Transportation | A | 4.1.2.f | G |
| 3.1.2.g | Shipping & Storage | A, D | 4.1.2.g | G, CONTR |

| | | | | |
|---|---|---|---|---|
| 3.2 | Characteristics | | N/A | N/A |
| 3.2.1 | Performance | | N/A | N/A |
| 3.2.1.1 | Loading & Unloading System | T | 4.2.1.1 | G, CONTR |
| 3.2.1.2 | Assembly Conveyor | I, A, D, T | 4.2.1.2 | G, CONTR |
| 3.2.1.3 | MAC II Assembly/Disassembly | D, T | 4.2.1.3 | G |
| 3.2.1.4 | Unimproved Surfaces & Leveling Devices | T | 4.2.1.4 | G |
| 3.2.1.5 | Lighting | C, T | 4.2.1.5 | G |
| 3.2.1.6 | Interface Control Board | I | 4.2.1.6 | G |
| 3.2.1.7 | Roller Conveyor Assembly | I, C, D | 4.2.1.7 | G, CONTR |
| 3.2.1.8 | Arming Wire Assembly | I, D | 4.2.1.8 | G |
| 3.2.1.9 | Tool Trays | I, D | 4.2.1.9 | G |
| 3.2.1.10 | Tubing Trolleys | I, D | 4.2.1.10 | G |
| 3.2.2 | Physical Characteristics | | N/A | N/A |
| 3.2.2.1 | Weight | I | 4.2.2.1 | G |
| 3.2.3 | Service Life | A, C | 4.2.3 | G, CONTR |
| 3.2.3.1 | Maintainability & Reliability | A, I, C | 4.2.3.1 | G, CONTR |
| 3.2.4 | Environmental Operational Conditions | I, A, T | 4.2.4 | G |
| 3.2.5 | Proof Load | I, T | 4.2.5 | G |
| 3.3 | Design & Construction | | N/A | N/A |
| 3.3.1 | Materials, Processes and Corrosion Resistance | I, C | 4.3.1 | G, CONTR |
| 3.3.1.1 | Metals | I, A, C | 4.3.1.1 | G, CONTR |
| 3.3.1.2 | Dissimilar Metals | I, C | 4.3.1.2 | G, CONTR |
| 3.3.1.3 | Standard and Commercial Parts | I | 4.3.1.3 | G |
| 3.3.1.4 | Nameplates and Product Marking | I | 4.3.1.4 | G |
| 3.3.2 | Workmanship | I | 4.3.2 | G |
| 3.3.3 | Interchangeability | I, D | 4.3.3 | G |
| 3.3.4 | Safety | I, A | 4.3.4 | G, CONTR |
| 3.3.4.1 | Grounding | I, T | 4.3.4.1 | G |
| 3.4 | Personnel | I, D | 4.4 | G |

*The government reserves the right to perform additional inspections, demonstrations, tests, and analyses set forth in the specification where such inspections, demonstrations, tests, and analyses are deemed necessary to assure supplies and services conform to prescribed requirements.

**4.1.2 Interfaces**

**4.1.2.a Stores**

Verification that the MAC II is capable of handling, assembling, and disassembling the munitions listed in Table 3.1.2.a shall be by inspection and demonstration. The government will inspect the MAC II to determine if the required functions for each of the intended munitions can be accomplished. Some or all of the munitions will be selected to demonstrate that they can be handled, assembled, and disassembled.

**4.1.2.b Transport Trailers/Tow Vehicles**

Verification that the off-load and the on load ends of the MAC II allow all of the transport trailers or tow vehicles listed in Table 3.1.2.b to pass through shall be accomplished by inspection, demonstration, and/or analysis as determined by the government.

**4.1.2.c Facilities**

Verification that the MAC II is capable of operation within a hardened facility (TAB VEE) shall be by inspection of the fully assembled MAC II and comparison with the maximum dimensions listed in 3.1.2.c.

**4.1.2.d Electrical Power Source**

Verification that the MAC II is capable of interfacing with the power sources listed in 3.1.2.d while using an electrical cord with the specified plug shall be by inspection and demonstration. Any or all of these power sources may be used to demonstrate the required interface capability.

**4.1.2.e Compressed Air Source**

Verification that the MAC II is capable of interfacing with and being powered by the MC-7 Air Compressor using the specified pneumatic hose coupling shall be by testing. This test shall include connecting pneumatic tools to at least four MAC II fittings and operating the tools simultaneously.

**4.1.2.f Mobility**

Verification that the MAC II meets the mobility requirements shall be by analysis. An analytical assessment will be made by the government of the MAC II on an MHU-110/M and an MHU-226 trailer to verify that the combined cube dimensions, weight, and trailer axle loadings of the MAC II and trailer can be certified per MIL-HDBK-1791 to meet the requirements for air transport on C-130, C-141, C-5, KC-10, and C-17 aircraft in accordance with MIL-A-7421 and 3.1.2.f.

**4.1.2.g Shipping and Storage**

Verification that the MAC II is capable of being shipped and stored using the aluminum containers and pallets listed in Table 3.1.2.g shall be by analysis and demonstration. An analytical assessment and demonstration will be made by the government concerning alternate long life reusable storage and shipping containers and/or pallets.

4.2 **Characteristics**

4.2.1 **Performance**

4.2.1.1 **Loading & Unloading System**

The ability of the MAC II to load and unload the munitions listed in Table I from trailers to the conveyors shall be verified by testing. Any or all of the munitions listed in Table 3.1.2.a may be used in this test. The lift speed of the primary hoist shall be measured and compared to that of the HL3000K. The lift speed of the optional electric hoist shall be measured and compared to that of the HL3000K.

4.2.1.2 **Assembly Conveyor**

Verification that the MAC II meets the requirements of 3.2.1.2 for strength, munitions accommodation, munitions securing, munitions movement, fittings, and layout, shall be by inspection, analysis, demonstration, and testing.

4.2.1.3 **MAC II Assembly/Disassembly**

Verification that the MAC II meets the assembly, disassembly, and repackaging requirements of 3.2.1.3 shall be by government testing and demonstration.

4.2.1.4 **Unimproved Surfaces and Leveling Devices**

Verification that the MAC II, when loaded to its peak capacity, meets the bearing surface pressure requirements and can be safely assembled on surfaces with a variation in surface height as specified in 3.2.1.4 shall be by government testing.

4.2.1.5 **Lighting**

The lighting levels and restart time required by 3.2.1.5 shall be verified by government testing while the MAC II is being powered by any of the power sources listed in 3.2.1.d. and under the ambient temperature conditions existing at the time and location of the test. Restart time at low temperatures and color temperature of the lighting shall be determined by contractor certification.

4.2.1.6 **Interface Control Board**

The presence of an ICB for control of the compressed air, electrical, and/or hydraulic systems shall be verified by inspection.

4.2.1.7 **Roller Conveyor Assembly**

The presence of the required pallet roller conveyor assembly shall be verified by inspection. The ability of the assembly to be used on uneven terrain without

requiring support at intervals less than five feet shall be verified by demonstration. The capacity of the roller conveyor assembly shall be verified by contractor certification.

**4.2.1.8 Arming Wire Assembly**

The presence of the arming wire dispenser and verification of its required characteristics shall be verified by inspection and demonstration.

**4.2.1.9 Tool Trays**

The presence and capacity of the required tool trays shall be verified by inspection. The effect of the placement and size of the tool trays on the technicians' work environment shall be evaluated during operational demonstrations.

**4.2.1.10 Tubing Trolleys**

The ability of the tubing trolleys to meet the requirements of 3.2.1.10 shall be verified by inspection and demonstration.

**4.2.2 Physical Characteristics**

**4.2.2.1 Weight**

The requirements of 3.2.2.1 shall be verified by inspection, including weighing.

**4.2.3 Service Life**

The service life requirements of 3.2.3 shall be verified by government and contractor analyses and by contractor certification.

**4.2.3.1 Maintainability & Reliability**

Data to verify that the MAC II meets the maintainability and reliability requirements of 3.2.3.1 will be accumulated throughout the period that the MAC II evaluation is being conducted. Verification that the hoists and components are capable of continuous operation for the period specified shall be by contractor certification and government inspection and analysis.

**4.2.4 Environmental Conditions**

The ability of the MAC II to operate and/or to be stored under the environmental conditions specified in 3.2.4 shall be verified by inspection, analysis, and testing by the government. Testing will be accomplished using the test methods, procedures, and parameters shown in Table 4.2.4. Any evidence of degradation in performance or corrosion shall be considered a failure.

**TABLE 4.2.4 Environmental Tests Methods, Procedures and Parameters**

| Condition | MIL-STD-810F | | |
|---|---|---|---|
| | **Method** | **Procedure** | **Parameter(s)** |
| High Temperature (operational) | 505.4 Solar Radiation | I (Cycling, Heating Effects) | +125°F ambient air with solar radiation |
| High Temperature (storage) | 501.4 | I (Storage) | +160°F maximum |
| Low Temperature (operational) | 502.4 | II (Operational) | -45°F minimum |
| Low Temperature (storage) | 502.4 | I (Storage) | -65°F minimum |
| Rain | 506.4 | I (Rain and Blowing Rain) | |
| Icing/Freezing Rain | 521.2 | I | Glaze Ice, 13 mm (Thickness) |
| Humidity | 507.4 | NA | |
| Sand and Dust | 510.4 | I (Blowing Dust) and II (Blowing Sand) | Air velocity of 35 mph |
| Salt Fog | ASTM B117 | | 96 hours |

**4.2.5 Proof Load**

The proof load of the MAC II shall be verified by test and inspection by the government. Testing will be accomplished using the test methods, procedures, and parameters in MIL-STD-1365.

**4.3 Design and Construction**

**4.3.1 Materials, Processes, and Corrosion Resistance**

The corrosion resistance of the materials used shall be evaluated during the testing specified in 4.2.4. Verification that toxic materials and processes have been avoided shall be by contractor certification and government inspection.

**4.3.1.1 Metals**

The presence and adequacy of the required treatment of metallic surfaces and joints shall be determined by inspection, government analysis, and contractor certification.

**4.3.1.2 Dissimilar Metals**

The requirement of 3.3.2.3 shall be verified by inspection and contractor certification.

4.3.1.3 **Standard and Commercial Parts**

The extent of the use of COTS parts shall be determined by inspection.

4.3.1.4 **Nameplates and Product Marking**

Verification that the MAC II is marked in accordance with MIL-STD-130K shall be determined by inspection.

4.3.2 **Workmanship**

Verification that the MAC II meets the requirements of 3.3.3 shall be by inspection. Verification that the welding has been accomplished in accordance with the stated specifications shall be accomplished by an American Welding Society-certified welding inspector.

4.3.3 **Interchangeability**

Interchangeability of piece parts and major components shall be verified by inspection and demonstration.

4.3.4 **Safety**

The safety of the MAC II shall be verified by an analysis of the design data, a review of the overall test results, and physical inspections to compare with the guidance and requirements in MIL-HDBK-46855A, MIL-STD-1472F, AFSC Handbook 1-6, AFMAN 91-201, and 3.3.5.

4.3.4.1 **Grounding**

The ability of the MAC II to be grounded shall be determined by inspection, including resistance measurements of applicable components.

4.4 **Personnel**

The MAC II shall be inspected by experienced government munitions handling equipment personnel who will evaluate the level of difficulty involved in operating the system and who will assess the level of training that would be required by personnel with the specified skill code.

5.0 **PREPARATION FOR DELIVERY**

5.1 **Packaging and Preservation**

Packaging and preservation shall be best commercial practice for shipment from the contractor's facility to the field.

5.2 **Markings**

In addition to any special marking required by the contract or order, the packages and shipping containers shall be marked in accordance with requirements of MIL-STD-129P.

6.0 **COST**

Alternately designed containers and/or pallets shall be included in the cost of the MAC II.

# MUNITIONS ASSEMBLY CONVEYOR (MAC) II

25 Mar 03

# STATEMENT OF OBJECTIVES (SOO)

1. Design a Munitions Assembly Conveyor (MAC) II in accordance with Performance Specification SP20038505.
2. Fabricate a MAC II prototype using production representative processes, personnel, tooling and materials.
3. Deliver MAC II prototype in accordance with the delivery schedule (section F of the contract).
4. Support government user evaluations and qualification testing.
5. Build production hardware in accordance with the delivery schedule (section F of the contract).
6. Maintain configuration control of the MAC II design using a structured configuration management system throughout production.
7. Provide a highly reliable, maintainable, and supportable system throughout the life cycle of the MAC II.

**Supportability Requirement**
**25 Mar 03**

Preoperational Support

The Contractor shall provide preoperational support/technical assistance during the Operational Testing at AFCOMAC, Beale AFB, CA. The contractor shall provide this support "on-call, as required" to resolve major or catastrophic failures requiring replacement parts and other than minor repair of the MAC II or its components under the provisions of the contractor's standard commercial warranty. Response time from notification by the Government contracting officer shall be NLT 24 hours. System/component warranties shall be the preferred method for handling system/component failures. The Government intends to use the preliminary technical order for the MAC II during test. However, the contractor may choose to be available in the local area during the period of testing to advise and assist the Government in the proper and safe operation of the MAC II. This support shall be for a period 30 days.

# Pricing Table

26 Mar 03

Please fill in prices for CLINs 0003-0010 in the spaces available. Please note that there shall be no escalation due to the EPA clause.

| Quantity | CLIN 0003-0010 |
| --- | --- |
| 1-7 | $__________ |
| 8-15 | $__________ |
| 16+ | $__________ |

**EXHIBIT C**

**REQUEST FOR PROPOSAL**
**MAY 1, 2003**

**PAGES 62-83**

Specification No. SP20038715
Code Ident. 18894
1 May 2003

**DEPARTMENT OF THE AIR FORCE**
AIR ARMAMENT CENTER (AFMC)
EGLIN AIR FORCE BASE, FLORIDA

# PERFORMANCE SPECIFICATION FOR

# CONVEYOR, MUNITIONS ASSEMBLY XXXX

Distribution A.

Approved for public release: Distribution is unlimited.

This document is unclassified and has been cleared for public release by a competent authority IAW directive 5230.9.

# TABLE OF CONTENTS

1.0 SCOPE ........ 5
2.0 APPLICABLE DOCUMENTS ........ 5
2.1 Government Documents ........ 5
2.1.1 Specifications ........ 5
2.1.1.1 Military ........ 5
2.1.1.2 Federal ........ 5
2.2 Standards ........ 5
2.2.1 Federal ........ 5
2.2.2 Military Publications ........ 5
2.3 Other Publications ........ 6
2.3.1 Air Force Publications ........ 6
2.4 Non-Government Documents ........ 6
3.0 REQUIREMENTS ........ 6
3.1 MAC II Item Definition ........ 6
3.1.1 MAC Item Diagram ........ 6
Figure 1. Functional Diagram ........ 7
3.1.2 Interface Definition ........ 8
3.1.2.a Stores ........ 8
TABLE 3.1.2.a Intended Munitions ........ 8
3.1.2.b Transport Trailers/Tow Vehicles ........ 9
TABLE 3.1.2.b Transport Trailers and Tow Vehicles ........ 9
3.1.2.c Facilities ........ 9
3.1.2.d Electrical Power Source ........ 9
3.1.2.e Compressed Air Source ........ 10
3.1.2.f Mobility ........ 10
3.1.2.g Shipping and Storage ........ 10
TABLE 3.1.2.g Shipping and Storage ........ 10
3.2 Characteristics ........ 10
3.2.1 Performance ........ 10
3.2.1.1 Loading & Unloading System ........ 11
3.2.1.2 Munition Assembly/Disassembly ........ 11
3.2.1.3 MAC II Assembly/Disassembly ........ 11
3.2.1.4 Unimproved Surfaces & Leveling Devices ........ 11
3.2.1.5 Lighting ........ 12
3.2.1.6 Temporary Storage Area ........ 12
3.2.1.7 Arming Wire Assembly ........ 12
3.2.1.8 Tool Trays ........ 12
3.2.2 Physical Characteristics ........ 12
3.2.2.1 Weight ........ 12
3.2.3 Service Life ........ 13
3.2.3.1 Maintainability & Reliability ........ 13
3.2.4 Environmental Operational Conditions ........ 13
TABLE 3.2.4 Environmental Condition Requirements ........ 13

3.2.5 Safety Factors and Design Proof Loads .......... 13
3.3 Design and Construction .......... 14
3.3.1 Materials, Processes, and Corrosion Resistance .......... 14
3.3.1.1 Metals .......... 14
3.3.1.2 Dissimilar Metal .......... 14
3.3.1.3 Standard and Commercial Parts .......... 14
3.3.1.4 Nameplates and Product Marking .......... 14
3.3.2 Workmanship .......... 14
3.3.3 Interchangeability .......... 14
3.3.4 Safety .......... 15
3.3.4.1 Grounding .......... 15
3.4 Personnel .......... 15
4.0 QUALITY ASSURANCE PROVISIONS .......... 15
4.1 General .......... 15
4.1.1 Special Tests or Inspections .......... 16
TABLE 4.1 Requirements and Verifications Cross-Reference Index .......... 16
4.1.2 Interfaces .......... 17
4.1.2.a Stores .......... 17
4.1.2.b Transport Trailers/Tow Vehicles .......... 17
4.1.2.c Facilities .......... 17
4.1.2.d Electrical Power Source .......... 18
4.1.2.e Compressed Air Source .......... 18
4.1.2.f Mobility .......... 18
4.1.2.g Shipping and Storage .......... 18
4.2 Characteristics .......... 18
4.2.1 Performance .......... 18
4.2.1.1 Loading & Unloading System .......... 18
4.2.1.2 Munition Assembly/Disassembly .......... 19
4.2.1.3 MAC II Assembly/Disassembly .......... 19
4.2.1.4 Unimproved Surfaces and Leveling Devices .......... 19
4.2.1.5 Lighting .......... 19
4.2.1.6 Temporary Storage Area .......... 19
4.2.1.7 Arming Wire Assembly .......... 19
4.2.1.8 Tool Trays .......... 19
4.2.2 Physical Characteristics .......... 19
4.2.2.1 Weight .......... 19
4.2.3 Service Life .......... 20
4.2.3.1 Maintainability & Reliability .......... 20
4.2.4 Environmental Conditions .......... 20
TABLE 4.2.4 Environmental Tests Methods, Procedures and Parameters .......... 20
4.2.5 Safety Factors and Design Proof Loads .......... 20
4.3 Design and Construction .......... 21
4.3.1 Materials, Processes, and Corrosion Resistance .......... 21
4.3.1.1 Metals .......... 21
4.3.1.2 Dissimilar Metals .......... 21

4.3.1.3 **Standard and Commercial Parts** .......... 21
4.3.1.4 **Nameplates and Product Marking** .......... 21
4.3.2 **Workmanship** .......... 21
4.3.3 **Interchangeability** .......... 21
4.3.4 **Safety** .......... 22
4.3.4.1 **Grounding** .......... 22
4.4 **Personnel** .......... 22
5.0 **PREPARATION FOR DELIVERY** .......... 22
5.1 **Packaging and Preservation** .......... 22
5.2 **Markings** .......... 22

## 1.0 SCOPE

This specification establishes the performance and validation requirements for a Munition Assembly Conveyor II (MAC II), XXXX. The MAC II shall be used to assemble munitions.

## 2.0 APPLICABLE DOCUMENTS

### 2.1 Government Documents

The following documents of the exact issue shown shall form a part of this specification to the extent specified herein. In the event of conflict between the documents referenced herein and the contents of this specification, this specification shall be considered a superseding requirement.

### 2.1.1 Specifications

#### 2.1.1.1 Military

| | |
|---|---|
| DoD 6055.9-STD | DoD Ammunition and Explosives Safety Standards |

#### 2.1.1.2 Federal

| | |
|---|---|
| W-C-596G | Connector, Plug, Receptacle and Cable Outlet, Electrical Power |
| A-A-59553 | Coupling, Hose (Half), Pneumatic, Universal Type |

### 2.2 Standards

#### 2.2.1 Federal

| | |
|---|---|
| FED-STD-595B | Color |

#### 2.2.2 Military Publications

| | |
|---|---|
| MIL-STD-129P | Marking for Shipment and Storage |
| MIL-STD-130K | Identification Marking of US Military Property |
| MIL-STD-2073/1D | Part and Equipment, Procedures for Packaging and Packing of |
| MIL-STD-810F | Environmental Test Procedures |
| MIL-STD-882D | System Safety |
| MIL-STD-1365B | General Design Criteria for Handling Equipment Associated with Weapons and Related Items |
| MIL-STD-1472F | Human Engineering |
| MIL-HDBK-1791 | Air Transportability Requirements, General Specification For |

## 2.3 Other Publications

### 2.3.1 Air Force Publications

| | |
|---|---|
| AFMAN 91-201 | Explosive Safety Standard |
| AFMAN 36-2108 | Enlisted Classification |
| AFOSHSTD 91-501 | Air Force Consolidated Occupational Safety Standard |

## 2.4 Non-Government Documents

| | |
|---|---|
| ANSI B30 | Material Handling Equipment Safety Standard |
| ASTM B117 | Salt Spray (Fog) Apparatus, Operating |
| AWS D1.1/D1.1M-2002 | Welding Code, Structural, Steel |
| AWS D1.2-1997 | Welding Code, Structural, Aluminum |

(Copies of specifications, standards, drawings, and publications, required by suppliers in connection with specified procurement functions should be obtained from the procuring activity or as directed by the Contracting Officer.)

## 3.0 REQUIREMENTS

## 3.1 MAC II Item Definition

The MAC II shall allow personnel to load and unload unassembled and assembled munitions from trailers onto temporary storage or directly for assembly or disassembly in a continuous process. A portable compressor and electrical power source shall provide power for the MAC II. The compressor and electrical power sources are current inventory items that will be supplied by the field unit.

### 3.1.1 MAC Item Diagram

Figure 1 is a notional functional diagram of the original MAC system. This is provided as information only. The MAC II system may contain improvements that result in a different way of assembling/disassembling weapons.

**Figure 1. Functional Diagram**




***NOTE: Generator and Compressor are field furnished and will be located no less than 25 feet from explosives (AFMAN 91-201). Fuzing, finning and arming wire stations may not necessarily be in the order shown.**

3.1.2 **Interface Definition**

The MAC II shall be capable of interfacing with the following:

3.1.2.a **Stores**

The MAC II shall be capable of handling, assembling, and disassembling the munitions listed in Table 3.1.2.a.

**TABLE 3.1.2.a Intended Munitions**

| Munition | Description |
|---|---|
| MK-82 | General-purpose bomb with MAU-93, BSU-49, GBU-38 fins and strakes |
| MK-84 | General-purpose bombs with BSU-50, GBU-31 fins and strakes, or conical fins |
| GBU-31 w/BLU-109 | Penetration warhead with fins and strakes |
| GBU-32 w/MK-83 | Guided bomb with fins and strakes |
| GBU-10, 12, 24, 27 | Guided bombs |
| SUU-64, 65, 66 | Dispensers* |
| CBU-87, 89, 97, 103 to 105 | Cluster bombs |
| M-117 | General-purpose bombs with MAU-91 and MAU-103 fins |
| M-129 | Leaflet bomb |

*NOTE: Dispensers contain the CBU-87, 89, 97, 103 to 105.

3.1.2.b Transport Trailers/Tow Vehicles

The MAC II shall allow the transport trailers or tow vehicles in Table 3.1.2.b easy access to load and unload munitions.

TABLE 3.1.2.b Transport Trailers and Tow Vehicles

| Munition Trailers | Triple Stacked Height (Feet) | Triple Stacked Width (Feet) |
|---|---|---|
| 1. MHU-141/M Munitions Trailer | 8.00* | 7.00 |
| 2. MHU-110/M Munitions Trailer | 7.50 | 7.25 |
| 4. MHU-226/M Munitions Trailer | 7.875 | 7.25 |
| **Semi-Trailer** | **Height (Feet)** | **Width (Feet)** |
| 5. 40-Foot Flatbed Trailer | 7.125** | 8.00 |
| **Tow Vehicles** | **Vehicle Height (Feet)** | **Vehicle Width (Feet)** |
| 6. Bobtail Tow Vehicle | 6.50 | 7.50 |
| 7. Commercial Tractor Tow Vehicle | 13.50 | 8.00 |
| 8. MB-4 Tow Vehicle | 8.25 | 8.00 |

*NOTE: Highest non-munition loading/unloading configuration.
**NOTE: 40-Foot Flatbed Trailer with MK-84 Aluminum Rail Set configuration is the highest munition configuration for loading/unloading. In this configuration the MK-84 lugs are 7.125 feet from the ground.

3.1.2.c Facilities

The MAC II shall be capable of operating within a Third Generation Hardened Facility (TAB VEE) with dimensions of approximately 27.4 feet high by 70.8 feet wide by 120 feet long as described by DoD 6055.9-STD.

3.1.2.d Electrical Power Source

The MAC II shall provide for control and distribution of electrical power. In addition, it shall have four 110V, 15 AMP receptacles to power miscellaneous electrical devices not list in this document. The MAC II electrical system shall conform to applicable AFOSHSTD 91-501 requirements. The MAC II shall have a male plug (W-C-596G designation) to interface with the following power sources that will be located a minimum of 25 feet from explosives (AFMAN 91-201).

(1) NF-2D Portable Floodlight Set
(2) FL-1D Floodlight

3.1.2.e **Compressed Air Source**

The MAC II shall have a ¾ inch pneumatic hose coupling, (A-A-59553 designation) that is capable of interfacing with the MC-7 Air Compressor located a minimum of 25 feet from explosives (AFMAN 91-201). The MAC II system shall have the capability to simultaneously power four pneumatic tools used for assembling munitions.

3.1.2.f **Mobility**

The MAC II shall be capable of being Air Transportability Certified per MIL-HDBK-1791 on C-130, C-141, C-5, KC-10, or C-17 aircraft when loaded into containers and pallets on either one MHU-110 or one MHU-226 trailer.

3.1.2.g **Shipping and Storage**

The MAC II system shall be capable of being shipped and stored using the existing aluminum containers* and pallets* listed in Table 3.1.2.g below. An alternate long life reusable storage and shipping containers and/or pallets may be used for storage and shipment of the MAC II if cost effective. The cost of the alternate design, if proposed, must be included in the cost of the MAC II and provided with each system at the time of delivery. MIL-STD-2073 may be used as guidance in developing additional containers and/or pallets. See paragraph 3.2.1.3.

**TABLE 3.1.2.g Shipping and Storage**

| Container Name | Drawing Number | Quantity | Approximate Internal Dimensions (Inches) | Tare Weight (Pounds) |
|---|---|---|---|---|
| Container 1 | 20038957 | 1 | 47.0L x 26.0W x 24.0H | 150 |
| Container 2 | 20038958 | 1 | 47.0L x 26.0W x 24.0H | 150 |
| Container 3 | 20038959 | 1 | 83.0L x 36.0W x 24.0H | 295 |
| Container 4 | 20038960 | 1 | 157.5L x 46.0W x 19.0H | 600 |
| **Pallet Name** | | **Quantity** | **Approximate External Dimensions (Inches)** | **Tare Weight (Pounds)** |
| Pallet 1 | 20038961 | 1 | 120.0L x 53.0W x 4.0H | 270 |
| Pallet 2 | 20038962 | 1 | 121.0L x 21.0W x 4.0H | 150 |

*NOTE: Interface Control Drawings of the containers and pallets are available.

3.2 **Characteristics**

3.2.1 **Performance**

3.2.1.1 **Loading & Unloading System**

The MAC II shall be capable of simultaneously loading and unloading bomb bodies and fully assembled munitions listed in Table 3.1.2.a from and onto the trailers listed in Table 3.1.2.b. The MAC II shall operate more efficiency (speed and/or weight capacity) than the current MAC. Load and unload features shall be of the same configuration and interchangeable. Safety features shall be included to preclude accidental dropping of the munitions. All movement of munitions during lifting shall be powered. If required for cold temperature, an alternate load and unload features can be an option. The MAC II shall have a manual brake release for lowering munitions in the event of a power failure.

3.2.1.2 **Munition Assembly/Disassembly**

The MAC II shall accommodate up to twenty-five, 500-pound class munitions at one time. The system shall facilitate the assembly/disassembly of the munitions listed in Table 3.1.2.a. Munition flow from loading to unloading shall be free and easy without binding. The MAC II shall preclude munitions from interfering with or impacting each other. The MAC II shall also allow munition assemblies to be torqued up to 625 ± 25 ft-lb. The MAC II shall have a working strength of 12,000 lbs per 10-foot section.

3.2.1.3 **MAC II Assembly/Disassembly**

The MAC II shall be capable of being assembled or disassembled and repackaged from transport trailers or tow vehicles in Table 3.1.2.b with a maximum of 15 Air Force personnel (AFSC 2W030/2W050 as described in AFMAN 36-2108) within 60 minutes using only a 6,000 lbs forklift, minimum hand tools, and no stand alone special tools. Special tooling for assembly may be integrated into the MAC II system. Marking or some other means of identification to facilitate assembly and repacking shall be provided. Disassembly and repackaging shall use the existing containers and meet the mobility requirements stated in 3.2.1.f. See Table 3.1.2.g for a list of containers with dimensions. An alternate long life reusable storage and shipping containers and/or pallets may be used. See paragraph 3.1.2.g.

3.2.1.4 **Unimproved Surfaces & Leveling Devices**

The MAC II system, when loaded to its peak capacity shall not impose a pressure on any portion of the bearing surface upon which it is assembled, greater than 5,430 pounds per square foot. The MAC II shall be capable of being safely assembled and used on improved as well as unimproved terrain consisting of a variation in surface height up to 5.25 inches. The MAC II shall not require anchors for stability.

3.2.1.5 **Lighting**

The MAC II system shall operate and maintain sufficient light to accomplish munition loading, assembly, and unloading. A lighting level of at least 75 foot-candles shall be maintained over the entire munition assembly/disassembly area at 3 feet above the ground. The lighting levels at the loading and off-loading areas shall be a minimum of 50 foot-candles 3 feet above the ground. The color of the light furnished shall be as near to the natural light as possible. The fixtures furnished shall not require more than 5 minutes of restart time when the light is turned off and back on again.

3.2.1.6 **Temporary Storage Area**

The MAC II shall have a munition storage area loading that shall allow easy manual movement of pallets to the loading area. It shall be capable of storing six, 2,000-pound class munition pallets double-stacked at one time. Each 2,000-pound class munition pallet contains two bomb bodies. It shall also be capable of storing seven, 500-pound class munition pallets triple-stacked at one time. Each 500-pound class munition pallet contains six bomb bodies.

3.2.1.7 **Arming Wire Assembly**

The MAC II shall have an arming wire dispenser that incorporates a wire straightener and an anti-backlash device, and can accommodate a spool of arming wire with an outer diameter of 9.00 inches, an inner diameter of 2.00 inches, and a width of 8.25 inches. The Arming Wire Assembly shall allow for easy dispensing.

3.2.1.8 **Tool Trays**

The MAC II shall incorporate at least four moveable tool trays strategically located to allow technicians to efficiently retrieve and store hand and air tools. The tray size shall be approximately 12 inches wide and 24 inches long. Hand and air tools shall consist of standard impact wrenches, torque wrenches, ratchets, speed handles, arming wire pliers, screwdrivers, and ratchet extensions. The tool tray placement and size shall not interfere with the technicians work environment and be of sufficient capacity to accommodate all tools.

3.2.2 **Physical Characteristics**

3.2.2.1 **Weight**

The MAC II shall meet the human engineering lifting requirements of MIL-STD-1472F for manually handled features up to 5 feet above the ground. The weight of the system including the containers shall not exceed 12,000 lbs to minimize the mobility footprint. The weights of the containers and pallets are in Table 3.1.2.g.

### 3.2.3 Service Life

All structural and support members of the MAC II shall have an expected service life of not less than 30 years. The service life of commercial off the shelf items shall conform to industry standards. The MAC II shall be capable of being stored outside for a minimum of five years.

### 3.2.3.1 Maintainability & Reliability

The MAC II shall be capable of continuous operation for 1,000 hours or more with no unscheduled maintenance required. Maintenance on the MAC II shall be limited to field level. Preventive maintenance for commercial off the shelf items shall be in accordance with industry standards. The mean time to repair (MTTR) by a skill level five person shall be no more than 4 hours using the technical manual.

### 3.2.4 Environmental Operational Conditions

The MAC II shall be capable of operation and storage throughout its service life without damage when exposed to the environmental conditions listed in Table 3.2.4.

**TABLE 3.2.4 Environmental Condition Requirements**

| Environmental Condition | Requirement | |
|---|---|---|
| Low Temperature | Operating: | -25°F |
| | Storage: | -65°F |
| High Temperature | Operating: | +125°F with solar load |
| | Storage: | +160°F |
| Humidity | Relative Humidity | 3% to 95% |
| Salt Fog | See Doc.: ASTM B117, 96 hours | |
| Blowing Rain | Rainfall Rate: | 2 inches per hour |
| | Wind: | 40 miles per hour |
| Blowing Dust | Dust Concentration: | $0.3 \pm 0.2$ g/ $ft^3$ |
| | Wind: | 35 miles per hour |
| Blowing Sand | Sand Concentration: | $0.0623 \pm 0.015$ g/$ft^3$ |
| | Wind: | 35 miles per hour |
| Ice/ Freezing Rain | Water Delivery Rate: | 25mm/h |
| | Droplet Size: | 1.0 mm to 1.5 mm |

### 3.2.5 Safety Factors and Design Proof Loads

The MAC II's safety factor and design proof load requirements shall meet MIL-STD-1365B and ANSI B30.

## 3.3 Design and Construction

### 3.3.1 Materials, Processes, and Corrosion Resistance

Materials used shall be corrosion resistant when exposed to environments in Table 3.2.4. If paint is used to provide corrosion protection, it shall be dark green, color number 34052, in accordance with FED-STD-595B. Painted surfaces shall be capable of being touched up without having to repaint adjacent areas. Hazardous and toxic materials and processes shall be avoided. The MAC II system shall not contain materials requiring special processes or treatment for disposal.

#### 3.3.1.1 Metals

All metallic surfaces and joints shall be treated to resist corrosion due to fuels, salt fog, or atmospheric conditions likely to be met in storage or normal service.

#### 3.3.1.2 Dissimilar Metal

Unless protected against corrosion, dissimilar metals shall not be used in direct contact with each other.

#### 3.3.1.3 Standard and Commercial Parts

The MAC II shall use commercial off-the-shelf (COTS) parts to the maximum extent practical.

#### 3.3.1.4 Nameplates and Product Marking

The MAC II shall be marked in accordance with MIL-STD-130K.

### 3.3.2 Workmanship

The MAC II shall be fabricated in a manner that will insure high quality appearance, fit, interchangeability and assembly. Particular attention shall be given to neatness and thoroughness of marking of parts and assemblies, plating, printing, riveting, machine screw assemblage and welding. The MAC II design shall not permit water accumulation in pockets, creases, fissures, or depressions, which could cause structural damage and or operational impairment upon freezing. Welded materials shall be IAW ANSI /AWS D1.2-1997 and or AWS D1.1-2002.

### 3.3.3 Interchangeability

MAC II piece parts shall be physically and functionally interchangeable between systems without the need for modification.

3.3.4 **Safety**

The MAC II shall allow effective operations and maintenance without injury or damage to personnel and equipment with emphasis on MIL-STD-882D and AFMAN91-201 requirements. To assure safe operation the MAC II shall implement durable effective hose trolleys that keep overhead compressed air lines, wires, and/or hydraulic lines (as applicable) safely out of danger and prevent tangling. The hose trolleys shall capture and hold any air lines, wires, and/or hydraulic lines firmly and resist pulling and tugging.

3.3.4.1 **Grounding**

The MAC II shall incorporate capability to be externally grounded in accordance with AFMAN 91-201.

3.4 **Personnel**

The MAC II shall not require maintenance above the using base maintenance squadron. All operations of the system shall be carried out by a three-person team of 2W0XX personnel as defined by AFMAN 36-2108. No special training shall be required. The level of training required shall not exceed that which can be provided by on-the-job training on site.

4.0 **QUALITY ASSURANCE PROVISIONS**

4.1 **General**

This section defines the inspections, certifications, demonstrations, tests, and analyses necessary to verify the ability of the MAC II to meet the requirements prescribed in Section 3. These inspections, certifications, demonstrations, tests, and analyses will be performed on the prototype MAC II's.

The MAC II Integrated Development and Operational Test Plan contains the detailed procedures for the inspections, demonstrations, and tests required by this section.

Table 4.1 provides a cross-index of the Section 3 requirements, the Section 4 quality assurance provisions, and the associated organizational responsibilities. The verification methods listed in Table 4.1 are defined as follows:

- I – Inspection. Careful and critical examination, including measurements, where appropriate. Usually an unaided visual examination.
- C – Certification. A formal confirmation that a particular quality, feature, or characteristic meets a specified standard or that the results provided are true and accurate.

- D – Demonstration. An activity showing that a particular capability or function exists.
- T – Testing. Accomplish tests as defined in Section 3 and Section 4.
- A – Analysis. Perform analysis as defined in Section 3 and Section 4. This may consist of comparison to existing designs.
- NA – Not Applicable.
- G – Government.
- CONTR – Contractor.

The government reserves the right to witness and perform any of the tests or demonstrations required by this specification where the government deems such tests necessary to assure that the MAC II conforms to the specified requirements.

The government reserves the right to verify contractor certifications by independent analyses or testing.

### 4.1.1 Special Tests or Inspections

When inspections or tests not described or referenced herein are required, they shall be conducted in accordance with industry-approved standards acceptable to the government.

**TABLE 4.1 Requirements and Verifications Cross-Reference Index**

| REQUIREMENT | DESCRIPTION | METHOD | VERIFICATION | RESPONSIBILITY |
|---|---|---|---|---|
| 3. | Requirements | | N/A | N/A |
| 3.1 | MAC II Item Definition | | N/A | N/A |
| 3.1.1 | MAC II Item Diagram | | N/A | N/A |
| 3.1.2 | Interface Definition | | N/A | N/A |
| 3.1.2.a | Stores | I, D | 4.1.2.a | G |
| 3.1.2.b | Transport Trailers/Tow Vehicles | I, A, D | 4.1.2.b | G |
| 3.1.2.c | Facilities | I | 4.1.2.c | G |
| 3.1.2.d | Electrical Power Source | I, D | 4.1.2.d | G |
| 3.1.2.e | Compressed Air Source | T | 4.1.2.e | G |
| 3.1.2.f | Mobility | A | 4.1.2.f | G |
| 3.1.2.g | Shipping & Storage | A, D | 4.1.2.g | G, CONTR |
| 3.2 | Characteristics | | N/A | N/A |
| 3.2.1 | Performance | | N/A | N/A |
| 3.2.1.1 | Loading & Unloading System | T | 4.2.1.1 | G, CONTR |
| 3.2.1.2 | Munition Assembly/Disassembly | I, A, D, T | 4.2.1.2 | G, CONTR |
| 3.2.1.3 | MAC II Assembly/Disassembly | D, T | 4.2.1.3 | G |
| 3.2.1.4 | Unimproved Surfaces & Leveling Devices | T | 4.2.1.4 | G |
| 3.2.1.5 | Lighting | C, T | 4.2.1.5 | G |
| 3.2.1.6 | Temporary Storage Area | I, C, D | 4.2.1.6 | G, CONTR |

| | | | | |
|---|---|---|---|---|
| 3.2.1.7 | Arming Wire Assembly | I, D | 4.2.1.7 | G |
| 3.2.1.8 | Tool Trays | I, D | 4.2.1.8 | G |
| 3.2.2 | Physical Characteristics | | N/A | N/A |
| 3.2.2.1 | Weight | I | 4.2.2.1 | G |
| 3.2.3 | Service Life | A, C | 4.2.3 | G, CONTR |
| 3.2.3.1 | Maintainability & Reliability | A, I, C | 4.2.3.1 | G, CONTR |
| 3.2.4 | Environmental Operational Conditions | I, A, T | 4.2.4 | G |
| 3.2.5 | Safety Factor and Design Proof Load | I, T | 4.2.5 | G |
| 3.3 | Design & Construction | | N/A | N/A |
| 3.3.1 | Materials, Processes and Corrosion Resistance | I, C | 4.3.1 | G, CONTR |
| 3.3.1.1 | Metals | I, A, C | 4.3.1.1 | G, CONTR |
| 3.3.1.2 | Dissimilar Metals | I, C | 4.3.1.2 | G, CONTR |
| 3.3.1.3 | Standard and Commercial Parts | I | 4.3.1.3 | G |
| 3.3.1.4 | Nameplates and Product Marking | I | 4.3.1.4 | G |
| 3.3.2 | Workmanship | I | 4.3.2 | G |
| 3.3.3 | Interchangeability | I, D | 4.3.3 | G |
| 3.3.4 | Safety | I, A | 4.3.4 | G, CONTR |
| 3.3.4.1 | Grounding | I, T | 4.3.4.1 | G |
| 3.4 | Personnel | I, D | 4.4 | G |

*NOTE: The government reserves the right to perform additional inspections, demonstrations, tests, and analyses set forth in the specification where such inspections, demonstrations, tests, and analyses are deemed necessary to assure supplies and services conform to prescribed requirements.

**4.1.2 Interfaces**

**4.1.2.a Stores**

Verification that the MAC II is capable of handling, assembling, and disassembling the munitions listed in Table 3.1.2.a shall be by inspection and demonstration. The government will inspect the MAC II to determine if the required functions for each of the intended munitions can be accomplished. Some or all of the munitions will be selected to demonstrate that they can be handled, assembled, and disassembled.

**4.1.2.b Transport Trailers/Tow Vehicles**

Verification that the off-load and the on-load features of the MAC II allow all of the transport trailers or tow vehicles listed in Table 3.1.2.b easy access shall be accomplished by inspection, demonstration, and/or analysis as determined by the government.

**4.1.2.c Facilities**

Verification that the MAC II is capable of operation within a Third Generation Hardened Facility (TAB VEE) shall be by inspection of the fully assembled MAC II and comparison with the maximum dimensions listed in 3.1.2.c.

**4.1.2.d Electrical Power Source**

Verification that the MAC II is capable of interfacing with the power sources listed in 3.1.2.d while having means with which to collect electrical power with the specified plug and providing a control and distribution source shall be by inspection and demonstration. Any or all of these power sources may be used to demonstrate the required interface capability.

**4.1.2.e Compressed Air Source**

Verification that the MAC II is capable of interfacing with and being powered by the MC-7 Air Compressor using the specified pneumatic hose coupling shall be by testing. This test shall include connecting pneumatic tools to at least four MAC II fittings and operating the tools simultaneously.

**4.1.2.f Mobility**

Verification that the MAC II meets the mobility requirements shall be by analysis. An analytical assessment will be made by the government of the MAC II on an MHU-110 and an MHU-226 trailer to verify that the combined cube dimensions, weight, and trailer axle loadings of the MAC II and trailer can be certified per MIL-HDBK-1791 to meet the requirements for air transport on C-130, C-141, C-5, KC-10, and C-17 aircraft in accordance with 3.1.2.f.

**4.1.2.g Shipping and Storage**

Verification that the MAC II is capable of being shipped and stored using the aluminum containers and pallets listed in Table 3.1.2.g shall be by analysis and demonstration. Verification that alternate long life reusable storage and shipping containers and/or pallets meet required storage and shipping requirements shall be by government analysis and demonstration.

**4.2 Characteristics**

**4.2.1 Performance**

**4.2.1.1 Loading & Unloading System**

The ability of the MAC II to simultaneously load and unload the munitions listed in Table 3.1.2.a from the trailers listed in Table 3.1.2.b shall be verified by testing. Any or all of the munitions listed in Table 3.1.2.a may be used in this test. Verification that the MAC II meets the requirements of 3.2.1.1 for capability, strength, and safety shall be by government testing. The required operation of the manual brake release shall be demonstrated.

4.2.1.2 **Munition Assembly/Disassembly**

Verification that the MAC II meets the requirements of 3.2.1.2 for strength, munitions accommodation, torquing, and strength shall be by inspection, analysis, demonstration, and testing.

4.2.1.3 **MAC II Assembly/Disassembly**

Verification that the MAC II meets the assembly, disassembly, and repackaging requirements of 3.2.1.3 shall be by government testing and demonstration.

4.2.1.4 **Unimproved Surfaces and Leveling Devices**

Verification that the MAC II, when loaded to its peak capacity, meets the bearing surface pressure requirements and can be safely assembled on surfaces with a variation in surface height as specified in 3.2.1.4 shall be by government testing.

4.2.1.5 **Lighting**

The lighting levels and restart time required by 3.2.1.5 shall be verified by government testing while the MAC II is being powered by any of the power sources listed in 3.1.2.d. and under the ambient temperature conditions existing at the time and location of the test. Restart time at low temperatures and color temperature of the lighting shall be determined by contractor certification.

4.2.1.6 **Temporary Storage Area**

The presence of the required pallet storage area shall be verified by inspection. The capacity of the storage area shall be verified by contractor certification.

4.2.1.7 **Arming Wire Assembly**

The presence of the arming wire dispenser and verification of its required characteristics shall be verified by inspection and demonstration.

4.2.1.8 **Tool Trays**

The presence and capacity of the required tool trays shall be verified by inspection. The effect of the placement and size of the tool trays on the technicians' work environment shall be evaluated during operational demonstrations.

4.2.2 **Physical Characteristics**

4.2.2.1 **Weight**

The requirements of 3.2.2.1 shall be verified by inspection, including weighing.

4.2.3 **Service Life**

The service life requirements of 3.2.3 shall be verified by government and contractor analyses and by contractor certification.

4.2.3.1 **Maintainability & Reliability**

The contractor shall certify, and shall provide the supporting analytical data, that the lifting source and its components meet the requirements of 3.2.3.1. The MTTR for the lifting source will be demonstrated during test using the preliminary technical order. Reliability and Maintainability data will be collected during the testing to augment the certifications.

4.2.4 **Environmental Conditions**

The ability of the MAC II to operate and/or to be stored under the environmental conditions specified in 3.2.4 shall be verified by inspection, analysis, and testing by the government. Testing will be accomplished using the test methods, procedures, and parameters shown in Table 4.2.4. Any evidence of degradation in performance or corrosion shall be considered a failure.

**TABLE 4.2.4 Environmental Tests Methods, Procedures and Parameters**

| | MIL-STD-810F | | |
|---|---|---|---|
| **Condition** | **Method** | **Procedure** | **Parameter(s)** |
| High Temperature (operational) | 505.4 Solar Radiation | I (Cycling, Heating Effects) | +125°F ambient air with solar radiation |
| High Temperature (storage) | 501.4 | I (Storage) | +160°F maximum |
| Low Temperature (operational) | 502.4 | II (Operational) | -25°F minimum |
| Low Temperature (storage) | 502.4 | I (Storage) | -65°F minimum |
| Rain | 506.4 | I (Rain and Blowing Rain) | |
| Icing/Freezing Rain | 521.2 | I | Glaze Ice, 13 mm (Thickness) |
| Humidity | 507.4 | NA | |
| Sand and Dust | 510.4 | I (Blowing Dust) and II (Blowing Sand) | Air velocity of 35 mph |
| Salt Fog | ASTM B117 | | 96 hours |

4.2.5 **Safety Factors and Design Proof Loads**

The safety factor and design proof load requirements of the MAC II shall be verified by test and inspection by the government. Testing will be accomplished

using the test methods, procedures, and parameters in MIL-STD-1365 and ANSI B30.

4.3 **Design and Construction**

4.3.1 **Materials, Processes, and Corrosion Resistance**

The corrosion resistance of the materials used shall be evaluated during the testing specified in 4.2.4. Verification that toxic materials and processes have been avoided shall be by contractor certification and government inspection.

4.3.1.1 **Metals**

The presence and adequacy of the required treatment of metallic surfaces and joints shall be determined by inspection, government analysis, and contractor certification.

4.3.1.2 **Dissimilar Metals**

The requirement of 3.3.1.2 shall be verified by inspection and contractor certification.

4.3.1.3 **Standard and Commercial Parts**

The extent of the use of COTS parts shall be determined by inspection.

4.3.1.4 **Nameplates and Product Marking**

Verification that the MAC II is marked in accordance with MIL-STD-130K shall be determined by inspection.

4.3.2 **Workmanship**

Verification that the MAC II meets the requirements of 3.3.2 shall be by inspection. Verification that the welding has been accomplished in accordance with the stated specifications shall be accomplished by an American Welding Society-certified welding inspector.

4.3.3 **Interchangeability**

Interchangeability of piece parts and major components shall be verified by inspection and demonstration.

4.3.4 **Safety**

The safety of the MAC II shall be verified by an analysis of the design data, a review of the overall test results, and physical inspections to compare with the guidance and requirements in MIL-STD-882D, AFMAN 91-201, and 3.3.4.

4.3.4.1 **Grounding**

The ability of the MAC II to be grounded shall be determined by inspection, including resistance measurements of applicable components.

4.4 **Personnel**

The MAC II shall be inspected by experienced government munitions handling equipment personnel who will evaluate the level of difficulty involved in operating the system and who will assess the level of training that would be required for operation and maintenance by personnel with the specified skill code.

5.0 **PREPARATION FOR DELIVERY**

5.1 **Packaging and Preservation**

Packaging and preservation shall be best commercial practice for shipment from the contractor's facility to CONUS and overseas bases. Subsequent shipments will be made in Government furnished containers and pallets listed in Table 3.1.2.g. (See paragraph 3.1.2.g for exception).

5.2 **Markings**

In addition to any special marking required by the contract or order, the packages and shipping containers shall be marked in accordance with requirements of MIL-STD-129P.

**EXHIBIT D**

**UNSOLICITED PROPOSAL**
**FEBRUARY 19, 2003**

**PAGES 84-106**

SPECTRUM
SCIENCES & SOFTWARE, INC.

91 Hill Avenue
Ft. Walton Beach, FL 32547
(850) 796-0909 • Fax: (850) 244-9560

19 February 2003

Department of the Air Force
Air Force Materiel Command
Air Armament Center/WMO
Eglin AFB, FL 32542

Subject: Unsolicited Proposal

Attention: Master Sergeant Tony Roy

Sergeant Roy,

Spectrum Sciences & Software, Inc. is pleased to provide our unsolicited proposal to build a Combat Munitions Assembly Conveyor (CMAC). Our proposal is submitted to only you, and is a result of several years of design and test in concert with our CRADA with the Air Armament Center. Our proposed design concept incorporates several new and unique features that provide innovative solutions to many of the old and persistent problems of the current system. We have blended new and improved technology, when it made sense to do so, with proven approaches to provide increased reliability, availability; to reduce design risks; and to minimize life-cycle costs and logistic support requirements.

Spectrum is fully prepared to dedicate all necessary resources and facilities to the execution of any contract resulting from this submittal. Our personnel are excited to have the opportunity to participate in a program of this importance, and we all look forward to a long and productive relationship with the Air Force.

Sincerely,

Donald L. Garrison
Chief Operating Officer

# TABLE OF CONTENTS

1.0 SYNOPSIS .......... 1
1.1 Type of Contract .......... 1
1.2 Cost Data .......... 1
1.3 Scheduling .......... 2
2.0 Qualifications .......... 2
2.1 General .......... 2
2.2 Why Spectrum .......... 2
2.3 Spectrum's Success Story (Updating the Current MAC) .......... 3
2.4 Past Performance .......... 3
2.4.1 Conveyor, Munitions Assembly .......... 3
2.4.1.1 Project Description .......... 4
2.4.1.2 Relevancy .......... 4
2.4.2 Set, Shipping and Storage, MAC Containers .......... 4
2.4.2.1 Project Description .......... 4
2.4.2.2 Relevancy .......... 5
2.4.3 Gila Bend AFAF & Barry M. Goldwater Ranges OM&S .......... 5
2.4.3.1 Project Description .......... 5
2.4.3.2 Relevancy .......... 5
3.0 Need .......... 6
3.1.1 Gantry .......... 6
3.1.2 Hoists .......... 6
3.1.3 Hoist Support Systems .......... 6
3.1.4 Hose Trolley .......... 6
3.1.5 Interface Control Board .......... 7
3.1.6 Lighting .......... 7
3.1.7 Rail Conveyor .......... 7
3.1.8 Conveyor Dollies .......... 7
3.1.9 Tools .......... 7
3.1.10 Containers .......... 8
4.0 DESIGN DETAILS .......... 8
4.1 MAC Gantry .......... 8
4.2 Hoists .......... 9
4.3 Hoist Trolley .......... 10
4.4 Triple Bomb Bar .......... 10
4.5 Hose/Line Trolley .......... 11
4.6 Interface Control Board .......... 11
4.7 Lighting .......... 12
4.8 Rail Conveyor .......... 12
4.8.1 Bearing Rails .......... **Error! Bookmark not defined.**
4.8.2 Dolly Stops .......... 12
4.9 Conveyor Dollies .......... 13
4.10 Containers .......... 13
4.11 Torque Device .......... 14
4.12 Tools .......... 14



*"Use or disclosure of data contained on this sheet is subject to the restriction of the title page of this proposal".* 

4.13 Munitions Assembly Conveyor System Set-Up ..... 14
5.0 LOGISTICS SUPPORT CONCEPT ..... 15
6.0 Manufacturing Capability ..... 15
6.1 Key Personnel ..... 15
6.2 Manufacturing Locations ..... 16
6.2.1 Headquarters Facility ..... 17
6.2.2 Lovejoy Road Facility ..... 17
6.3 Equipment ..... 17
6.3.1 Machine/Welding Shop ..... 17
6.3.2 Metal Treatment Shop ..... 17
6.3.3 Non-Destructive Testing and Quality Measurement ..... 18
7.0 Summary ..... 18
Attachment A - Stress Analysis ..... 19

# 1.0 SYNOPSIS

SPECTRUM SCIENCES & SOFTWARE, INC, (SPECTRUM) proposes to design and build a new Combat Munitions Assembly Conveyor (CMAC) capable of supporting the increased weight requirements of today and future combat weapons. The design is a result of knowledge gained from 20 years of field operations, our key personnel's 100+ years of combined munitions experience, and our two and one-half years of design, development, and testing completed in our Munitions Support Laboratory in support of our Cooperative Research and Development Agreement (CRDA) with Eglin Air Force Base. Incorporated within the design are the latest technologies and Commercial-off-the-shelf items to support the war-fighter both timely and efficiently. Spectrum will build and deliver a First Article, and associated operational technical data, for use by the Air Force at a facility of their choosing. The First Article can be delivered within three (3) months after notice-to-proceed. We also have the capability to expedite completion of the first article if necessary.

## 1.1 TYPE OF CONTRACT

SPECTRUM suggests a Firm-Fixed Price (FFP) contract, but would entertain other methods, such as an Indefinite Delivery/Indefinite Quantity (IDIQ) if some yearly minimums were established and some reassurance that programming would support continued acquisition. All contract types are available for negotiation.

Additionally, Spectrum would also entertain the idea of a Contractor Logistic Support (CLS) contract to ensure up-to-date technical data, re-supply, and maintenance of the system, eliminating the need for the warehousing and accounting for equipment and supplies needed to support any system during its lifetime. A CLS contract could be established as a Cost Plus contract. This would enable units to secure needed support fast and efficiently and also support analysis of support costs over the life of the article.

## 1.2 COST DATA

| | **6 Year Production Schedule** | **8 Year Production Schedule** |
|---|---|---|
| CMAC 1st Article | $178,550 | $178,550 |
| Tech Data | $35,000 | $35,000 |
| Production CMAC | $139,000 | $128,206 |

As the production schedule is compressed, additional workforce and facilities must be committed to meet schedules. Raw material and hardware savings from a more aggressive production schedule are rapidly offset by labor and facilities cost to meet increased production schedules. Although we anticipate a yearly increase due to cost of materials and labor, labor cost increases significantly going from an eight-year program to a six-year program. The quoted costs are for delivery within the CONUS or to port. This quote is good for 120 days from date of submission.



*"Use or disclosure of data contained on this sheet is subject to the restriction of the title page of this proposal".* 

### 1.3 SCHEDULING

*Notional Schedule is for an Eight Year Production Run*




After First Article approval, production can commence on a negotiated schedule. We have developed a schedule and cost for production based upon the assumed number of systems in the field and extended the production run for a total of eight (8) years, at a delivery rate of one CMAC every two weeks, dependent upon funding and urgency. This could be accomplished within our current facilities and with our current workforce. We have the capability to meet surge requirements should the situation warrant such action.

The new CMAC uses the lessons learned from 20 years of operational use, and our application of those lessons during study and design under Cooperative Research and Development Agreement (CRDA), 00-AAC-02. After all systems are fielded, Spectrum will provide the complete Level-Three drawing package to the government as part of the buy.

## 2.0 QUALIFICATIONS

### 2.1 GENERAL

SPECTRUM SCIENCES & SOFTWARE is a quality oriented ISO 9001-2000 Qualified manufacturing firm located in the Fort Walton Beach, Florida Industrial Park. We specialize in the design, development, manufacture, and functional integration of aircraft, munitions, and ground support equipment. Our staff includes highly skilled managers, administrators, engineers, technicians, inspectors and technical writers. SPECTRUM is a small business that has the required assets, facilities, skilled production personnel, general support staff and a detailed plan to design, build, and deliver a 6,000 pound capacity Combat Munitions Assembly Conveyor (CMAC) system with latest technology, superior quality, on-time, and at a reasonable cost.

### 2.2 WHY SPECTRUM

SPECTRUM understands the problem. Our company has a history of superior performance on major Government contracts. We also have a history of developing functional systems that support the war-fighters need. Our leadership and key personnel collectively have over 100 years of experience in the design, development, manufacture, and use of munitions handling equipment in both peace and wartime environments. We

understand the challenges of developing a functional and durable system from both the user and manufacturers perspectives.

Our design not only exceeds the current system performance, but also incorporates the user perspective, something unique our key personnel bring to the table from their munitions backgrounds. We have the personnel, the facilities, the storage space, the equipment, the procedures, and the resources to manufacture the CMAC and to support it worldwide over the term of any contract (and beyond). SPECTRUM will guarantee our product against defective workmanship for a period of *one year*. Members of our design and management team, as former users, are intimately familiar with the current Munitions Assembly Conveyor and its desirable features, as well as its deficiencies.

### 2.3 SPECTRUM'S SUCCESS STORY (UPDATING THE CURRENT MAC)

During the effort to find a reliable heavy lift hoist, Spectrum conducted an extensive search of industry for new and better sources for hoists and found three possible vendors. From that search, Spectrum was successful in identifying an alternative source for the current 4,000-lb. MAC hoist identified for the A/E32K-3. The current hoist identified in the technical data is from a source outside the US and has become a logistical problem due to the lead-time required to secure repair kits or replacements. The hoist identified by Spectrum provides several advantages over the current hoist.

- The new pneumatic hoist is faster than the present model.
- The new pneumatic hoist comes weight certified to the user.
- The new pneumatic hoist comes with environmentally safe oil.
- The new pneumatic hoist delivery time from the factory is three weeks; the old hoist is 6 months.
- The new pneumatic hoist repair procedure is 30% less expensive and 30% less frequent.
- The new pneumatic hoist costs 25 to 30% less than the present model; a savings of over $3,000.00 per unit replaced.

Spectrum coordinated the stock listing of this new hoist as an alternate item and it has been added to the DLA Inventory. Units are already securing the benefit of our efforts to investigate newer methods and technologies applicable to the MAC.

### 2.4 PAST PERFORMANCE

Spectrum has and is performing on contracts of national and international importance. Some examples are provided in the following paragraphs that illustrate our ability to meet quality standards, timeliness of delivery, and at the agreed price.

**CONVEYOR, MUNITIONS ASSEMBLY**

| 1. Contracting Agency | 2. Contract Number | 3. Type of Contract |
|---|---|---|
| **Ministry of Defense, United Kingdom** | **ALMC2/4782** | **FFP** |
| 4. Total Contract Value | 5. Period of Performance | 6. Contracting Officer |
| **$417,591.00** | **14 November 2002 –31 March 2003** | **A Crawford, Commercial Officer 01480 452451, ext 5045** |
| 7. Program Manager | 8. ACO | 9. Major Subcontractors |
| **Unknown** | **DCH Cooper, Commercial Officer** | **None** |



*"Use or disclosure of data contained on this sheet is subject to the restriction of the title page of this proposal".* 

#### 2.4.1.1 Project Description

Build three (3) Munitions Assembly Conveyors for the Ministry of Defense, United Kingdom. The contract required delivery of three Conveyors, Munitions Assembly, A/E32K-3, NSN 1730-01-202-5141 and three mobility kits for the United Kingdom. The first delivery was required at 180 days for all three items and the mobility kits. We were asked to expedite delivery due to the current world situation. Spectrum is currently ahead of schedule and prepared for early delivery.

#### 2.4.1.2 Relevancy

This contract is for operational conveyors, munitions assembly, similar to the CMAC we are proposing. The UK has requested several alternate items currently approved for use with the MAC. These include the alternate hoist, dolly stops, containers, lights, and table legs. The USAF has approved each item as an optional part for use with the MAC. This demonstrates our ability to meet a schedule, as well as support surge to meet real-world requirements.

**SET, SHIPPING AND STORAGE, MAC CONTAINERS**

| 1. Contracting Agency | 2. Contract Number | 3. Type of Contract |
|---|---|---|
| (1-5) DSC-Phil<br>(6-8) Boeing Corp | (1) SPO560-00-C-031<br>(2) SP0560-01-M-1473<br>(3) SPO560-01-M-0368 / 0389<br>(4) SP0560-01-M-5090<br>(5) SPO560-01-M-C706<br>(6) PO OXN035954-9<br>(7) PO OXN038037-9<br>(8) PO 0XN046920-9 | FFP |
| **4. Total Contract Value** | **5. Period of Performance** | **6. Contracting Officer** |
| (1-5) $711,967<br>(6-8) $405,403<br>$1,117,370 | Mar 17, 2000/Apr 25, 2001<br>Sep 28, 2000/Aug 30, 2001 | (1-5) Mr. Joe McHenry (215) 737-7438<br>(6-8) Roger Bridgewood (562) 593-9639 |
| **7. Program Manager** | **8. ACO** | **9. Major Subcontractors** |
| Shelia Jones (215) 737-7438<br>Mr. Ed Lockner (215) 737-7385<br>Tom Nicoletti (562) 593-9639 | Jo Ann Byrd, DCMA (205) 716-7491 | None |

#### 2.4.1.3 Project Description

Spectrum designed and built over 1000 containers, delivered to over 250 locations in less than a two-year period. From our design we developed a manufacturing process and delivery schedule that met all contract requirements. From our design and testing, we developed item improvements that further enhanced container function. We submitted Value Engineering Change Proposals at no cost to the Government. Our proposals were accepted and the improvements were made. Spectrum organized our manufacturing operation around a "LEAN" manufacturing concept to reduce inventory, reduce cost, and ensure adequate quality control procedures. We employed production cells verses the typical assembly line operation. Each cell was responsible for the items they produced and became very efficient at the task. The result was all containers delivered before required delivery or on time at the prescribed cost, with no discrepancies. Some of these containers have been in the field for over two years and the customer is completely satisfied. These containers will house and support our proposed CMAC.



"Use or disclosure of data contained on this sheet is subject to the restriction of the title page of this proposal". 

#### 2.4.1.4 Relevancy

These contracts are relevant in several ways. Spectrum observed opportunities for functional improvement during our test evaluation process and initiated the engineering change proposal process to the satisfaction of the Defense Logistic Agency Engineers. Each different agency required shipment to several different destinations, much as the CMAC will require. Additionally, these contracts were executed over an extended period-of-time, requiring coordination with several different vendors for on-time delivery of parts and accessories. The size and variety of containers required the efficient layout of the manufacturing and fabrication cells to ensure the smooth flow of raw materials to the finished products. The processes performed for these contracts are similar to the processes that will be used for manufacture of the CMAC.

**GILA BEND AFAF & BARRY M. GOLDWATER RANGES OM&S**

| 1. Contracting Agency | 2. Contract Number | 3. Type of Contract |
|---|---|---|
| 56th Contracting Squadron, 14100 West Eagle Street, Luke AFB, AZ 85309-1217 | F02604-99-C-M001 | FFP |
| **4. Total Contract Value** | **5. Period of Performance** | **6. Contracting Officer** |
| $41,318,063 | 1 May 1999/30 Apr 2004 | Alan Zero |
| **7. Program Manager** | **8. ACO** | **9. Major Subcontractors** |
| Mr. David Mendez (928) 683-6261 FAX#: (928) 683-6239 | Darlene Brown (623) 856-7179 x241 FAX#: (623) 856-3447 | Environmental Management Inc.; Washington Group Intl. |

#### 2.4.1.5 Project Description

Spectrum is the prime contractor responsible for providing the full range of Operations, Maintenance & Support at GBAFAF and BMGR. The Gila Bend Airfield and Barry M. Goldwater Ranges is one of the heavier used National Range complexes. Tasks include Operations Scheduling, Air Traffic Control, Security, Fire Fighting, Vehicle Maintenance, Communications & Electronics, Supply, Billeting, Civil Engineering, Environmental Management, and Quality Management. Spectrum maintains a close working relationship with the Program Manager associated with GBAFAF and BMGR to resolve challenges before they became problems.

#### 2.4.1.6 Relevancy

This contract is highly relevant in that it illustrates our capability to plan for, manage, staff, and execute a contract of comparable dollar size and complexity. The Gila Bend/BMGR is a five year $41 million contract that entails the performance of numerous diverse tasks. The tasks range from construction of hundreds of realistic targets per year, to the operation and maintenance of several threat emitters and communications gear, to the conduct of airfield tower operations and the simultaneous control of multiple flight operations on seven different bombing and gunnery ranges. We are currently in our third option period of this base plus five-option period contract. Our highly successful performance on this contract illustrates our capability to plan, manage, schedule, document, and execute. It also demonstrates our ability to handle complex contract requirements, the implementation of a comprehensive quality assurance program, the management of several large subcontractors, and the delivery of required products and services on time, within budget, and with excellence. Logistics support, cost management, and effective scheduling by Spectrum during the course of this contract has saved the Government a significant amount of funds.



*"Use or disclosure of data contained on this sheet is subject to the restriction of the title page of this proposal".* 

## 3.0 NEED

Spectrum and the Air Force recognized the need for an upgraded MAC long ago. In October 2000, Spectrum and the Air Force entered into a Cooperative Research and Development Agreement (CRDA), 00-AAC-02. It was to better define and refine the requirements for a new system, gain an understanding as to whether it would be best to upgrade current systems or replace them, and design, build and test a new system and components based on newly identified requirements. Relying upon Spectrum personnel's extensive experience, and in cooperation with many Air Force personnel, Spectrum approached the task using well-established principals for defining functional requirements and needs, and by performing a detailed evaluation of what is presently in service that works well.

While the current MAC has served the munitions community and the war-fighter well, changes in operational philosophy and numerous deficiencies dictate the need for an upgrade to the system. Based upon current and future mission needs, coupled with the current system deficiencies, a number of specific new system requirements have been identified. These requirements were reported in our final report submitted to the Air Force under our CRDA. These specific requirements and associated recommendations are summarized as follows:

### GANTRY

Requirement: Upgrade the gantry to accommodate a working load of 6,000 lbs

Spectrum's Recommendation: Use current system design to the extent possible to maintain continuity with systems in current use, and minimize the extent of new engineering required.

### HOISTS

Requirement: All system hoists must support the 6,000 lb. working load requirement.

Spectrum's Recommendation: Replace the current pneumatic hoist with a new, combat-ready, pneumatic hoist that meets required working load capability. Additionally, replace the manual hoist with a combat ready electric hoist with required working load capability.

### HOIST SUPPORT SYSTEMS

Requirement: The trolley system must support the working load requirement.

Spectrum's Recommendation: Replace the current trolley with a powered trolley with required working load capability. Provide both a pneumatic and electric powered trolley. Also, move the trolley stop to accommodate powered trolleys. Place the oiler for the hoist and trolley near the point of use, using modern, more efficient, oiler technology, and change to environmentally friendly oil.

### HOSE TROLLEY

Requirement: Current hose trolley system does not support intense operations and interferes with hoist operations.



*"Use or disclosure of data contained on this sheet is subject to the restriction of the title page of this proposal".* 

Spectrum's Recommendation: Replace current hose management system with a system that supports both pneumatic and electrical lines. New management system must not interfere with combat operations.

### TRIPLE BOMB BAR

Requirement: The Triple bomb bar is rated at 2 ton. It must be able to lift the increased loads and all size munitions that may be assembled.

Spectrum's Recommendation: Redesign the triple bomb bar to handle increased weapon weights and size.

### INTERFACE CONTROL BOARD

Requirement: The ICB must support the requirements of both the heavier duty pneumatic and electric hoists as well as other new system requirements.

Spectrum's Recommendation: Replace current filters and water separation systems with modern, high through-put, and efficient systems. Increase all plumbing to ¾ inch to accommodate the higher air volumes for efficient operations. Provide for electric power connection and distribution for the new hoists and lights.

### LIGHTING

Requirement: Provide quality, reliable, and efficient lights. Provide better distribution of lighting to include the gantry areas as well as the bomb assembly areas.

Spectrum's Recommendation: Replace current lights with modern, efficient, low voltage, easily maintained, broad-spectrum lights. Increase the number of lights from four to six to provide lighting for the gantry work areas.

### RAIL CONVEYOR

Requirement: Provide for an increased life of the Rail Conveyor's load bearing wear rail.

Spectrum's Recommendation: Change the wear rail from a one-time use to a 4x usage rail.

### CONVEYOR DOLLIES

Requirement: Eliminate jamming of the current dollies. Correct the deficiency that allows the dolly rollers to inadvertently fall out. Provide a dolly stop that won't damage the dollies when stopped under heavy load. Provide a mechanism to prevent weapons from bumping one another during assembly.

Spectrum's Recommendations: Redesign the dolly to correct the identified deficiencies by moving bearings, using larger bearings, increase the size of dollies, and design a new dolly stop.

### TOOLS

Requirements: Provide a mechanism to allow on-conveyor torquing of weapons. Also provide a modern pneumatic tool kit to support the needs of the MAC users.



*"Use or disclosure of data contained on this sheet is subject to the restriction of the title page of this proposal".* 

Spectrum's Recommendation: Design, test, and provide a weapon stabilization tool to allow on-conveyor torque up to 650 ft-lbs. Provide modern, ergonomic, durable, and easily maintained pneumatic tools with sufficient speeds and power to meet the MAC user needs.

### CONTAINERS

Requirement: MAC shipping and storage containers must accommodate all MAC components and be transportable on the MHU-110 trailer. Containers must meet air shipping, and other previously specified, container requirements.

Spectrum's Recommendation: Use the Spectrum designed containers currently in use worldwide, modified, if required, to accommodate new or modified components.

Ensure that the new container lids maintain compatibility with the container legs currently fielded.

The CMAC that Spectrum is proposing was designed to meet all of these requirements. Further, a prototype of the system, including its many new components, has been built and tested. The test program, in which Air Force personnel either participated in or monitored, verified that the Spectrum CMAC meets or exceeds all identified combat requirements. Within the development process, an extensive engineering analysis was conducted on each design change, followed by developmental testing. For each Commercial-Off-The-Shelf (COTS) item several vendors were evaluated using cost, functional requirements, availability, and durability as the yardsticks. Our design accommodates current munitions and all identified future munitions assembly requirements. We have mitigated design risk through the use of extensive structural analysis, prototype testing, and the incorporation of technologically advanced COTS items. Selection of COTS items provides reliable data on failure rates and data that can be directly applied to the provisioning process, further mitigating the design risk. The COTS items applied to the design enable us to exceed current capabilities and expedite the fielding process.

# 4.0 DESIGN DETAILS

## 4.1 MAC GANTRY



Problem/Deficiency of Current System:
The current MAC Gantry was designed to accommodate a 4000 lb. working load. To meet current and future mission requirements, a new MAC must provide the capability to accommodate a 6000 lb. working load.

Spectrum's Solution: A structural analysis of the current MAC was performed to determine its real capability and identify its weakest

points. Reinforcement alternatives were formulated and analyzed, and a "best alternative" was selected. The design and structural analysis of this "best alternative" is included in Appendix A. Our design strengthens the main beam and spreader bar to accommodate the required working loads, readjusts and strengthens the attachment points for the leg braces and provides clearance for the powered trolley, and adjusts the system lift points to accommodate the new center of gravity location. All basic dimensions, functionality, and system erection procedures remain the same except for the changes that were necessary for mounting the new lights and hose management system.

A prototype gantry has been built in accordance with our design and successfully tested to the new workload requirements (designed to hold an 18,000 lb. static load, tested to hold a 12,000 lb. static load for ten minutes without permanent deformation, and tested under operational conditions with a 6,000 lb. dynamic load for one hour). These successful tests were conducted and documented under our CRDA and monitored by USAF MMHE Focal Point personnel.

### 4.2 HOISTS

Problems/Deficiencies of Current System: Operating a pneumatic hoist in cold weather is a continuing problem. The current water separation system is simply inadequate. As water builds up in the system, lines freeze, lubricating oils are washed away, seals become brittle and break, and hoists fail prematurely.

Additionally, the current hoist is not domestically manufactured. As a consequence, the time required to obtain parts or replacements has become unacceptably long.

If the main hoist fails, the current backup is a manual hoist. In a wartime bomb production environment, a production rate on the order of one bomb per minute is crucial. This rate is impossible to achieve, much less, maintain with a manual hoist.

Spectrum's Solution: Spectrum's solution to these problems is multifaceted. Our solution successfully addresses cold weather operational problems, the uselessness of the manual hoist as a backup device, the requirement for a 6000 lb. working load capacity, issues of durability, agility, environmental friendliness, and the critical issues of maintainability, availability, and supportability. Our solution uses two types of powered hoists, one is electric, and the other is pneumatic. Both are weight certified to the user and are ready for combat operations upon arrival.

The pneumatic hoist we are proposing is domestically manufactured by Ingersol-Rand, and is prepared by Spectrum to be combat ready. We propose this pneumatic hoist be the primary hoist. It has a 6600 lb. working lift capacity with two fall speeds (8 and 3 ft/min), providing the agility necessary for precision placement of heavy loads on the conveyor dollies and trailer chocks. It has a manual brake release should the primary system fail and switching to the backup becomes necessary. This hoist meets ASME B30.7 specifications with H5 duty classification for non-stop operation, self-adjusting spring-set air-released multi-disc brakes, and a zinc plated load chain. This hoist uses environmentally friendly lubricating oil, and its use rate is less than one fifth that of

current hoists. The oiler for this hoist is mounted atop the gantry near the hoist for increased effectiveness.

We are proposing an electric hoist as the backup hoist, replacing the manual hoist. It is also manufactured by Ingersol-Rand and made combat ready by Spectrum. In cold weather operations (or hot weather for that matter), this hoist can be used as the primary hoist, thus eliminating all concerns regarding water degradation of the pneumatic hoist performance. This hoist is rated at 6,600 lbs., meets ASME B30.16 with H4 duty classification, has a high temperature motor, is UL listed, has self adjusting steel brakes with a lifetime guarantee, NEMA 3R hoist enclosure, NEMA 4X pendant enclosure, a 150% overload clutch, minimum five pocket chain wheels, and a zinc plated load chain. This hoist has two fall speeds (16 and 3 ft/min) again providing the agility necessary for precision placement of heavy loads on the conveyor dollies and trailer chocks. The hoist operates on 460 VAC, 3-phase, 60-Hz power. This hoist has also been successfully tested in Spectrum's Munitions Handling Equipment Laboratory under simulated combat duty cycles.

Major advantages of both hoists are the facts that they are domestically manufactured, made combat ready from COTS by Spectrum, parts or replacement hoists are readily available (less than three week lead time required), and they are ready to support the systems worldwide today.

### 4.3 HOIST TROLLEY

Problems/Deficiencies of Current System: The hoist trolley for the CMAC system must support the 6,000 lb working load requirement. This is not a hard requirement to meet. However, a 6,000 lb. load, because of its inertia, is difficult to start moving and even more difficult and dangerous to stop moving when manually maneuvered. In the tempo of a combat environment this would rapidly exhaust even the most physically fit ammo troops.

Spectrum's Solution: Spectrum's solution is to provide powered trolleys for both the pneumatic and electric hoist systems. We have acquired, made combat ready, and tested two highly suitable powered trolleys. The pneumatic trolley has a continuously variable speed capability providing the necessary agility and power to deftly handle 6,000 lb loads, even when the CMAC gantry is erected on non-level ground. The electric trolley is a two-speed 6,000 lb. trolley that fully supports combat requirements. We tested these systems with one end of the gantry raised one foot higher than the other end. Both trolleys performed very well both up hill and down hill under full load. Both trolleys meet the ASME B30.7 specifications with an H5 duty classification for continuous operation.

The hoist and trolley systems that we are proposing fully meet all operational requirements for the CMAC system and will operate with full effectiveness from power supplied to operate the hoist. These trolleys are matched to the hoist and operate from the same hand control.

### 4.4 TRIPLE BOMB BAR



"Use or disclosure of data contained on this sheet is subject to the restriction of the title page of this proposal". 10

Problems/Deficiencies of Current System: The Triple bomb bar is also rated at 2 ton on the existing MAC. It must be able to lift the increased loads and size of munitions that will be assembled on the CMAC.

Spectrum's Solution: The increased weight demands the need to strengthen the triple bomb-bar to handle the increased load. Spectrum has developed a new triple bomb bar that is longer, has larger cables and hooks, and is designed to handle the increased weights. The triple bomb bar has been redesigned from top to bottom, to increase the capacity from 2 ton to 3 ton, so that no weak link will exist. The size has been widened from 17 inches to 18 inches to accommodate lifting of three 18 inch diameter munitions during loading onto the rail conveyor. The hooks, cable assembly, u-bolts and beam have all been upgraded to be able to repetitively lift the new load requirements with the same factor of safety of 3 to 1.

### 4.5 HOSE/LINE TROLLEY

Problems/Deficiencies of Current System: The current hose trolley design impedes the operation of the pneumatic hoist, is hard to maintain and allows the hose to interfere with hoist operation.



Spectrum's Solution: Develop a system that supports both electric and pneumatic hoist operations, requires little or no maintenance and is easy to install and remove. The CMAC hose/line trolley has been designed to eliminate the problem of cables and electrical lines interfering with normal operations. We have designed a trolley that supports either electrical cable or servicing air hose without binding. Spectrum's trolley is a non-binding simple design made from aluminum. The base of the trolley clamps to the gantry and houses both an oiler and a junction box with 460 VAC watertight receptacles. It can be removed and disassembled for shipment. The trolley extends halfway across the gantry area and holds the hose/line well away from the hoist and hoist trolley mechanisms. Additionally, we have moved the oiling mechanism for the pneumatic hoist to the gantry, ensuring the hoists are always lubricated.

### 4.6 INTERFACE CONTROL BOARD

Problems/Deficiencies of Current System: The interface control board heater and dryer are inefficient and freeze during extreme cold weather operations. There are insufficient electrical outlets for chargers, tools, or other accessories. The oiler is located too far away from the equipment it supports and loses effectiveness.

Spectrum's Solution: Spectrum's newly reconfigured Interface Control Board (ICB) provides dry filtered air to all systems and is capable of operating in both hot and cold weather. It mates with current Air Force mobile generators and air carts. Plumbing size



"Use or disclosure of data contained on this sheet is subject to the restriction of the title page of this proposal". 

on the CMAC has been increased to ¾ inch tubing to provide a greater volume of air to the hoists and hand tools. It includes safety devices to insure inadvertently detached/ruptured hoses do not remain pressurized, eliminating a significant hazard. It provides waterproof receptacles (NEMA 4, 4X and 6, plus IP65 and 67 Standards) for the operation of the hoist, lights and accessories. It also contains 4 additional 120 Volt AC junction boxes for accessories.

### 4.7 LIGHTING

Problems/Deficiencies of Current System: Current sodium vapor light system only illuminates the area between the gantries, does not provide necessary light or redundancy if a bulb quits working, and are slow to reconstitute when power is interrupted. The yellow glow generated from the lights cause increased fatigue after exposure for extended periods.

Spectrum's Solution: Secure new lights that are more user friendly, develop some light redundancy to prevent work stoppage when bulbs blow, and mount fixtures so that they can be directed to the gantry areas, as well as the assembly area. Spectrum has designed new light brackets that can be installed without tools on the gantry. Each gantry is equipped with three (3) 400 watt, UL listed, metal halite lights, two for the assembly area and one for the gantry area, eliminating the need for additional lighting assets when assembling bombs at night. One (1) light in each set of three (3) has a junction box containing three (3) 120-vac receptacles, eliminating separate extension cords to ICB. These lights provide welder quality lighting in the immediate work area between the gantries, and within the gantry areas. This creates significantly less eye-strain and promotes a safer work area.



### 4.8 RAIL CONVEYOR BEARING RAILS

Problems/Deficiencies of Current System: Bearing Rails can only be used once.

Spectrum's Solution: Design Bearing Rails that can be changed end-over-end and side-to side to increase wear. Design a positive brake that does not damage the bomb dolly when heavier weapons are being assembled. Spectrum has modified the Bearing Rails to support their reuse and increases Bearing Rail life by 400% over the current design. The Bearing Rails we designed are the full width of the conveyor and are mounted with holes in the center, so that they can be used on either side and rotated end-over-end.

### 4.9 DOLLY STOPS

Problems/Deficiencies of Current System: The current brake for the rail conveyor damages the bomb dollies and does not positively stop the heavier weight weapons being used. This creates an extreme safety hazard when working with weapons of increased weight.



"Use or disclosure of data contained on this sheet is subject to the restriction of the title page of this proposal". 

Spectrum's Solution: Design new dolly stops. The return rail stops have been replaced with a dolly stop system that uses polyurethane bumpers that cannot damage the dolly bearing and eliminates the possibility of dollies jumping over the stops. These stops are easily and quickly installed and storable on the rail assembly. In the stored position, dollies can pass over the system unencumbered.



### 4.10 CONVEYOR DOLLIES

Problems/Deficiencies of Current System: The conveyor dollies bind with the heavier weapons and the end bearings can be damaged through rough handling. Also, large diameter weapons are bumping each other when pushed down the assembly line.

Spectrum's Solution: Spectrum conducted extensive tests to determine the best method to eliminate the binding and damage problems. After extensive testing and remanufacture, the conveyor dollies have been modified to eliminate diagonal binding by using a larger, sturdier, bearing. Additionally, the bearings have been moved (as depicted) and are protected by the end of the dolly during unloading and bumping. Additionally, the ends of the dollies are being extended *one inch* on each end to ensure that all weapons that might be assembled cannot touch together during travel down the conveyor. Another continuing irritant that has plagued the assembly process is that bomb rollers on the dollies must be easily removable, yet when the dolly is tipped or moved to the return channel, the rollers fall out. We have designed the dolly with a detent in the roller receptacles that will hold the rollers in-place, much in the manner that a socket is retained on a ratchet, yet they can be removed with a minor pull. These changes eliminate the identified problems and have been thoroughly tested and validated.




### 4.11 CONTAINERS

Problems/Deficiencies of Current System: Current containers will support the current MAC. The added equipment creates the need for additional containers or reorganization of containers. Also, a method needs to be devised to provide a suitable work area for personnel when assembling munitions.



Spectrum's Solution: The newly developed Spectrum light kit includes one additional shipping container that meets the current container standard and meshes with the current MAC shipping and storage set. This additional container fits on the MHU-110 with the current containers, and the set will hold the CMAC, eliminating any mobility risk. The whole assembly, in the stored containers, will fit onto a single MHU-



110 trailer and is air transportable in this configuration.

### 4.12 WORK TABLES

Problems/Deficiencies of Current System: When the current Legs have been developed to fit on the container lids to make worktables when the system is employed. The legs are height adjustable, assemble without hand tools, and fit within the current mobility containers. Two of the largest container lids are easily converted into worktables for fuze/booster assembly. The largest container lid, the –30, requires the use of four sets of legs, and the medium container lid, the –20, requires two sets of legs. The lids, when used as tables with the easily attachable legs, will hold over 600 lbs. of tools and accessories. These legs are currently in use today by several units who have already purchased them.

### 4.13 TORQUE DEVICE

Problems/Deficiencies of Current System: There is no approved method or device to safely and effectively torque different adapters while the munitions are on the assembly conveyor system.

Spectrum's Solution: Spectrum has developed a specialized attachment for positively locking down general-purpose bombs to enable technicians to torque the various adapters with over 650 foot-pounds of torque. The weapon can remain on its dolly, the tool can be inserted, and the adapter tightened without moving the weapon to another device. This attachment is easily manipulated, quick to install and remove, and does not require any special hand tools.



### 4.14 TOOLS

Problems/Deficiencies of Current System: Current pneumatic tools are different at each unit. No approved method exists for tool storage during the bomb assembly process.

Spectrum's Solution: Spectrum has identified and tested several off-the-shelf powered hand tools that are adjustable to the various torque settings required during bomb buildup. We have identified modern, ergonomic, durable, and easily maintained pneumatic tools with sufficient speeds and power to meet the MAC user needs. We have designed a tool holding fixture that fits on the rail conveyor for immediate tool storage when tools are normally laid down. This fixture ensures that the tools are readily available and keeps them out of the way and clean when not in use.

### 4.15 MUNITIONS ASSEMBLY CONVEYOR SYSTEM SET-UP

Problems/Deficiencies of Current System: Only a limited number of personnel, tools, and equipment are available to set-up and assemble a munitions assembly conveyor when mobilized.

Spectrum's Solution: Spectrum has maintained the basic setup characteristics of the MAC in the CMAC. We have developed all upgrades so that a crew of 15 personnel can



"Use or disclosure of data contained on this sheet is subject to the restriction of the title page of this proposal". 

assemble the CMAC in less than two hours. Additionally, the various support structures are labeled to facilitate the setup process. Labels are visible and easily readable, making the process of assembly much the same as it is now. No additional tools are required to assemble the CMAC.

## 5.0 LOGISTICS SUPPORT CONCEPT




SPECTRUM is a seasoned veteran in the logistics support arena. We have an established web site to provide worldwide support for the current Munitions Assembly Conveyor (MAC), and will update this site to support the CMAC and MAC throughout the fielding process. We have received many positive comments from our customers on the ease of use; overall product support, and reliability of our logistic support web sites. We have supported the MAC successfully on a continuous basis for over two years and our record speaks for itself. We will build from this legacy to provide a world-class web based logistics support system for the CMAC.

## 6.0 MANUFACTURING CAPABILITY

SPECTRUM entered the manufacturing arena in August 1999. Since that time, SPECTRUM has concentrated on the manufacture of aerospace and munitions handling support equipment. We have the tools, equipment, and capacity to accommodate the production of the CMAC. We have never been late on a delivery, nor have we ever failed to perform. We have a record of over two hundred fifty contracts delivered on time at the contracted price with zero deficiencies over this period.

### 6.1 KEY PERSONNEL

SPECTRUM prides itself on selecting quality personnel for the task at-hand. Our senior staff includes degreed and non-degreed personnel with experience as managers in both the military and civilian environments. As highlighted in these summaries, our staff has extensive hands-on experience with the MAC, as well as other military support equipment. Each individual has an identified backup, with similar experience, to step in and continue the successful operation should a long absence be necessary. The following summaries are for our key staff that will be directly involved in production of the CMAC.

| DIRECTOR OF MANUFACTURING | MR. DWIGHT HOWARD |
|---|---|
| Retired Chief Master Sergeant United States Air Force after 28 years of service. Directed and supervised personnel at all levels of the Munitions Career Field. Managed resources from the entry worker level to Major Command Functional Manager. Reorganized the Air Armament Center Munitions Materiel Handling Equipment (MMHE) focal point into the structure it currently maintains. Responsible for the complete operation of 50,000 sq ft Aircraft/Munitions Support Equipment Manufacturing Operation and a workforce of over 50 people. Completed over 250 Government/Civilian contracts with no late deliveries and 100% customer satisfaction. Completed ISO 9001-2000 Specialist certification for manufacturing. | |

| PROGRAM MANAGER | MR. DANNY BRIDGES |
|---|---|
| Retired Air Force Chief Master Sergeant with over 28 years experience in armament related operations. Major Air Command munitions functional manager. Theater focal point for US State Department officials and the Israel Defense Forces for bed down, accountability and maintenance of 4,000 tons of armament under the War Reserve Stocks-Israel agreements. USAF focal point for evaluating new MMHE, as superintendent of AFCOMAC. | |



"Use or disclosure of data contained on this sheet is subject to the restriction of the title page of this proposal". 

Assisted in the development of the lightweight tow bar, trailer tongue brake-line quick-disconnect initiative, and the brake-line damage problem associated with stacking/unstacking MHU-110 & MHU-141 trailers with a forklift. As SPECTRUM's Quality Manager, he authored our Quality Management System. Company is now ISO 9001-2000 compliant, and US Government qualified.

| LOGISTICS & TECH DATA MANAGER | MR. PAT CARPENTER |
|---|---|

Retired Air Force Captain with over 24 years military experience in armament, command-control, test and combat operations and 15 years experience in civilian industry supporting newly developed military equipment and concepts. Major Air Command staff officer and program manager for AWACS, ABCCC, and Fixed-Wing Gunships. IOT&E Test Operations Director for the AN/TYQ 23 Modular Control Equipment. Conducted the Logistics and Operational Analysis for the AN/TYQ 23 Modular Control Equipment. Participant in the IOT&E of the MJ-4. Developed the Maintenance and Operations Technical Order for the AC-130A/E/H fire control and gun systems. Developed and conducted the Operational Utility Evaluation for Joint Stars.

| SENIOR DESIGN ENGINEER | MR. RANDALL HENNING, P.E. |
|---|---|

A registered Professional Engineer with over twenty years experience. Projects have included the design of automotive lubrication & lifting equipment, fittings, hydraulic cylinders, and pumps for Military contracts and private sector customers. He has also designed batteries to MIL standards and FAA compliance for General Dynamics Corporation. Designed mechanical components for the Navy A-12 Aircraft Program. Audited the entire F-16 bill of material and worked with 52 subcontractors to reduce part numbers and standardize parts per MIL-STD-965A. Has successfully implemented Lean manufacturing flow lines and shortage management systems.

| QUALITY ASSURANCE | MR. FOSTER BROWN |
|---|---|

A retired Air Force Master Sergeant and aircraft crew chief, he has over 20 years experience operating all types of Aerospace ground handling equipment in support of various fighter aircraft. He has over 17 years experience in civilian industry as Quality Assurance Technician and Manager. A certified welder, he has completed Geometric Dimensioning and Tolerance training per ANSI Y14.5, and is our Quality Assurance Manager.

| OPERATIONS MANAGER | MR. LEROY HARRIS |
|---|---|

He has over 15 years of production experience, coordinating the efforts of production control, purchasing, estimating, and management of various shop and trade personnel. A proven efficiency expert for manufacturing operations, Mr. Harris plans, examines, analyzes and evaluates program operations for improvement, and identifies and resolves operational quirks before they become problems. His experience and past performance within the fabrication business in both engineering and production ensures contractual goals, as well as product quality, are met. He interfaces with the Director of Manufacturing on a daily basis to ensure all plant activities and jobs are completed per contractual requirements.

| PLANT MANAGER | MR. MICHAEL DUVAL |
|---|---|

He has over 30 years experience in all facets of manufacturing. He has been a manufacturing plant engineer, system manager, and production manager. With over 15 years experience with CAD, he lends a unique perspective to the manufacturing process. As plant manager, he reviews all drawing packages and assesses the requirements to determine production linking, manufacturing sequencing, personnel allocations, and defining in-process inspection requirements. He is responsible for the smooth and efficient plant operations; managing costs, time, and activities between multiple facilities and functions. He coordinates on a daily basis with the Operations Manager, Quality Assurance Manager, and the Director of Manufacturing.

## 6.2 MANUFACTURING LOCATIONS

Our main facility occupies eight and one-quarter acres at 91 Hill Avenue, in the Fort Walton Beach Industrial Park.

| Facility Location | Mfg | Office | Storage | Total |
|---|---|---|---|---|
| Headquarters, 91 Hill Ave, Fort Walton Beach FL | 22,200 | 15,000 | 6 Acres | 37,200 |
| 755 Lovejoy Road, Fort Walton Beach FL | 10,000 | | | 10,000 |
| Totals | 32,200 | 15,000 | 6 Acres | 47,200 |

### HEADQUARTERS FACILITY



SPECTRUM maintains offices in three states, with our headquarters and main manufacturing plant located in the Industrial Park area of Fort Walton Beach, Florida. Our headquarters building, located at 91 Hill Avenue, consists of 37,200 square feet of space, 22,200 square feet open bay for manufacturing and 15,000 square feet of office space.



### LOVEJOY ROAD FACILITY

We have an additional manufacturing facility located nearby at 755 Lovejoy Road in Fort Walton Beach FL. This facility consists of 10,000 square feet totally dedicated to sheet metal, machine and welding shop activities.

## 6.3 EQUIPMENT

Spectrum's manufacturing facilities are equipped with quality metal cutting, bending, welding, and machining equipment along with a vast array of support and finishing equipment for tool grinding, painting, precision measuring, non-destructive testing, and material handling.

### MACHINE/WELDING SHOP

Our Machine Shop precision machining equipment includes five CNC machining centers (Mori Seiki MH63 4-axis horizontal machining center, MV-80A and MV-80B 3-axis vertical machining centers, MV 35/40 3-axis machining center, and a Lagun HDV-2 3-axis milling machine). The Mori Seiki CNC machining centers are all programmable using our SurfCam software. Additionally we have four Lagun manual mills with digital readouts, numerous manual drills ranging from ½ to ¾ inch, plus tool cutters and tool grinders. Our Machine/Sheet Metal Shop is equipped with five metal cutting band saws. We have a numerically controlled plasma torch and cutting table, a Piranha Notcher, a Niagara 175 ton press brake, a Wysong 12 foot shear with auto squaring arm, and a precision tube-bending machine capable of bending ¼ inch up to 2-inch pipe.

Our Weld Shop is equipped with eleven MIG, five TIG, one spot, and two stick welding machines. All eleven MIG welders are equipped with Miller radiators and Cobramatic wire feeders. The Weld Shop is also equipped with eight (six 5 ft by 5 ft and two 5 ft by 8 ft) Acorn Welding Platens that support a wide variety of general purpose welding applications.

### METAL TREATMENT SHOP

Spectrum's Paint Shop is equipped with a 13.5x 26x9.5 foot environmentally controlled paint booth, and a 40x40-foot drying area. We have the capability for plastic, glass bead, sand, aluminum oxide, and steel ball blasting. We can accomplish passivation per ASTM-967, chem. film per MIL-C-5541, Class 1A & 3 (Clear and Gold), MIL-Spec Coatings; enamel, polyurethane (MIL-PRF-85285), chemical agent resistant coating (CARC, MIL-P-46168) and epoxy (MIL-P-22750).



"Use or disclosure of data contained on this sheet is subject to the restriction of the title page of this proposal". 

**NON-DESTRUCTIVE TESTING AND QUALITY MEASUREMENT**

Our Non-Destructive Testing (NDT) Shop has significant NDT capability. We conduct Liquid Penetrant Testing (visual) in accordance with MIL-STD-6866, SNT-TC-1A, and MIL-I-25135. We also conduct Magnetic Particle Dry Testing in accordance with MIL-STD-1949, and SNT-TC-1A. Inspection tools and equipment include Parker Magnetic Particle Inspection Equipment and a portable Florescent Penetrant Inspection Kit. Our Quality Assurance and Precision Measuring Shop equipment and tools include: Rockwell All Scale Hardness Tester, Mitutoyo Profile Projector (PH-350 Optical Comparator), Mitutoyo Master Height Micrometer, Manometer, Salt Spray Tester, Push/Pull Tester, Transit, Hydrostatic Tester, Psycho-Dyne, Calipers, Micrometers, and Ball Gages.

## 7.0 SUMMARY

Bottom line: **SPECTRUM has all the equipment, material, facilities, people, expertise, to build the Combat Munitions Assembly Conveyor. WE ARE READY!**



*"Use or disclosure of data contained on this sheet is subject to the restriction of the title page of this proposal".* 

# ATTACHMENT A - STRESS ANALYSIS



*"Use or disclosure of data contained on this sheet is subject to the restriction of the title page of this proposal".* 

# UNSOLICITED PROPOSAL

Combat Munitions Assembly Conveyor (CMAC)

PREPARED BY

SPECTRUM SCIENCES & SOFTWARE, INC.

91 HILL AVENUE, FORT WALTON BEACH, FL 32548
Phone (850) 796-0909, FAX (850) 244-9560
Cage Code 1X179 A For Profit Small Business

Presented to the

**DEPARTMENT OF THE AIR FORCE**
**AIR FORCE MATERIEL COMMAND**
**AIR ARMAMENT CENTER/WMO**
**314 W. CHOCTAWHATCHEE AVE. SUITE 104**
**Eglin AFB, FL 32542-5717**

No other federal, state, or local agency or party has received this proposal or has funded its effort.

Submitted on this date, the 19th of February 2003.

Name and Title of person authorized to sign offer: Don Garrison, Chief Operating Officer

Signature: ______________________________

Evaluation/Negotiation Contacts: Dwight Howard, Manufacturing Division Director
Pat Carpenter, Business Development Director

# UNSOLICITED PROPOSAL

Copy 1 of 5

*The data in this proposal will not be disclosed outside the Government and will not be duplicated, used, or disclosed in whole or in part for any purpose other than to evaluate the proposal; provided, that if a contract is awarded to this offeror as a result of or in connection with the submission of these data, the Government will have the right to duplicate, use, or disclose the data to the extent provided in the contract. This restriction does not limit the Government's right to use information contained in the data if obtainable from another source without restriction.*