IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPECTRUM SCIENCES, INC. | ) | |
| | ) | |
| Plaintiff, | ) | No. 04-1366C |
| | ) | (Judge Francis M. Allegra) |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

**FIRST AMENDED COMPLAINT**

COMES NOW, Spectrum Sciences and Software, Incorporated, by and through its undersigned attorney, and sues the United States, and as grounds therefore, hereby alleges:

**General Allegations**

1. Spectrum Sciences & Software, Incorporated is a Florida corporation whose principal place of business is 91 Hill Avenue, Ft. Walton Beach, Florida 32548 ("Spectrum" or "Plaintiff").

2. The United States as represented by the Department of the Air Force, Air Armament Center, is located at Eglin Air Force Base, Florida ("USAF" or "Government").

3. Spectrum has a manufacturing capability that includes personnel with over 100 years experience manufacturing and maintaining munitions support equipment for the United States defense establishment.

4. Spectrum's staff and personnel include individuals with extensive expertise in munitions handling, design, development and deployment, as well as highly

trained scientists, engineers and technicians whose background and experience are relevant to the munitions handling and support equipment fields, including specifically the Munitions Assembly Conveyor ("MAC") (previously named "RAMS" for Rapid Assembly of Munitions System). This munitions handling and support equipment has recently been renamed by the Government to the Munitions Lift Assembly ("MLA"). However, for the purposes of this action, the munitions handling and loading support equipment shall be referred to as the Munitions Assembly Conveyor ("MAC") in these pleadings.

5. As a result of operational problems with the original MAC and the need to update the MAC to accommodate the larger ordinance being utilized by the USAF, the following elements of the original MAC were identified by Spectrum as needing improving and/or upgrading:

a. Gantry – The original MAC was built to handle MK-82, 500 lb bombs with conical fins. The stated bomb buildup rate of one bomb per minute in the Technical Order was based on this size bomb. No other size bombs could be built at that sustained rate. Newer, precision guided munitions were required, with some bomb and guidance kits weighing in excess of 2800 pounds each. The original MAC gantry could not support two of these bombs at once, and the hoist could not lift them.

b. Hoist Trolley – The original MAC had manual trolleys that had to be pulled into position up or down the gantry by hand. These manual trolleys were not only extremely tiring to use, but also dangerous.

c. Torque bar – The original requirement for the MAC was for 500 lb bombs with conical fins. This fin was attached with set-screws, and did not require that the bomb be held in place during tightening. However, modern ordinance rely heavily on laser guidance packages. These packages require installation of a collar (called the forward adapter) that must be tightened to a torque of 600-700 ft/lbs. The collar is radially aligned with the bomb, so the bomb has a tendency to rotate instead of tighten.

d. Lighting – The lighting provided with the original MAC was inadequate.

e. Hoist – After even moderate wear and tear, especially in cold weather, the original MAC's hoist could only lift one bomb at a time, slowing production rates. At temperatures below zero degrees Fahrenheit, the hoist developed ice crystals internally, and cut the seals causing catastrophic failure. The original hoist also used oil that is very hard to find and was very environmentally unfriendly.

f. Dolly Stops – The original MAC had a rudimentary stop to prevent bomb dollies from inadvertently rolling off the rail conveyor. It would prevent bombs from going over the edge at very slow speeds, but not when pushed with authority as often happened when the rail conveyor was not completely level.

g. Interface Control Board – The interface control board supplied with the original MAC needed modernizing to make it more useful, efficient and user friendly, both in the electrical and pneumatic systems.

**COUNT I - BREACH OF EXPRESS CONTRACT**

6. This is an action for damages for breach of an express contract between the Plaintiff and the United States, namely the Cooperative Research and Development Agreement dated October 14, 2000 ("CRADA").

7. The jurisdiction of the United States Court of Federal Claims is conferred by the Tucker Act, 28 U.S.C. Section 1491.

8. Spectrum realleges and reasserts paragraphs 1 through 5 as if fully set forth herein.

9. For over a period of approximately one year prior to the execution of the CRADA, Spectrum engaged in substantial design, development and manufacturing of a full scale, operational laboratory test MAC for the purpose of improving the original MAC.

10. Benefiting from its extensive experience and intellectual capital, and prior to the execution of the CRADA, Spectrum established and developed new replacement part procurement protocols for the original MAC.

11. Benefiting from its extensive experience and intellectual capital, and prior to the execution of the CRADA, Spectrum was uniquely involved in designing and making major modifications and improvements to integral components of the original MAC, which modifications and improvements constituted trade secrets and the intellectual property of Spectrum at the time Spectrum and the USAF entered into the CRADA, including the following :

a. the MAC's gantry design was improved to provide higher weight capacity to the hoist component of the MAC for the newer, precision guided munitions which are substantially heavier than past munitions;

b. the MAC's powered hoist trolley system was automated to allow the MAC to be used more efficiently when the unit is in less than optimal settings and to reduce the strain on human operators by replacing them with automation;

c. a torque bar was designed and introduced to improve the Airmen's capability to add the necessary components for today's high technology munitions;

d. additional lighting was designed and added to the MAC to help illuminate the entire MAC area of operation to include not only the assembly area but also the staging area all around the MAC;

e. a more powerful, dependable, more easily repaired hoist was introduced to increase the MAC's loading capabilities for weight, speed, and number of munitions, and improved its operation in less than hospitable environments;

f. light shipping and storage containers were designed and manufactured for the MAC in order to properly and safely transport the new lighting described in (d.) above;

g. dolly stops were redesigned and added to the MAC's conveyor system to prevent falloff of munitions as they reached the terminal end of the system, especially when the unit was setup on uneven terrain; and,

h. The MAC's air handling system was upgraded including the interface control board to increase electrical power, and adding ¾ inch airlines throughout to improve the pneumatic operation of the entire system.

12. Spectrum expended substantial sums of money for research and development to design, modify and improve the MAC prior to entering into the CRADA.

13. Prior to entering into the CRADA, Spectrum installed a MAC laboratory demonstration area within its manufacturing facility to provide the capability to visualize and test improvements to the current munitions support systems as well as to demonstrate new concepts and designs for munitions handling and support equipment.

14. Prior to entering into the CRADA, Spectrum demonstrated the modifications and improvements that it made to the original MAC to USAF Air Armament Center personnel who visited Spectrum's laboratory to view and assess the improvements. This demonstration of the MAC modifications and improvements to the USAF, which included Spectrum's trade secrets and intellectual property, was made under circumstances where Spectrum and the USAF agreed and understood that such disclosure of Spectrum's prototype, trade secrets and intellectual property was made in strictest confidence.

15. As a direct and immediate result of the substantial research and development and the favorable improvements made by Spectrum on the original MAC, the USAF Air Armament Center requested Spectrum to enter into a Cooperative Research And Development Agreement ("CRADA"), which the parties did on or about October 17, 2000, a copy of which is attached hereto, and incorporated by reference

herein, as Exhibit “A”, pursuant to 15 U.S.C. Section 3710a (as amended) and Air Force Instruction 61-302. The Air Armament Center Munitions Material Handling Equipment (“MMHE”) Focal Point was the primary USAF point of contact for Spectrum under the CRADA.

16. The purpose of the CRADA was to further refine the research, development, design, and testing of the important improvements to the MAC already substantially undertaken by Spectrum.

17. Paragraph 5.1.1 of Appendix A of the CRADA expressly acknowledges that prior to the CRADA Spectrum had engaged in substantial design and development of a product line of munitions handling equipment and that Spectrum specifically claimed intellectual property rights relating to Spectrum’s existing product line and design work related to the MAC.

18. Spectrum’s intellectual property expressly referenced in Paragraph 5.1.1 of Appendix A of the CRADA includes the following:

a. Modification of the gantry to 6,000 pounds load limit;

b. The braking system on the rail conveyor;

c. Improvements to the air handling system including the interface control board to increase electrical power, and ¾ inch airlines throughout to enhance pneumatic operations;

d. Modification to the rail conveyor for torque of guided bomb units (GBU’s);

e. The development of an electric hoist with powered trolly;

f. The new lighting system; and

g. A working table utilizing the container lid.

19. Spectrum's intellectual property referenced in Paragraph 5.1.1 of Appendix A of the CRADA was developed by Spectrum prior to entering into the CRADA.

20. Paragraph 7.1 of the CRADA expressly provides that any proprietary information not developed under the CRADA shall not be disclosed by the parties except in connection with their duties under the CRADA, and then only upon express consent provided in a separate writing. No such separate writing was ever provided to the Government.

21. Pursuant to Section 7.1 of Appendix A of the CRADA, on or about August 15, 2002, Spectrum submitted to the USAF a Final Report of Completion for all the requirements identified in the CRADA.

22. SMSgt. Daniel T. Mank ("Mank") worked for the Defendant at MMHE Focal Point as the superintendent during Spectrum's development of the MAC prior to the CRADA and during the testing and verification of combat capability during the performance of the CRADA. In such official capacity Mank had access to the confidential and proprietary information developed by Spectrum prior to the CRADA alleged in Paragraph 18 and was intimately aware of Spectrum's design, development and testing of the MAC prior to and during the performance of the CRADA.

23. CMSgt. Tom Turner ("Turner") worked for the Defendant at MMHE Focal Point during the period in which the USAF was evaluating the possibility of entering into the CRADA with Spectrum. In such official capacity Turner had access to the confidential information developed by Spectrum prior to the CRADA alleged in

Paragraph 18 Turner continued to be involved with the Government's evaluation and application of the Spectrum's improvements to the MAC during the performance of the CRADA after he was transferred to the 46th test wing at Eglin AFB. In such official capacity, Turner visited Spectrum's laboratory on several occasions, received full briefings and observed all the improvements that Spectrum developed on the MAC, and otherwise had access to Spectrum's confidential and proprietary information developed by Spectrum prior to the CRADA alleged in Paragraph 18.

24. During the performance of the CRADA as well as following Spectrum's submission of the Final Report of Completion of the CRADA, Spectrum presented its ideas and development progress for the MAC, including pictures and drawings, to U.S. military personnel at USAF munitions conferences throughout the United States. These conferences, which included disclosure, description and assessment of intellectual property and proprietary information developed by Spectrum prior to entering into the CRADA, as well as further developments and technologies developed under the CRADA, were conducted by Spectrum only after informing the attendees that such information was confidential and proprietary, and with the express understanding that under Article Seven of the CRADA, such intellectual property and proprietary information would be protected by the Government.

25. Mank and Turner both attended such munitions conferences while in the USAF in their official capacity while involved with the MAC under the CRADA with Spectrum, and in such capacity they were provided official briefings by Spectrum personnel on Spectrum's confidential and proprietary developments of the MAC.

26. Following submission of the Final Report of Completion of the CRADA, the USAF sought to purchase Spectrum's rights in the MAC, including a complete set of drawings of the redesigned MAC. Spectrum refused the USAF's overtures to purchase Spectrum's rights in the redesigned MAC because the USAF offer was inadequate to compensate Spectrum for its total investment in redesigning the MAC and in light of potential licensing opportunities with other government military entities.

27. After the Government failed to purchase the rights to the redesigned MAC from Spectrum, the Government deliberately breached its obligations to Spectrum under the CRADA to safeguard and protect Spectrum's intellectual property and proprietary information by improperly disclosing and widely disseminating to third parties, including competitors of Spectrum, Spectrum's intellectual property and proprietary information in the draft Request for Proposal specifications (dated March 25, 2003) ("draft RFP") and the Final Request for Proposal (dated May 1, 2003) specifications, for the design and production of a Munitions Assembly Conveyor (MAC), Solicitation No. F08635-03-R-0077, issued by the USAF ("Final RFP"). Copies of the draft RFP specification and the Final RFP specification are attached hereto, and incorporated by reference herein, as Exhibits "B" and "C", which solicitations utilized specifications that included Spectrum's intellectual property and proprietary information relating to the redesigned MAC.

28. Although the Government did remove and alter several sections of the draft RFP following strenuous objections made by Spectrum to the USAF that such disclosure was improper and a breach of the CRADA that required the USAF to protect Spectrum's intellectual property and proprietary information relating to the redesigned MAC, the Government deliberately and knowingly again breached the CRADA by

subsequently issuing the Final RFP that further improperly disclosed to third parties (including Spectrum's competitors) Spectrum's intellectual property and proprietary information relating to the redesigned MAC.

29. Without utilizing Spectrum's intellectual property and proprietary information relating to the redesigned MAC, the Government would have been unable to produce the specifications contained in the Draft RFP and Final RFP for the design and production of a Munitions Assembly Conveyor (MAC), Solicitation No. F08635-R-0077.

30. Upon Turner's retirement from the USAF, Turner was employed by Indyne Corporation who contracted with the D&D Machinery & Sales, Inc. to perform the development and engineering part of D&D Machinery & Sales, Inc.'s proposal in response to RFP No. F08635-R-0077. In such capacity Turner was intimately involved with preparing the development and engineering part of D & D Machinery & Sales, Inc.'s proposal. D&D Machinery & Sales, Inc. ultimately was awarded the contract for Solicitation No. F08635-R-0077. Spectrum was the next best valued proposal under this solicitation.

31. Upon Mank's retirement from the USAF, Mank also participated in advising competitors of Spectrum who submitted proposals to Solicitation No. F08635-R-0077.

32. Upon information and belief, during the preparation of the Draft RFP and Final RFP and during the bidding process for RFP No. F08635-R-0077 the USAF personnel knew that Turner and Mank, while employed by the USAF, had been personally and substantially involved with Spectrum's development of the improvements to the MAC prior to and during the performance of the CRADA, and in their official

capacity with the USAF Mank and Turner had access to Spectrum's proprietary and confidential information..

33. Upon information and belief, after they retired from government service, Turner and Mank improperly utilized Spectrum's confidential and proprietary information in breach of the CRADA, and in violation of 18 U.S.C. §1905, to assist Spectrum's competitors submitting proposals on RFP No. F08635-R-0077.

34. Upon information and belief, the above-alleged involvement of Turner and Mank after they retired from the USAF on behalf of Spectrum's competitors violated 18 U.S.C. §§ 207(a) and 207(a)(2) and the regulations promulgated thereunder by the Office of Government Ethics at 5 C.F.R. Part 2637.

35. In connection with Turner and Mank's actions referenced above, the Government breached its obligations under the CRADA to safeguard and protect Spectrum's intellectual property and proprietary information from being improperly disclosed and widely disseminated to third parties, including competitors of Spectrum.

36. The Government further breached its obligations to Spectrum under the CRADA by failing to confer and consult with Spectrum before it published or otherwise publicly disclosed the results of the work as required by Paragraph 7.3 of the CRADA.

37. The Government further breached its obligations to Spectrum under the CRADA by improperly disclosing Spectrum's intellectual property and proprietary information in violation of the CRADA and 18 U.S.C. § 1905 by allowing Turner, as a representative of the contractor who ultimately won the bid on Solicitation No. F08635-R-0077, D&D Machinery & Sales, Inc., to physically view and inspect prototype products for the MAC at AFCOMAC, Beale AFB, California, during the competition

period under Solicitation No. F08635-R-0077. These prototype products for the MAC were designed, developed and manufactured by Spectrum prior to entering into the CRADA, and were provided to the Government by Spectrum as examples of the proprietary improvements made to the MAC under the CRADA and expressly referenced in Paragraph 5.1.1 of Appendix A of the CRADA .

38. Section 7.2 of the CRADA further provides that any designs, technologies or integration of technologies developed solely by Spectrum under the CRADA is proprietary to Spectrum and solely owned by Spectrum.

39. By reason of the conduct of the Government alleged herein, the Government further knowingly and improperly disclosed proprietary information developed solely by, and solely owned by, Spectrum under the CRADA.

40. Spectrum attempted to resolve this dispute with the USAF arising under Section 8.4 of the CRADA by communicating with the USAF officials on several occasions, and upon failing to resolve this dispute, Spectrum requested that the UNIT (as defined in the CRADA) refer the dispute to the REVIEWING OFFICIAL (as defined in the CRADA), but the UNIT refused to refer the dispute to the REVIEWING OFFICIAL, thereby frustrating and exhausting Spectrum's administrative remedies under the CRADA.

41. All of the foregoing breaches by the Government of its obligations under the CRADA have caused irreparable harm and severe financial damage to Spectrum in an amount not less than Three and One Half Million Dollars ($3,500,000.00).

WHEREAS, Plaintiff prays the Court to enter judgment in favor of Plaintiff for monetary damages against the United States in an amount not less than Three and One

Half Million Dollars ($3,500,000.00), and to further award Plaintiff all costs, fees, expenses and attorney's fees as allowed by the Equal Access to Justice Act, 28 U.S.C. Sec. 2412, and other applicable law, and such other and further relief as the Court may deem appropriate.

**COUNT II – BREACH OF IMPLIED IN FACT CONTRACT**

42. This is an action for damages for breach of an implied in fact contract with United States.

43. The jurisdiction of the United States Court of Federal Claims is conferred by the Tucker Act, 28 U.S.C. Section 1491.

44. Spectrum realleges and reasserts paragraphs 1 through 5 and, 9 through 16, and 22 through 40, as if fully set forth herein.

45. Following the submittal by Spectrum of its Final Report on the design and development of the MAC under the CRADA, the USAF indicated its willingness to accept an unsolicited proposal from Spectrum for a 6,000 pound capacity MAC.

46. In response, on or about February 24, 2003, Spectrum submitted to the USAF an Unsolicited Proposal to build a Combat Munitions Assembly Conveyor ("C-MAC"), which proposal was dated February 19, 2003, a copy of which is attached hereto, and incorporated by reference herein, as Exhibit "D" ("Unsolicited Proposal").

47. Spectrum's Unsolicited Proposal disclosed numerous trade secrets and proprietary information of Spectrum, including trade secrets and proprietary information developed by Spectrum following the submittal of the Final Report under the CRADA. The Unsolicited Proposal also included a printed and prominent restrictive legend which prohibited the use or disclosure by the Government of Spectrum's trade secrets and

proprietary information for any purpose other than the Government's evaluation of the Unsolicited Proposal.

48. An implied in fact contract was created when Spectrum submitted its Unsolicited Proposal to the Government, which imposed on the Government an obligation to maintain the confidentiality of Spectrum's trade secrets and proprietary information contained in the Unsolicited Proposal.

49. The Unsolicited Proposal contained the following trade secrets and proprietary information relating to the MAC that were developed by Spectrum before it entered into the CRADA with the Government:

a. Modification of the gantry to upgrade to a 6,000 pounds load limit;

b. The dolly brakes on the rail conveyor;

c. Improvements to the air handling system including the interface control board to increase electrical power, and ¾ inch airlines throughout to enhance pneumatic operations;;

d. Modification to the rail conveyor to allow proper torque of bombs;

e. The development of an electric hoist with powered trolley; and

f. A working table utilizing attachments to shipping container lid: and

g. A new lighting system.

50. The Unsolicited Proposal also contained the following trade secrets and proprietary information relating to the MAC that were developed by Spectrum after the completion of the CRADA:

a. Rail Conveyor Dolly; and

b. Tool holding tray

51. The USAF accepted and purported to review Spectrum's Unsolicited Proposal for the MAC for a full month while the USAF, without informing Spectrum of its true intentions and inclinations, was preparing to issue its own Request for Proposal for the manufacture of the MAC which ultimately, in the form of the draft RFP and the Final RFP as alleged above, improperly utilized and disclosed Spectrum's intellectual property and trade secrets.

52. On or about March 24, 2003, the USAF notified Spectrum that the USAF would not accept Spectrum's Unsolicited Proposal because the USAF had instituted an acquisition program to acquire a C-MAC. This was the first time that the Government informed Spectrum that it was preparing an acquisition program for a MAC or similar system.

53. The next day, on March 25, 2003, the USAF issued the draft RFP, followed by the Final RFP on or about May 1, 2003, for Solicitation No. F08635-03-R-0077 (Exhibits "B" and "C"). As alleged previously herein, by issuing both the draft RFP and the Final RFP the Government knowingly, deliberately and improperly disclosed to third parties (including to Spectrum's competitors) numerous trade secrets and intellectual property developed by Spectrum both before and after the CRADA, and that were contained in the Unsolicited Proposal.

54. The Government knowingly, deliberately and improperly breached its obligation to Spectrum to maintain the confidentiality of the trade secrets and intellectual property of Spectrum contained in its Unsolicited Proposal by releasing the draft RFP

dated March 25, 2003, and the Final RFP dated May 1, 2003, for Solicitation No. F08635-03-R-0077 (Exhibits "B" and "C"), because these solicitations contained these trade secrets and intellectual property misappropriated by the Government from Spectrum's Unsolicited Proposal without the knowledge or approval of Spectrum.

55. The Government further breached its obligations to maintain the confidentiality of Spectrum's trade secrets contained in its Unsolicited Proposal by allowing the contractor who ultimately won the bid on Solicitation No. F08635-03-R-0077 to physically view prototype products developed by Spectrum for the MAC, as well as proprietary information relating thereto, at AFCOMAC, Beale AFB, California, during the competition period under the Solicitation.

56. As a direct and immediate result of the Government's breach of its obligations to maintain the confidentiality of the trade secrets and proprietary information contained in Spectrum's Unsolicited Proposal, the Government has irreparably harmed Spectrum and caused severe financial damage to Spectrum in an amount not less than Three and One Half Million Dollars ($3,500,000.00).

WHEREAS, Plaintiff prays the Court to enter judgment in favor of Plaintiff for monetary damages against the United States in an amount not less than Three and One Half Million Dollars ($3,500,000.00) and to further award Plaintiff all costs, fees, expenses and attorney's fees as allowed by the Equal Access to Justice Act, 28 U.S.C. Sec. 2412, and other applicable law, and such other and further relief as the Court may deem appropriate.

**COUNT III – MISAPPROPRIATION OF TRADE SECRETS**

57. This is an action for misappropriation of trade secrets.

58. The jurisdiction of the United States Court of Federal Claims as conferred by the Tucker Act 28 U.S.C. § 1491.

59. Spectrum realleges and reasserts paragraphs 1 through 5, 9 through 40, and 45 through 55.

60. The Government knowingly, deliberately and improperly misappropriated Spectrum's trade secrets and proprietary information relating to the MAC, including the following:

a. Modification of the gantry to upgrade to a 6,000 pounds load limit;

b. The dolly brakes on the rail conveyor;

c. Improvements to the air handling system including the interface control board to increase electrical power, and ¾ inch airlines throughout to enhance pneumatic operations;

d. Modification to the rail conveyor to allow proper torque of bombs;

e. The development of an electric hoist with powered trolley;

f. New lighting system;

g. A working table utilizing attachments to shipping container lids;

h. Rail Conveyor Dolly; and

i. Tool holding tray

61. This action for misappropriation of trade secrets involve Government conduct arising out of and related to the express contract between Spectrum and the Government, namely the CRADA, and the implied in fact contract arising out of the Unsolicited Proposal, all as alleged above.

62. As a direct and immediate result of the Government's misappropriation of Spectrum's trade secrets, the Government has irreparably harmed Spectrum and caused severe financial damage to Spectrum in an amount not less than Three and One Half Million Dollars ($3,500,000.00).

WHEREAS, Plaintiff prays the Court to enter judgment in favor of Plaintiff for monetary damages against the United States in an amount not less than Three and One Half Million Dollars ($3,500,000.00), and to further award Plaintiff all costs, fees, expenses and attorney's fees as allowed by the Equal Access to Justice Act, 28 U.S.C. Sec. 2412, and other applicable law, and such other and further relief as the Court may deem appropriate.

Dated this 14th day of March, 2005.

s/ Terrance R. Ketchel

KETCHEL & LESTER
4 Eleventh Avenue, Suite 2B
Shalimar, Florida 32579
Tel: (850) 651-5508
Fax: (850) 651-5722
Florida Bar No. 39815

OF COUNSEL:
David A. Dopsovic, Esq.
LASA, MONROIG & VEVE, LLP
2121 K Street, N.W., Suite 800
Washington, D.C.
D.C. Bar No. 391393
Telephone No.: (202) 261-3570
Facsimile No.: (202) 261-3523

Attorney for Plaintiff