No. 04-1366C
(Judge Allegra)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

SPECTRUM SCIENCES AND SOFTWARE INC.

Plaintiff,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

OF COUNSEL:

CHUN-I CHANG
ALAN LUTHY
Department of the Air Force

LAUREN S. MOORE
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 307-6288
Fax: (202) 514-8640

Attorneys for Defendant

MAY 31, 2005

**TABLE OF CONTENTS**

| | | PAGE(S) |
|---|---|---|
| DEFENDANT'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT | | 1 |
| DEFENDANT'S BRIEF | | 1 |
| STATEMENT OF THE ISSUES | | 1 |
| STATEMENT OF THE CASE | | 2 |
| I. | Nature Of The Case | 2 |
| II. | Statement Of Facts | 3 |
| ARGUMENT | | 7 |
| I. | Summary Judgment Should Be Granted In Favor Of Defendant With Respect To Spectrum's Claims That (1) The Draft And Final Request For Proposals Divulged Spectrum's Proprietary Information And (2) The Air Force Improperly Showed Spectrum's Equipment To A Former Employee | 7 |
| | A. Summary Judgment Is An Appropriate Method For The Disposition Of These Claims | 7 |
| | B. The Draft And Final Requests For Proposals Did Not Divulge Spectrum's Proprietary Information | 10 |
| | C. The Air Force Did Not Divulge Spectrum's Proprietary Information To Mr. Turner | 19 |
| II. | Spectrum Has Presented A Claim Upon Which Relief Cannot Be Granted With Respect To Its Allegation That Two Former Employees Of The Air Force Improperly Divulged Proprietary Information Belonging To Spectrum | 22 |
| | A. Standard Of Review | 22 |

**TABLE OF CONTENTS (cont'd)**

**PAGE(S)**

B. The Statutes Upon Which Spectrum Relies Do Not Provide A Cause Of Action Against The United States . . . . . . . . . . . . . . . . . 22

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . 28

# TABLE OF AUTHORITIES

**CASE** **PAGE(S)**

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . 7, 8

Bromley Contracting Co. v. United States, 15 Cl. Ct. 100 (1988) . . . . . . . . . . . . . . . . . . . . 9

Burke Corp. v. United States, 47 Fed. Cl. 340 (2000), aff'd, 277 F.3d 1346 (Fed. Cir. 2002) . . . . . . . . . . . . . . . . . . . . 18

Campbell v. United States, 2 Cl. Ct. 247 (1983) . . . . . . . . . . . . . . . . . . . . 9

Carrier Corp. v. United States, 6 Cl. Ct. 169 (1984) . . . . . . . . . . . . . . . . . . . . 9

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . 8

Coney v. Gibson, 355 U.S. 41 (1957) . . . . . . . . . . . . . . . . . . . . 22

D&S Universal Mining v. United States, 4 Cl. Ct. 94 (1984) . . . . . . . . . . . . . . . . . . . . 9

Frodge v. United States, 204 Ct. Cl. 812 (1974) . . . . . . . . . . . . . . . . . . . . 21

Hawaiian Bituminous & Paving v. United States, 26 Cl. Ct. 1234 (1992) . . . . . . . . . . . . . . . . . . . . 17

Intergraph Corp. v. Intel Corp., 195 F.3d 1346 (Fed. Cir. 1999) . . . . . . . . . . . . . . 21

Kiewit Constr. Co. v. United States, 56 Fed. Cl. 414 (2003) . . . . . . . . . . . . . . . . . . . . 18

Mingus Constructors, Inc. v. United States, 812 F.2d 1387 (Fed. Cir. 1987) . . . . . . . . . . . . . . . 7

Perez v. United States, 156 F.3d 1366 (Fed. Cir. 1998) . . . . . . . . . . . . . . 22

## TABLE OF AUTHORITIES (cont'd)

**CASE** **PAGE(S)**

Polaris Indus., L.P.,
168 F.3d 1320 (Fed. Cir. 1998) . . . . . . . . . . . . . . 21

Ponder v. United States,
117 F.3d 549 (Fed. Cir. 1997) . . . . . . . . . . . . . . . 22

Spirit Leveling Contractors v. United States,
19 Cl. Ct. at 89 n.1 . . . . . . . . . . . . . . . . . . . . 9

Sweats Fashions, Inc. v. Pannill Knitting Co., Inc.,
833 F.2d 1560 (Fed. Cir. 1987) . . . . . . . . . . . . . 8, 9

Thomas Creek Lumber & Log Co. v. United States,
36 Fed. Cl. 220 (1996) . . . . . . . . . . . . . . . . . . 8

United States v. Nofziger,
878 F.2d 442 (D.C. Cir. 1989) . . . . . . . . . . . . . . . 27

United States v. Spearin,
248 U.S. 132 (1918) . . . . . . . . . . . . . . . . . 17, 18

## STATUTES AND REGULATIONS

**PAGE(S)**

18 U.S.C. §§ 207(a) . . . . . . . . . . . . . . . . . . . . . . passim

18 U.S.C. §§ 1905 . . . . . . . . . . . . . . . . . . 22, 23, 24, 26

28 U.S.C. § 1346 . . . . . . . . . . . . . . . . . . . . . . . . . 2

5 C.F.R. § 2637.101 (emphasis added) . . . . . . . . . . . 22, 23,27

INDEX TO DEFENDANT'S APPENDIX


| Document | Page(s) |
| --- | --- |
| USAF CRADA Number 00-AAC-02 | 1-27 |
| Excerpts from the Draft Request for Proposals, dated March 25, 2003 | 28-54 |
| Documents related to Industry Day, April 16, 2003 | 55-81 |
| Sections L and M of the Draft Request for Proposals | 82-111 |
| Excerpts from the Final Request for Proposals, dated May 1, 2003 | 112-133 |
| Contract Award Cover Sheet to D&D Machinery & Sales, Inc. | 134 |
| GAO Bid Protest | 135-46 |
| Declaration of Thomas P. Turner, and attached documents | 147-60 |
| Contract No. F08635-84-C-0301, between the USAF and Ver-Val Enterprises, Inc., dated September 12, 1984 | 161-70 |
| Excerpts from the Draft and Final RFP No. F08635-03-R-0077 | 171-88 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SPECTRUM SCIENCES AND SOFTWARE INC.<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 04-1366C<br>(Judge Allegra) |

DEFENDANT'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT

Pursuant to Rules 12(b)(6) and 56 of the Rules of the United States Court of Federal Claims, and this Court's order dated May 6, 2005, defendant, the United States, respectfully requests that the Court grant our motion for partial dismissal and partial summary judgment upon the issue of liability and dismiss the complaint with prejudice. In support of this motion, we rely upon the pleadings and the following brief and appendix.

DEFENDANT'S BRIEF

STATEMENT OF THE ISSUES

1. Whether the Department of The Air Force ("Air Force") released Spectrum Sciences and Software, Inc.'s ("Spectrum") proprietary information in the draft or final Request for Proposal;

2. Whether the Air Force released proprietary information belonging to Spectrum when it showed a former employee a partially-assembled Munitions Assembly Conveyor during the spring of 2003; and

3. Whether Spectrum's amended complaint states a claim for which relief can be granted with respect to its allegation that two former Government employees improperly divulged proprietary information belonging to Spectrum.

## STATEMENT OF THE CASE

### I. Nature Of The Case

This case arises pursuant to the Tucker Act, 28 U.S.C. § 1491(a)(1), and 28 U.S.C. § 1346, establishing this Court's jurisdiction. Plaintiff, Spectrum, maintains that the Air Force improperly divulged proprietary information belonging to Spectrum in its draft and final Request for Proposals No. F08635-03-R-0077. Spectrum also claims that the Air Force improperly showed a former employee a MAC and related equipment, consisting of proprietary information belonging to Spectrum. Finally, Spectrum alleges that the Government is liable for the actions of two former Air Force employees who allegedly divulged Spectrum's proprietary information to its competitors. As we demonstrate below, the Court should dismiss the latter claim because it is a claim upon which relief cannot be granted pursuant to Rule 12(b)(6) of the Rules of this Court. Moreover, summary judgment upon the issue of liability should be granted in favor of defendant upon plaintiff's remaining two claims.

II. Statement Of Facts

On October 17, 2000, the Air Force and Spectrum entered into a Cooperative Research and Development Agreement ("CRADA"), consisting of a research and development project to demonstrate possible improvements to the Munitions Assembly Conveyor ("MAC"). App. 1-18.[1] The MAC is an existing Government inventory item that has been utilized in the final assembly of munitions by Air Force personnel at bases around the world for several decades. See App. 58. The MAC and its components are manufactured for the Air Force by several firms, including Spectrum; the Government possesses a license to use the designs and drawings for the MAC. App. 61; 161-70.

Appendix A of the CRADA, entitled "Work Plan for Improving Munitions Support Equipment," listed a number of areas in which the existing MAC design was deficient and tasked the parties to cooperate in demonstrating improvements in those areas. App. 12-13. Paragraph 5.1.1 of the CRADA, Appendix A, stated that Spectrum claimed intellectual property rights to its "existing product line, and design work completed on the laboratory RAMS . . . ."[2] App. 14. Paragraph 2.9 of the CRADA defined

[1] "App. ___" refers to the appendix attached to this brief. "Am. Compl. ____" refers to the referenced paragraph of Spectrum's amended complaint.

[2] Spectrum installed a Rapid Assembly of Munitions System ("RAMS") laboratory demonstration area within its facility. App. 11.

proprietary information as "information which embodies trade secrets or which is confidential technical, business or financial information **provided that such information is not generally known, or is not available from other sources without obligations concerning its confidentiality . . . .**" App. 2 (emphasis added).

In accordance with the CRADA, Spectrum submitted a status report dated October 1, 2001, and a Final Report dated August 15, 2002, to the Air Force. App. 19-21; 22-25. These reports outlined Spectrum's progress in demonstrating improvements to the MAC. Id. The CRADA did not require, and Spectrum did not submit, drawings or designs for the purported improvements to the Air Force. See App. 1-18.

Subsequent to the CRADA, on February 19, 2003, Spectrum submitted an unsolicited proposal to sell the Air Force an improved version of the MAC, a product that Spectrum called the Combat Munitions Assembly Conveyor ("CMAC"). See App. 26. According to Spectrum, the CMAC would incorporate improvements that were developed under the CRADA. Id. On March 25, 2003, Air Force contracting officer Karen Turner rejected the unsolicited proposal upon the grounds that there was a pre-existing acquisition under way to satisfy the Air Force's requirement for an improved MAC. App. 27.

Shortly thereafter, the Air Force conducted a competitive procurement to develop and produce the MAC II, an improved version of the MAC. On April 1, 2003, the Air Force released the draft Request for Proposal ("RFP") for the MAC II, RFP No. F08635-03-R-0077. See App. 28-54 (pages from the performance specification for the draft proposal). Two weeks later, on April 16, 2003, the Air Force held a "MAC II Industry Day" at Eglin Air Force Base, Florida. See App. 55-111. The purpose of Industry Day was to discuss the draft RFP and to "help [the Air Force] refine [its] RFP as far as descriptions, cost variances, technical and production issues, etc." App. 57. The participants at Industry Day, consisting of Air Force officials and 22 individuals from private industry, were shown a fully-assembled MAC, some munitions, and the compressor that was used with the MAC. App. 57-58. They were encouraged to closely inspect the MAC, and to ask detailed, technical questions about the MAC and its capabilities, deficiencies, and proposed improvements, as well as take pictures of it. App. 57-61. Mark Hillman, the Air Force's lead engineer for the procurement, "explained how the [G]overnment bought drawings and technical data for the old [MAC] and had to use multiple companies/ manufacturers for parts." App. 61. He also explained how "the designs proposed should be based on what [was] written within the [RFP’s] Performance Spec[ification]." He "[r]eminded everyone

that the purpose of their company [was] to meet [the Government's] performance spec[ification] . . . ." Id.

Spectrum president Dwight Howard, along with Spectrum officials Pat Carpenter, Randy Henning, and Danny Bridges attended Industry Day, as did Tom Turner upon behalf of Weapon Systems Design & Manufacturing ("Weapon Systems"). App. 55-56. Spectrum did not object to the display of the fully-assembled MAC or its related equipment at Industry Day and did not express concern to the Air Force that it believed that the MAC and related equipment shown to the attendees consisted of Spectrum's proprietary information. See App. 55-111.

On May 1, 2003, the final Request for Proposal for the MAC II was electronically published by the Air Force. See App. 112-33 (pages from the RFP's Performance Specification). Approximately two weeks later, on May 13, 2003, Tom Turner, a former Air Force employee and currently an employee of Weapon Systems, visited Beale Air Force Base in California in an effort to gather information for Weapons System's proposal design. App. 147-50 (Declaration of Tom Turner); 151-53; 154-60. During his visit, Mr. Turner was allowed to see a partially-assembled MAC that was used for training purposes. App. 149. The MAC shown to Mr. Turner was indistinguishable from the MAC he saw at Industry Day a month earlier. App. 149 (Turner Decl. ¶ 6). He was allowed to ask technical questions about the MAC, and discussed the MAC

and its capabilities with Air Force personnel. App. 149-50; 151-53; 154-60. Mr. Turner did not see or learn about any designs or drawings concerning the MAC or its related equipment. Id.

On or about August 15, 2003, the Air Force announced that D&D Machinery and Sales, Inc. ("D&D") was the apparent successful offeror in the MAC II competition. App. 134. Spectrum filed a protest with the Government Accountability Office ("GAO") against the award on August 22, 2003, claiming that the Air Force's draft and final RFPs had improperly released Spectrum's proprietary information. App. 135-46. Similar to the complaint in this case, the protest also claimed that the Air Force had improperly allowed one of the potential offerors to view Spectrum's proprietary prototype equipment. The protest was dismissed as untimely by the GAO on September 16, 2003.

## ARGUMENT

### I. Summary Judgment Should Be Granted In Favor Of Defendant With Respect To Spectrum's Claims That (1) The Draft And Final Request For Proposals Divulged Spectrum's Proprietary Information And (2) The Air Force Improperly Showed Spectrum's Equipment To A Former Employee

#### A. Summary Judgment Is An Appropriate Method For The Disposition Of These Claims

Summary disposition is appropriate where there are no genuine disputes as to any material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387 (Fed. Cir. 1987). It is "a salutary

method of disposition designed to secure the just, speedy and inexpensive determination of every action." Sweats Fashions, Inc. v. Pannill Knitting Co., Inc., 833 F.2d 1560, 1562 (Fed. Cir. 1987) (quoting Celotex Corp. v. Catrett, 477 U.S. 317 (1986)). As the United States Court of Appeals for the Federal Circuit emphasized in Sweats Fashions, "the burden is not on the movant to produce evidence showing the absence of a genuine issue of material fact." 833 F.2d at 1563 (emphasis in original). Rather,

> the burden on the moving party may be discharged by "showing" -- that is, pointing out to the [Court of Federal Claims] -- that there is an absence of evidence to support the non-moving party's case.

Id. (emphasis in original) (quoting Celotex Corp. v. Catrett, 477 U.S. at 325).

Once the moving party has met its burden, the non-movant "must proffer countering evidence sufficient to create a genuine factual dispute." Sweats Fashions, 833 F.2d at 1562. The non-movant must, therefore, present sufficient evidence as to the existence of a dispute as to a material fact such that the trier of fact could reasonably find in favor of the non-movant. See Anderson, 477 U.S. at 249-50. A fact is material if it will affect the outcome of the case, and its materiality is determined by the substantive law applicable to the case. Anderson, 477 U.S. at 248; Thomas Creek Lumber & Log Co. v. United States, 36

Fed. Cl. 220, 234 (1996); Spirit Leveling Contractors v. United States, 19 Cl. Ct. 84, 89 n.1 (1989).

The Federal Circuit has delineated the non-moving party's burden as follows:

> The non-movant may not rest on its conclusory pleadings, but under Rule 56, must set out, usually in an affidavit by one with knowledge of specific facts, what specific evidence could be offered at trial. Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd. 731 F.2d 831, 836 (Fed. Cir. 1984).

Sweats Fashions, 833 F.2d at 1562-63. The non-movant's burden to set forth the specific facts that generate the issue for trial, therefore, "is not met by reliance on its pleadings alone, or by conclusory allegations and generalities." Bromley Contracting Co. v. United States, 15 Cl. Ct. 100, 105 (1988); see Campbell v. United States, 2 Cl. Ct. 247, 249 (1983). The non-movant's response "must set forth facts [showing] that there is a genuine issue for trial." Carrier Corp. v. United States, 6 Cl. Ct. 169, 175 (1984); see D&S Universal Mining v. United States, 4 Cl. Ct. 94, 96 (1984). Here, as we demonstrate below, there are no genuine issues of material fact in dispute and defendant is entitled to judgment as a matter of law.

B. The Draft And Final Requests For Proposals Did Not Divulge Spectrum's Proprietary Information

Spectrum claims that the draft and final RFPs contained information that was proprietary to Spectrum, in breach of the CRADA. Am. Compl. ¶ 53; 54. The CRADA, at paragraph 5.1.1, stated as follows:

> 5.1.1 SPECTRUM
>
> Spectrum has supported the development of a product line of munitions handling equipment prior to this AGREEMENT and specifically claims intellectual property rights particularly as related to their existing product line, and design work completed on the laboratory RAMS which includes modification of the gantry to 6000 lbs load limit, the braking system on the rail conveyor, the interface control board to make it electrical/ pneumatic, modification to the rail conveyor for torque of GBU's, the development of a 5500 lb electric hoist with powered trolley, new lighting system and development of a working table with modification of container lid. WMOM will protect Spectrum's proprietary rights in accordance with Article 7 of this AGREEMENT.

App. 14 (emphasis added). As set forth above, the CRADA stated that Spectrum considered its existing product line and design work completed on the RAMS to consist of proprietary information.

Neither the draft nor final RFP mentioned Spectrum's existing product line or contained Spectrum's design work. In fact, Spectrum did not submit designs or drawings for the MAC to the Air Force under the CRADA, or at any time. The RFPs contained performance specifications, as opposed to design

specifications, and identified desired improvements to the MAC, leaving the actual design of the improvements up to the successful offeror. Contract Line Item Number 0001 of the draft and final RFP stated that "[t]he contractor shall design and manufacture one prototype in conformance with Section C and the System Performance Specification, Attachment 2." App. 173; 182 (emphasis added). The improvements are identified in the performance specifications only in terms of desired functional outcomes. No design details are specified. Nowhere is Spectrum's work under the CRADA to improve the MAC design mentioned, and nothing about Spectrum's purported design of improvements to the MAC, under the CRADA or otherwise, is disclosed. App. 28-54; 112-33.

The draft and final RFPs' performance specifications were not identical, but each included numerous requirements for desired improvements to the MAC. Specifically, the draft RFP's performance specifications were as follows:

> 3.2.1 Performance
>
> 3.2.1.1 Loading & Unloading System
>
> The MAC II shall be capable of simultaneously loading and unloading the munitions listed in Table 3.1.2.a from trailers in Table 3.1.2.b. The MAC II shall have capabilities to lift up to three bomb bodies or 2 fully assembled munitions simultaneously as listed in 3.1.2.a. Load and unload features shall be of the same configuration and interchangeable. Safety features shall be included to preclude accidental dropping of the munitions. All move-

ment of munitions during lifting shall be powered. The MAC II loading and unloading system shall have a working strength of 6,000 lbs. If required for cold temperature, alternate load and unload features can be an option. The MAC II shall have a manual brake release for lowering munitions in the event of a power failure.

3.2.1.2 Munition Assembly/Disassembly

The MAC II shall accommodate up to twenty-five, 500-pound class munitions at one time. The system shall facilitate the assembly/disassembly of the munitions listed in Table 3.1.2.a. The MAC II shall allow torquing during munitions assembly to 625 + [or minus] 25 ft-lb. The MAC II shall have a working strength of 12,000 lbs per 10-foot section.

3.2.1.3 MAC II Assembly/Disassembly

The MAC II shall be capable of being assembled or disassembled and repackaged from transport trailers or tow vehicles in Table 3.1.2.b with a maximum of 15 Air Force personnel (AFSC 2 W030/2 W050 as described in AFMAN 36-2108) within 60 minutes using only a 6,000 lbs forklift, minimum hand tools, and no stand alone special tools. Special tooling for assembly may be integrated into piece parts of the MAC II system. Disassembly and repackaging shall use the existing containers and meet the mobility requirements stated in 3.2.1.f. See Table 3.1.2.g for a list of containers with dimensions. An alternate long life reusable storage and shipping containers and/or pallets may be used. See paragraph 3.1.2.g.

3.2.1.4 Unimproved Surfaces & Leveling Devices

The MAC II system, when loaded to its peak capacity shall not impose a pressure on any portion of the bearing surface upon which it is assembled, greater than 5,430 pounds per square foot. The MAC II shall be capable of being safely assembled and used on improved as well as unimproved terrain consisting of a variation in surface height up to 5.25 inches.

The MAC II shall not require anchors for stability.

3.2.1.5 Lighting

The MAC II system shall operate and maintain sufficient light to accomplish the loading and assembly. A lighting level of at least 75 foot-candles shall be maintained over the entire munition assembly/disassembly area at 3 feet above the ground. The lighting levels at the loading and off-loading areas shall be a minimum of 50 foot-candles 3 feet above the ground. The color of the light furnished shall be as near to the natural light as possible. The fixtures furnished shall not require more than 5 minutes of restart time when the light is turned off and back on again.

3.2.1.6 Temporary Storage Area

The MAC II shall have a munition storage area prior to assembly that shall be capable of storing six, 2,000-pound class munition pallets double stacked at one time. Each pallet contains two bomb bodies, and shall allow easy movement of pallets to loading area.

3.2.1.7 Arming Wire Assembly

The MAC II shall have an arming wire dispenser that incorporates a wire straightener and an anti-backlash device, and can accommodate a spool of arming wire with an outer diameter of 9.00 inches, an inner diameter of 2.00 inches, and a width of 8.25 inches. The Arming Wire Assembly shall allow for easy dispensing.

3.2.1.8 Tool Trays

The MAC II shall incorporate at least four moveable tool trays strategically located to allow technicians to efficiently place hand and air tools along the MAC II when not in use. The tray size shall be approximately 12 inches wide and 24 inches long. Hand and air tools shall consist of standard impact wrenches, torque wrenches, ratchets, speed handles,

arming wire pliers, screwdrivers, and ratchet extensions. The tool tray placement and size shall not interfere with the technicians work environment and be of sufficient capacity to accommodate all tools.

3.2.1.10 Tubing Trolleys

The MAC II shall use durable effective tubing trolleys that keep overhead compressed air lines, wires, and/or hydraulic lines (as applicable) safely out of danger and prevent tangling. The tubing trolley shall capture and hold the tubing firmly and resist pulling and tugging.

App. 38-41.

The final RFP's performance specifications were as follows:

3.2.1 Performance

3.2.1.1 Loading & Unloading System

The MAC II shall be capable of simultaneously loading and unloading bomb bodies and fully assembled munitions listed in Table 3.1.2.a from and onto the trailers listed in Table 3.1.2.b. The MAC II shall operate more efficiency (speed and/or weight capacity) than the current MAC. Load and unload features shall be of the same configuration and interchangeable. Safety features shall be included to preclude accidental dropping of the munitions. All movement of munitions during lifting shall be powered. If required for cold temperature, an alternate load and unload features can be an option. The MAC II shall have a manual brake release for lowering munitions in the event of a power failure.

3.2.1.2 Munition Assembly/Disassembly

The MAC II shall accommodate up to twenty-five, 500-pound class munitions at one time. The system shall facilitate the assembly/disassembly of the munitions listed in Table 3.1.2.a. Munition flow from loading to

unloading shall be free and easy without binding. The MAC II shall preclude munitions from interfering with or impacting each other. The MAC II shall also allow munition assemblies to be torqued up to 625+ [or minus] 25 ft-lb. The MAC II shall have a working strength of 12,000 lbs per 10-foot section.

3.2.1.3 <u>MAC II Assembly/Disassembly</u>

The MAC II shall be capable of being assembled or disassembled and repackaged from transport trailers or tow vehicles in Table 3.1.2.b with a maximum of 15 Air Force personnel (AFSC 2W030/ 2W050 as described in AFMAN 36-2108) within 60 minutes using only a 6,000 lbs forklift, minimum hand tools, and no stand alone special tools. Special tooling for assembly may be integrated into the MAC II system. Marking or some other means of identification to facilitate assembly and repacking shall be provided. Disassembly and repackaging shall use the existing containers and meet the mobility requirements stated in 3.2.1.f. See Table 3.1.2.g for a list of containers with dimensions. An alternate long life reusable storage and shipping containers and/or pallets may be used. See paragraph 3.1.2.g.

3.2.1.4 <u>Unimproved Surfaces & Leveling Devices</u>

The MAC II system, when loaded to its peak capacity shall not impose a pressure on any portion of the bearing surface upon which it is assembled, greater than 5,430 pounds per square foot. The MAC II shall be capable of being safely assembled and used on improved as well as unimproved terrain consisting of a variation in surface height up to 5.25 inches. The MAC II shall not require anchors for stability.

3.2.1.5 <u>Lighting</u>

The MAC II system shall operate and maintain sufficient light to accomplish munition loading, assembly, and unloading. A lighting level of at least 75 foot-candles shall be maintained

over the entire munition assembly/disassembly area at 3 feet above the ground. The lighting levels at the loading and off-loading areas shall be a minimum of 50 foot-candles 3 feet above the ground. The color of the light furnished shall not require more than 5 minutes of restart time when the light is turned off and back on again.

3.2.1.6 Temporary Storage Area

The MAC II shall have a munition storage area loading that shall allow easy manual movement of pallets to the loading area. It shall be capable of storing six, 2,000-pound class munition pallets double-stacked at one time. Each 2,000-pound class munition pallet contains two bomb bodies. It shall also be capable of storing seven, 500-pound class munition pallets triple-stacked at one time. Each 500-pound class munition pallet contains six bomb bodies.

3.2.1.7 Arming Wire Assembly

The MAC II shall have an arming wire dispenser that incorporates a wire straightener and an anti-backlash device, and can accommodate a spool of arming wire with an outer diameter of 9.00 inches, an inner diameter of 2.00 inches, and a width of 8.25 inches. The Arming Wire Assembly shall allow for easy dispensing.

3.2.1.8 Tool Trays

The MAC II shall incorporate at least four moveable tool trays strategically located to allow technicians to efficiently retrieve and store hand and air tools. The tray size shall be approximately 12 inches wide and 24 inches long. Hand and air tools shall consist of standard impact wrenches, torque wrenches, ratchets, speed handles, arming wire pliers, screwdrivers, and ratchet extensions. The tool tray placement and size shall not interfere with the technicians work environment and be of sufficient capacity to accommodate all tools.

App. 121-23.

Furthermore, Section M of the draft and final RFPs, entitled "Evaluation Factors for Award," stated that "[t]he Government will evaluate the offeror's ability to develop and manufacture[3] [the MAC] as required by this contract as specified in the System Performance Specification (Attachment 2)." App. 180; 186 (emphasis added). Section M of the final RFP also stated that "[a] sound Systems Engineering process provides for: (1) the translation of requirements (Per[formance] Spec[ification]) into design requirements using a disciplined concurrent integrated approach, (2) compatibility of functional and physical interfaces, and (3) technical risk characterization and management." App. 187 (emphasis added). Indeed, the first requirement listed in both RFPs' "Statement of Objectives" was to "Design a Munitions Assembly Conveyor (MAC) II in accordance with Performance Specification SP20038505." App. 52; 188 (emphasis added).

This Court has held that whether a specification is a design or performance specification is a question of law. Hawaiian Bituminous & Paving v. United States, 26 Cl. Ct. 1234, 1239 (1992)(citing United States v. Spearin, 248 U.S. 132 (1918)). Design specifications "set forth in precise detail the materials to be employed and the manner in which the work [is] to be

[3] The draft RFP used the word "build" in place of the word "manufacture." App. 181.

performed, from which the contractor is "not privileged to deviate ... but is required to follow ... as one would a road map." Id. In contrast, a performance specification "sets forth an objective or standard to be achieved ...," requiring the contractor to exercise its ingenuity in achieving the standard of performance, in selecting the means, and in assuming a corresponding responsibility for that selection. Id. (citing J.L. Simmons Co. v. United States, 188 Ct. Cl. 684, 412 F.2d 1360, 1362 (1969)). Accord Kiewit Constr. Co. v. United States, 56 Fed. Cl. 414, 421 (2003); Burke Corp. v. United States, 47 Fed. Cl. 340, 349 (2000), aff'd, 277 F.3d 1346 (Fed. Cir. 2002).

Here, the above specifications did not detail how the desired improvements were to be achieved. Rather, they set forth the functional outcome of the desired improvement, and relied upon the offeror to create a way to achieve that function. Significantly, Spectrum agrees that the specifications contained in the draft and final RFPs consist of "concepts" or "ideas" as opposed to designs. In its bid protest before the GAO, which also claimed that the Air Force had released its proprietary information in the RFPs, Spectrum asserted that it would "compare the ideas/concepts that were developed by Spectrum and first presented to the USAF by Spectrum in the CRADA reports and in the unsolicited proposal submitted by Spectrum with the requirements contained in the Draft RFP and Final RFP of the Solicitation that

are the subject of this Protest." App. 140. Spectrum and the Government agree, therefore, that not only did Spectrum not provide "design work" to the Air Force under the CRADA, but that the specifications contained in the RFPs state ideas, concepts, or functional outcome, i.e., desired performance, rather than design. Clearly, the specifications were performance, rather than design, specifications. For this reason, and because Spectrum did not submit designs or drawings relating to the MAC to the Air Force, the draft and final RFPs did not divulge proprietary information belonging to Spectrum.

C. The Air Force Did Not Divulge Spectrum's Proprietary Information To Mr. Turner

Spectrum's amended complaint, paragraph 37, alleges that the Air Force improperly divulged proprietary information belonging to Spectrum to a former Air Force employee, Tom Turner. Am. Compl. ¶ 37. Spectrum asserts that, during a visit to Beale Air Force Base at the time of the competition for the MAC II contract, Air Force employees showed Mr. Turner, a former Air Force employee, "prototype products" belonging to Spectrum. Id.

We do not dispute that Mr. Turner visited Beale Air Force Base on May 13, 2003, during the competition for the MAC II contract. App. 149 (Turner Decl. ¶ 4); 151; 154. We also do not dispute that Mr. Turner saw a partially-assembled MAC during his visit and spoke to Air Force officials concerning the capabilities, deficiencies, and desired improvements to the

existing MAC. App. 149-50 (Decl. ¶¶ 6-7). As Mr. Turner stated in his declaration, however, he was shown a generic MAC which was indistinguishable from the MAC that he and the other attendees saw a month earlier at Eglin AFB on Industry Day. App. 149 (Turner Decl. ¶ 6). Mr. Turner was not provided with and did not learn about any drawings or designs for the MAC. App. 149-50 (Turner Decl. ¶¶ 7-8).

Spectrum does not assert that the MAC shown to the participants at Industry Day consisted of its proprietary information. Nor does Spectrum assert that the MAC displayed at Industry Day was manufactured by it. It follows, therefore, that a similar, generic MAC shown to Mr. Turner a month later also would not be proprietary to Spectrum. Indeed, Spectrum cannot demonstrate that the MAC shown to Mr. Turner contained information or improvements that were proprietary to Spectrum.

Even assuming that the MAC shown to the attendees at Industry Day on April 16, 2003, was manufactured by Spectrum and that it was proprietary to Spectrum, it would fall within the CRADA's exception to the definition of "proprietary information." Specifically, paragraph 2.9 of the CRADA stated that proprietary information "means information which embodies trade secrets or which is confidential technical, business or financial information **provided that such information is not generally known, or is not available from other sources without obligations**

**concerning its confidentiality** . . . ." App. 2 (emphasis added). Here, a MAC that was indistinguishable from the MAC later shown to Mr. Turner, was shown to 22 industry officials, including Mr. Turner, on Industry Day, April 16, 2003. The participants at Industry Day were allowed and encouraged to inspect the MAC thoroughly and to ask detailed technical questions regarding its capabilities. Because the MAC shown to Mr. Turner on May 13, 2003, was indistinguishable from the MAC shown to participants at Industry Day, Spectrum cannot complain that the Air Force showed him proprietary information belonging to Spectrum during his visit to Beale AFB. Bonito Boats, Inc. v. Thunder Craft Boats, Inc., 489 U.S. 141, 161 (1989)(trade secrets are of value only before the products embodying them are commercially available); see also Intergraph Corp. v. Intel Corp., 195 F.3d 1346 (Fed. Cir. 1999)(something which is generally known cannot be appropriated as a trade secret); accord Injection Research Spec., Inc. v. Polaris Indus., L.P., 168 F.3d 1320 (Fed. Cir. 1998); Frodge v. United States, 204 Ct. Cl. 812 (1974).

## II. Spectrum Has Presented A Claim Upon Which Relief Cannot Be Granted With Respect To Its Allegation That Two Former Employees Of The Air Force Improperly Divulged Proprietary Information Belonging To Spectrum

### A. Standard Of Review

A motion to dismiss pursuant to RCFC 12(b)(6) for failure to state a claim upon which relief can be granted is appropriate when the plaintiff's alleged facts do not entitle it to a remedy. Perez v. United States, 156 F.3d 1366, 1370 (Fed. Cir. 1998). Dismissal pursuant to RCFC 12(b)(6) is proper only when it is apparent that the plaintiff can prove no set of facts in support of its claim that would entitle it to relief. Ponder v. United States, 117 F.3d 549, 552 (Fed. Cir. 1997)(quoting Coney v. Gibson, 355 U.S. 41, 45-46 (1957)). A case dismissed pursuant to RCFC 12(b)(6) is considered a dismissal upon the merits. Id. at 552-53.

### B. The Statutes Upon Which Spectrum Relies Do Not Provide A Cause Of Action Against The United States

Spectrum alleges that two former employees of the Air Force, Tom Turner and Dan Mank, improperly divulged proprietary information belonging to Spectrum in violation of 18 U.S.C. §§ 1905 and 207(a), as well as 5 C.F.R. Part 2637. Am. Compl. ¶¶ 33-34. Spectrum alleges as follows:

> 33. Upon information and belief after they retired from government service, Turner and Mank improperly utilized Spectrum's confidential and proprietary

> information in breach of the CRADA, and in violation of 18 U.S.C. § 1905, to assist Spectrum's competitors submitting proposals on RFP No. F08635-R-0077.
>
> 34. Upon information and belief, the above-alleged involvement of Turner and Mank after they retired from the USAF on behalf of Spectrum's competitors violated 18 U.S.C. §§ 207(a) and 207(a)(2) and the regulations promulgated thereunder by the Office of Government Ethics at 5 C.F.R. Part 2637.

Am. Compl. ¶¶ 33, 34.

The statutes upon which Spectrum relies, 18 U.S.C. §§ 1905 and 207(a), do not provide for a cause of action against the United States. Specifically, 18 U.S.C. § 1905 states as follows:

> Whoever, being an officer or employee of the United States or of any department or agency thereof, any person acting on behalf of the Office of Federal Housing Enterprise Oversight, or agent of the Department of Justice as defined in the Antitrust Civil Process Act, or being an employee of a private sector organization who is or was assigned to an agency under chapter 37 of title 5, publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties or by reason of any examination or investigation made by, or return, report or record made to or filed with, such department or agency or officer or employee thereof, which information concerns or relates to the trade secrets, processes, operations, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corporation or association; or permits any income return or

> copy thereof or any book containing any abstract or particulars thereof to be seen or examined by any person except as provided by law; shall be fined under this title, or imprisoned not more than one year, or both; and shall be removed from office or employment.

18 U.S.C. § 1905 (emphasis added).

Title 18, United States Code, section 207(a) provides as follows:

> 207. Restrictions on former officers, employees, and elected officials of the executive and legislative branches
>
> (a) Restrictions on all officers and employees of the executive branch and certain other agencies.--
>
> (1) Permanent restrictions on representation on particular matters.
>
> Any person who is an officer or employee (including any special Government employee) of the executive branch of the United States ... and who, after the termination of his or her service or employment with the United States or the District of Columbia, knowingly makes, with the intent to influence, any communication to or appearance before any officer or employee of any department, agency, court, or court-martial of the United States ... in connection with a particular matter-
>
> (A) in which the United States or the District of Columbia is a party or has a direct and substantial interest,
>
> (B) in which the person participated personally and substantially as such officer or employee, and
>
> (C) which involved a specific party or specific parties at the time of such participation, shall be punished as provided in section 216 of this title.

> (2) Two-year restrictions concerning particular matters under official responsibility.
>
> Any person subject to the restrictions contained in paragraph (1) who, within 2 years after the termination of his or her service or employment with the United States or the District of Columbia, knowingly makes, with the intent to influence, any communication to or appearance before any officer or employee of any department, agency, court, or court-martial of the United States or the District of Columbia, on behalf of any other person (except the United States or the District of Columbia), in connection with a particular matter–
>
> (A) in which the United States or the District of Columbia is a party or has a direct and substantial interest,
>
> (B) which such person knows or reasonably should know was actually pending under his or her official responsibility as such officer or employee within a period of 1 year before the termination of his or her service or employment with the United States or the District of Columbia, and
>
> (C) which involved a specific party or specific parties at the time it was so pending, shall be punished as provided in section 216 of this title.

18 U.S.C. § 207(a). The language of both statutes governs the actions and communications of individuals who have left the employment of the United States. Id. Neither statute proscribes communications of persons currently employed by the United States, or provides a cause of action against the United States in the event the statute is not complied with. Id. Instead, the statutes provide for a punishment of an individual who acts contrary to the statutes. Id. The statutes provide that the

subject individual, rather than the United States, "shall be fined under this title, or imprisoned not more than one year, or both" or "shall be removed from office or employment," 18 U.S.C. § 1905, or "shall be punished as provided in section 216 of this title." 18 U.S.C. § 207(a).

Indeed, the United States is the authority that prosecutes violations of 18 U.S.C. § 207(a). Title 5, Code of Federal Regulations, part 2637.101, states as follows:

> (5) The provisions of 18 U.S.C. 207 do not, however, bar any former Government employee, regardless of rank, from employment with any private or public employer after Government service. Nor do they effectively bar employment even on a particular matter in which the former Government employee had major official involvement except in certain circumstances involving persons engaged in professional advocacy. Former Government employees may be fully active in high-level supervisory positions whether or not the work is funded by the united States and includes matters in which the employee was involved while employed by the Government. The statutory provisions are not intended to discourage the movement of skilled professionals in Government, to and from positions in industry, research institutions, law and accounting firms, universities and other major sources of expertise. Such a flow of skills can promote efficiency and communication between th Government and private activities, and it is essential to the success of many Government programs. Instead, only certain acts which are detrimental to public confidence in the Government are prohibited.
>
> (6) Departments and agencies have primary responsibility for the administrative enforcement of the post employment restrictions found in the Act. <u>The Department of Justice may</u>

> initiate criminal enforcement in cases involving aggravated circumstances; agency heads are required to report substantiated allegations of violations of 18 U.S.C. 207 to the Department of Justice and the Director, OGE. * * * Special attention should be given to the need to preserve the free flow of expertise, especially in scientific, technological and other technical areas, from private activities to the Government.

5 C.F.R. § 2637.101 (emphasis added).

In In re Nofziger, 969 F.2d 1138 (D.C. Cir. 1992), the United States Court of Appeals for the District of Columbia Circuit ("appellate court") recognized that, by regulation, the Government was responsible for enforcing 18 U.S.C. § 207, i.e., the Ethics in Government Act. Id. at 1139. Accord United States v. Nofziger, 878 F.2d 442 (D.C. Cir. 1989). The appellate court also ruled that, to obtain a conviction under 18 U.S.C. § 207, the Government had to prove that the former Government employee knew that his communication with his former agency of employment was unlawful. In re Nofziger, 878 F.2d at 448.

Here, paragraphs 33 and 34 of the amended complaint do not assert that Messrs. Mank and Turner wrongly communicated with the Air Force after their employment. Instead, they assert that they wrongly communicated with Spectrum's competitors. Thus, the facts as alleged by Spectrum do not reflect a violation of either statute, not to mention a cause of action against the United States. For these reasons, Spectrum's claim that Messrs. Mank and Turner wrongly communicated with Spectrum's competitors after

they left Government employment, is a claim upon which relief cannot be granted and should be dismissed with prejudice.

## CONCLUSION

For the reasons stated above, we respectfully request that the Court grant our motion for summary judgment and dismiss Spectrum's amended complaint with prejudice.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.

HAROLD D. LESTER, JR.
Assistant Director

s/ Lauren S. Moore

LAUREN S. MOORE
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W.
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202) 307-6288
Fax: (202) 514-8640

Attorneys for Defendant

OF COUNSEL:

CHUN-I CHANG
ALAN LUTHY
Department of the Air Force

MAY 31, 2005

**CERTIFICATE OF FILING**

I hereby certify that on the 31st day of May, 2005, a copy of the foregoing "DEFENDANT'S MOTION TO DISMISS AND FOR SUMMARY JUDGMENT" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system, and that the parties may access this filing through the Court's system.

/s/ Lauren S. Moore