| AWARD / CONTRACT | 1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 350) | RATING DO-C9 | PAGE 1 of PAGES 27 |
|---|---|---|---|
| 2. CONTRACT (PROC. INST. IDENT.) NO. F08635-03-D-0155 | 3. EFFECTIVE DATE 17 Sep 2003 | 4. REQUISITION / PURCHASE REQUEST / PROJECT NO. See Section G | |
| 5. ISSUED BY AAC/WMOK CODE FA8678<br>DEPARTMENT OF THE AIR FORCE<br>AIR ARMAMENT CENTER<br>314 W. CHOCTAWHATCHEE AVE, STE 104<br>EGLIN, AFB FL 32542<br>CHRISTI D. OLEARY 850-882-4686 X339<br>CHRISTI.OLEARY@EGLIN.AF.MIL | | 6. ADMINISTERED BY (IF OTHER THAN ITEM 5) CODE S4404A<br>DCMA SAN ANTONIO<br>615 EAST HOUSTON ST<br>P O BOX 1040<br>SAN ANTONIO TX 78294-1040<br>SCD: C PAS: (NONE) | |
| 7. NAME AND ADDRESS OF CONTRACTOR (NO., STREET, CITY, COUNTY, STATE AND ZIP CODE)<br>D & D MACHINERY & SALES INC<br>2420 W R LARSON ROAD<br>SAN ANTONIO TX 78261-2200<br>(830) 438-2309<br>BEXAR COUNTY | | 8. DELIVERY ☐ FOB Origin ☒ Other (see below)<br>9. DISCOUNT FOR PROMPT PAYMENT N | |
| CAGE CODE 1Y128 | FACILITY CODE | 10. SUBMIT INVOICES (4 COPIES UNLESS OTHERWISE SPECIFIED) TO THE ADDRESS SHOWN IN | ITEM See Block 12 |
| 11. SHIP TO / MARK FOR CODE<br>See Section F | | 12. PAYMENT WILL BE MADE BY CODE HQ0339<br>DFAS-CO/WEST ENTITLEMENT OPER<br>P O BOX 182381<br>COLUMBUS OH 43218-2381<br>EFT: T | |
| 13. AUTHORITY FOR OTHER THAN FULL AND OPEN COMPETITION | | 14. ACCOUNTING AND APPROPRIATION DATA | |

| 15A. ITEM NO | 15B. SUPPLIES/SERVICES | 15C. QUANTITY | 15D. UNIT | 15E. UNIT PRICE | 15F. AMOUNT |
|---|---|---|---|---|---|
| See Section B | | | | | |
| | | 15G. TOTAL AMOUNT OF CONTRACT | | | |

16. Table of Contents



| | SEC | DESCRIPTION | PAGE(S) | | SEC | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I - THE SCHEDULE | | | | PART II - CONTRACT CLAUSES | |
| √ | A | SOLICITATION/CONTRACT FORM | 1 | √ | I | CONTRACT CLAUSES | 20 |
| √ | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 2 | | | PART III - LIST OF DOCUMENTS, EXHIBITS & ATTACHMENTS | |
| √ | C | DESCRIPTION/SPECS./WORK STATEMENT | 10 | √ | J | LIST OF ATTACHMENTS | 27 |
| √ | D | PACKAGING AND MARKING | 11 | | | PART IV - REPRESENTATIONS AND INSTRUCTIONS | |
| √ | E | INSPECTION AND ACCEPTANCE | 12 | | K | REPRESENTATIONS, CERTIFICATIONS AND | |
| √ | F | DELIVERIES OR PERFORMANCE | 13 | | | OTHER STATEMENTS OF OFFERORS | |
| √ | G | CONTRACT ADMINISTRATION DATA | 14 | | L | INSTRS., CONDS., AND NOTICES TO | |
| √ | H | SPECIAL CONTRACT REQUIREMENTS | 16 | | M | EVALUATION FACTORS FOR AWARD | |



CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE

17. ☒ **Contractor's Negotiated Agreement** (Contractor is required to sign this document and return 1 copies to issuing office). Contractor agrees to furnish and deliver all items or perform all services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.)

18. ☐ **Award** (Contractor is not required to sign this document). Your offer on solicitation number , including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary.

| 19A. NAME AND TITLE OF SIGNER (TYPE OR PRINT) | | 20A. NAME OF CONTRACTING OFFICER | |
|---|---|---|---|
| DAVID MARTINEZ, VICE-PRESIDENT | | KAREN S. TURNER | |
| 19B. Name of Contractor<br>by [signature]<br>(signature of person authorized to sign) | 19C. Date Signed<br>AUG 7, 2003 | 20B. United States of America<br>by Karen S. Turner<br>(signature of Contracting Officer) | 20C. Date Signed<br>17 Sep 03 |

NSN 7540-01-152-8069
Previous Editions unusable
ConWrite Version 5.3.7

STANDARD FORM 26 (Rev 4-85)
Prescribed by GSA FAR (48 CFR) 53.214(a)
Created 11 Jul 2003 1:36 PM

315

134

# Fax

SAF/AQCX
(703) 588-7018 (DSN 425)
(703) 588-7915 (FAX)

| | | | |
|---|---|---|---|
| To: | AAC | Jan Kerbow | Fax: 872-1873 |
| | AFLSA/JACN | Carolyn Smith | (703) 696-9084 |
| | AFMC | Lois Todd | 787-7257 |
| From: | Eric Kallner | | |
| Pages: | 12 | | |
| Date: | 8/25/03 | | |

☑ For Action ☐ For Information Only

Subject: GAO Protest B-292751 Spectrum Sciences

| | |
|---|---|
| Solicitation / Contract Number | F08635-03-R-0077 |
| Protest received at GAO | 08/22/2003 |
| SAF/AQCX notified by GAO (7/21/03) | 08/25/2003 |
| Email MOL / COS / TOC due to AFLSA/JACN and SAF/AQCX | ~~09/09/2003~~ |
| Protest Files due to AFLSA/JACN | ~~09/15/2003~~ |
| GAO Decision Due | 12/01/2003 |

AFLSA/JACN will file the agency response to this protest. Please ship the protest files via Federal Express to:

AFLSA/JACN
Attn: Carolyn Smith (703) 696-9053
1501 Wilson Blvd, Room 606
Arlington, VA 22209-2403

cc: SAF/GCQ (Mr Hughes) 703 697 3796

265

# NOTICE OF BID PROTEST

August 22, 2003

B-292751-1

Via Facsimile No.: (202) 512-9749

Office of General Counsel
General Accounting Office
441 G. Street, N.W.
Washington, D.C. 20548

2003 AUG 22 PM 2:23

Attention: Procurement Law Control Group

Re: Solicitation No. F08635-03-R-0077

COMES NOW, Spectrum Sciences & Software, Inc. ("Spectrum"), by and through its undersigned attorney, and files this Pre-Award Protest ("Protest") pursuant to the Federal Acquisition Regulations ("FAR") Part 33.104, 4 Code of Federal Regulations, Part 21 (4 CFR Part 21), The Competition in Contracting Act of 1984 and the Federal Acquisition Reform Act of 1996, and states as follows:

1. This Protest is filed on behalf of Spectrum Sciences & Software, Inc. whose address is 91 Hill Avenue, Fort Walton Beach, Florida 32548, whose electronic mail address is dhoward@specsci.com, whose telephone number is (850) 796-0909; and whose facsimile number is (850) 244-9560.

2. The contracting agency is the Department of the Air Force Air Armament Center, 314 W. Choctawhatachee Avenue, Suite 104, Eglin Air Force Base, Florida 32542; The Contract Solicitation Number is F08635-03-R-0077 ("Solicitation").

3. The following history and background of Spectrum's development of the Munitions Assembly Conveyor ("MAC") is presented in order to explain the origin and

development of the proprietary data included in the Solicitation that is the basis of this bid protest.

On October 17, 2000, Spectrum Sciences & Software, Inc. entered into a Cooperative Research and Development Agreement ("CRADA") with USAF Air Armament Center, a copy of this CRADA is attached as Exhibit "A". The stated purpose of this CRADA was "to provide a vehicle for the research, development, design and fielding of improved munitions handling and loading support equipment" (Section 1.0 of Appendix A of the CRADA). Specifically, the work plan for improving munitions support equipment contained in Appendix A of the CRADA lists specific improvements to the Munitions Assembly Conveyor (MAC) as the primary goals of the CRADA

Immediately following the execution of this CRADA, Spectrum initiated efforts to identify problem areas and developed solutions to upgrade the 4,000 lb. MAC. Within weeks a new 4000 lb. hoist was developed and delivered to the field. This new hoist included numerous technological improvements, provided a significant cost savings and improved the delivery time to the field. This hoist has been stock-listed at DLA by Spectrum and is presently being utilized in the field. The National Stock Number and Part Number for the 4,000 lb. hoist is: Stock Number 3950-01-495-8679, Part Number SS01030001. Spectrum has proprietary rights pursuant to Paragraph 7.4 of the CRADA in this 4,000 lb. MAC.

During the development of the 6,000 lb. MAC, Spectrum submitted an interim status report to document the progress on the CRADA. A copy of this interim report dated October 1, 2001 is attached as Exhibit "B".

In addition to the improvements made to the existing MAC, Spectrum designed, developed and tested the following these technologies and integration of technologies, all of which have been included in the Solicitation that is the subject of the Protest: (a) A new 6,000 lb. Hoists, Electric and Pneumatic, with power trolleys, (b) A new Interface Control Board that will serve the hoist, power tools and power supplies; and (c) A new Torque Bar for use in torqueing of Guided Bomb Units (GBU's) on the MAC.

Further, Spectrum integrated the technologies to design and develop a new lighting system and to upgrade the Rail Conveyor/Dolly. In addition, a new container for lights was developed which was already accepted as proprietary by the Government.

The above listed items were tested at both Spectrum's equipment laboratory and at USAF field units. In each test they met or exceeded the USAF Combat Munitions Production requirements.

On August 15, 2002, Spectrum submitted a final report of completion for all the requirements identified in the CRADA through the Material Handling Equipment (MMHE) focal point were conducted. A copy of this final report is attached as Exhibit "C". During the past two years Spectrum has briefed its ideas and development progress for the Munitions Assembly Conveyor (MAC), including pictures and drawings, at munitions conferences throughout the USAF. These conferences, which highlighted the development and testing of technologies and integration of technologies for use in the development of a 6,000 lb. capable Munitions Assembly Conveyor, were conducted by Spectrum with the express understanding that under Paragraph 7 of the CRADA such proprietary information developed by Spectrum would be protected by the Government. Unfortunately, as outlined in greater detail below, the

Government utilized substantially all of the proprietary data developed by Spectrum under the CRADA in the development of the Solicitation, and contained such proprietary data in the specifications included in the Solicitation.

Thereafter, following submittal of its final report on the design and development of the MAC under the CRADA, USAF personnel indicated their willingness to accept an unsolicited proposal for a 6,000 lb. capable MAC. The unsolicited proposal relating to a 6,000 lb. capable MAC was submitted by Spectrum on February 24, 2003. A copy of the unsolicited proposal is attached as Exhibit "D". After approximately thirty (30) days, on or about March 24, 2003, Spectrum was notified that the Government could not accept their unsolicited proposal due to the acquisition program already being in place, which program Spectrum had not previously been informed about. However, as outlined in more detail below, the Government apparently reviewed Spectrum's unsolicited proposal and utilized at least two specific elements of the unsolicited proposal that were not a part of the final report for the CRADA, and also inserted these elements into the Solicitation that is the subject of this Protest.

unsolicited proposal. 2 elements used

4. The basis of this Protest is the misuse of proprietary data developed by Spectrum in the draft RFP and the final RFP of the Solicitation. Specifically, this misuse of Spectrum's proprietary data falls into two categories.

First, the Government's use of data developed by Spectrum in the Solicitation was violative of Spectrum's proprietary rights pursuant to the expressed language of the Cooperative Research and Development Agreement (CRADA) entered into between USAF Air Armament Center and Spectrum. As noted below specific technologies developed and applied by Spectrum in the development of the 6,000 lb. capable MAC that is the subject of the Solicitation was an

improper use of Spectrum's proprietary data. Previous rulings of the GAO have stated that it is appropriate that the GAO consider claims of misuse of proprietary data "in order not to give any semblance of approval to improper disclosures of data and so as not to expose the Government to liability for damages resulting from the disclosures". Matter of Celesco Industries, Inc., 1976 WL 9798 (Comp.Gen.), B-186, 596, 76 2 CPD P 203, citing Data General Corporation, B-185897, April 28, 1976, 76-1 CPD 287. Use of such data would also be in violation of FAR 3.104-5, and 27.400 et. seq. The law is also well established that "any combination of designs in components which affords one a competitive advantage or represents, in some considerable degree, independent efforts, is a protectable secret and that sufficient similarity between two designs provides a legal basis for finding misappropriation". To the Secretary of the Air Force, 40 Comp.Gen.28, 1969 WL 4668 (Comp.Gen.), B-165,542, 1969 CPD P47, citing Smith v. Dravo Corporation, 202 F.2d 369, 373; Imperial Chemical Industries Ltd. v. National Distillers and Chemical Corporations, 342 F.2d 737, 742; and International Industries v. Warren Petroleum Corporation, 99 F.Sup. 907, 914, Firmed 248 F.2d 696. The similarities detailed below clearly explain the similarities between both the unsolicited proposal and the technologies developed by Spectrum under the CRADA.

GAO hears case

The following information will compare the Ideas/concepts that were developed by Spectrum and first presented to the USAF by Spectrum in the CRADA reports and in the unsolicited proposal submitted by Spectrum with the requirements contained in the Draft RFP and FINAL RFP of the Solicitation that are the subject of this Protest:

(1) Gantry. The 6000 lbs. gantry was designed and tested by Spectrum to verify the concept and combat capability under the CRADA. It was also identified in Spectrum's unsolicited proposal as

a concept and combat capable. The draft RFP utilized Spectrum's 6000 lb requirement and the FINAL RFP utilized Spectrum's requirement to lift fully assembled 2000 lbs bomb bodies weighting approximately 5600 lbs. The evaluation notice also utilized Spectrum's 6000 lb. requirement.

(2) Powered Trolley. The Powered Trolleys were designed and tested by Spectrum to verify the concept and combat capability under the CRADA. They were also identified in Spectrum's unsolicited proposal as a concept and combat capable. The draft RFP and the FINAL RFP utilized Spectrum's concept that all munitions movements must be powered.

(3) Hose Trolley. Hose Trolleys were designed and tested by Spectrum to verify the concept and combat capability under the CRADA. They were also identified in Spectrum's unsolicited proposal as a concept and combat capable. The draft RFP utilized Spectrum's Tubing Trolley that was same concept as Spectrum had provided in CRADA and its Unsolicited Proposal. Spectrum challenged government at industry day for using these items Spectrum had developed and language referring to the Tubing Trolley was removed. However, the FINAL RFP still utilized Spectrum's required hose management system that holds any airlines, wires and or pneumatic lines firmly and resist pulling and tugging.

(4) Compressed Air Source. Air management system was designed and tested by Spectrum to verify the concept and combat capability including ¾ inch airlines through Spectrum's system in CRADA. This system was also identified in Spectrum's unsolicited proposal as a concept and combat capable. The draft RFP requires ¾ inch airlines through our system, and the FINAL RFP also requires ¾ inch airlines throughout system.

(5) **Light receptacles.** Spectrum designed and tested, 4 ea. 120V light receptacles in the CRADA for concept and combat capability. These receptacles were also identified in Spectrum's unsolicited proposal as a concept and combat capable. The draft RFP utilized Spectrum's 4 ea. 120V light receptacles, and the FINAL RFP utilized Spectrum's 4 ea. 120 V light receptacles.

(6) **Torque Bar.** Torque Bar was designed and tested by Spectrum to verify the concept and combat capability in the CRADA. It was also identified in Spectrum's unsolicited proposal as a concept and combat capable. The draft RFP utilized Spectrum's torque method to hold munitions while being torqued, and the FINAL RFP utilized Spectrum's torque method to hold munitions while torqued.

(7) **Lighting.** New lighting was designed and tested by Spectrum to verify the concept and combat capability and to get new lighting as close to natural light as possible in the CRADA. This new lighting was identified in Spectrum's unsolicited proposal as a concept and combat capable. The draft RFP utilized Spectrum's light requirement for munitions production area and natural light requirement, and the FINAL RFP utilized Spectrum's light requirement for munitions production area and natural light requirement.

(8) **Rail Conveyor Dolly.** The new rail conveyor dolly was designed and tested by Spectrum to verify the concept and combat capability and eliminate binding with heavy weapons after the final report was submitted on the CRADA. This Rail Conveyor Dolly was first identified in Spectrum's unsolicited proposal as a concept and combat capable and improved to prevent munitions binding and from touching during assembly. The draft RFP utilized Spectrum's requirement to prevent munitions from touching during assembly and allow easy movement. The

FINAL RFP utilized Spectrum's requirement to prevent munitions from touching during assembly and prevent binding.

(9) Tool Holding Fixture was first developed by Spectrum after the final report under the CRADA and was first identified in the unsolicited proposal as a concept and combat capable. Both the draft RFP and FINAL RFP utilized Spectrum's requirement for tool tray to hold tools.

(10) Hoist. Spectrum's Final Report under the CRADA identified a two hoist requirement, one electric and one pneumatic. These requirements were also identified in Spectrum's unsolicited proposal as a concept and combat capable. The draft RFP utilized Spectrum's two-hoist requirement, one electric and one pneumatic, and the FINAL RFP also utilized Spectrum's powered munitions movements.

(11) MAC Storage and Shipping Containers that are presently in use throughout the USAF are proprietary to Spectrum and were identified in the Draft RFP and final RFP with sizes and drawing to be provided to all competitors. Spectrum's containers were displayed at Industry Day even though Spectrum objected to the Government Program Manager.

(12) Spectrum's Impaired/Proprietary Items. Air Force Combat Ammunition Center personnel told Spectrum that a competitor was allowed to view Spectrum's actual improved proprietary items at the Center with the permission of the Eglin Air Force Base Contracting Officer during the open period of the RFP.

Secondly, the similarity between the procurement Specifications soliciting a 6,000 lb. capable MAC that is the subject of this Protest, and the unsolicited proposal submitted by Spectrum (as detailed above) to furnish that same item "raises the presumption the Offeror's proprietary data was improperly disclosed, and the Contracting Officer unable to identify the

source of the material used in writing specifications, their use by the Government to consummate a competitive procurement without the developer's consent would violate the obligation of the Government not to divulge the proprietary data..." To the Secretary of the Air Force, 1969 WL 4668, (Comp. Gen.) B-165,542, 1969 CPD P 47. The use of data contained in Spectrum's unsolicited proposal in this solicitation is also in clear violation of FAR 15.609(d) which states that "all Government personnel must exercise extreme care to ensure that the information in this proposal is not disclosed to any individual who has been authorized access to such data in accordance with FAR 3.104; and is not duplicated, used or disclosed in whole or in part for any purpose other than evaluation of the proposal, without the written permission of the Offeror (underlining added)". Such written permission was never received from Spectrum for use of their proprietary information that was submitted in their unsolicited proposal to develop a 6,000 lb capable MAC in which data was ultimately included (as noted above) in the draft RFP and Final RFP of the Solicitation that is the subject of this Protest.

5. The Protest is timely and in accordance with 4 CFR Part 21, Section 21.2(a)(1). In the event that this Protest is untimely, this Protest should be considered by GAO pursuant to Section 21.2(c) due to the fact that this Protest clearly raises issues significant to the procurement system. Specifically, this Protest raises significant issues as to the applicability of the proprietary protections under the Cooperation Research and Development Agreement (CRADA). The CRADA is a widely utilized research and development tool utilized in the U.S. Department of Defense to encourage technology transfer, examine and implement message to encourage such transfer, to encourage diversification of defense laboratory and to coordinate such technology transfer within the military community. 10 U.S.C.A. Section 2514. In fact, if the appropriation

by the U.S. Government of proprietary data developed under Cooperative Research and Development Agreements as evidenced by this Protest were to become widely known within the civilian contractor community, the CRADA and cooperative development of technologies between the civilian and military communities would be greatly diminished, thereby dramatically harming the military mission and defense of the United States. For this reason the resolution of this issue would be of widespread interest of the procurement community and therefore should be considered under the significant issue exception (see 4 CFR Section 21.2(c) of GAO's Bid Protest Procedures), if the Protest is deemed untimely. Matter of Cal Capital Exports, 62 Comp. Gen. 345, 1983 WL 26204 (Comp. Gen.) B-209,070, 83-1 CPD P 429. This exception should be further considered due to the fact that this issue of widespread interest to the procurement community has not been considered on the merits in a previous decision. Emerson Electric Co. – Reconsideration, B-220517.2, Nov. 26, 1985, 85-2 CPD P 607. Finally, this exception under 4 CFR Section 21.2(c) should be invoked because it involves improper action by the Government that is "clearly inconsistent with statute and regulation" thereby warranting invoking the significant issue exception to the timeliness rules. Matter of Adrian Supply Company – Reconsideration, 66 Comp. Gen. 367, 1987 WL 96929 (Comp. Gen.), B-225,4440, B-225440.2, 87-1 CPD P 357. This is clearly the case in this Protest as the government violated regulations and statutes when they utilized proprietary information contained in the unsolicited proposal and utilized such data in the Solicitation. For all these reasons the GAO should consider this Protest even in the event that it is deemed untimely.

6. Due to the complexity of both of the facts supporting the Protest as well as the technology upon which this Protest is based, as well as the significant procurement issues raised

in this Protest, Spectrum requests a hearing to resolve this Protest pursuant to Section 2.1(d)(3) of GAO's Bid Protest Regulations in order to determine the rights of the Government to use such Proprietary Data developed under the CRADA.

7. Based on the above and the record as developed during this Protest proceeding, Spectrum requests that the GAO issue a ruling sustaining this Protest, and directing the Department of the Air Force Air Armament Center to:

(a) Negotiate a sole source contract with Spectrum; and

(b) Award Spectrum its costs, including attorneys fees.

8. In light of the proprietary nature of the information contained in this Protest, Spectrum hereby requests the Comptroller General to issue a protective order limiting the release of documents to persons approved by the GAO. This is made pursuant to Section 21.1(d)(1) of GAO's Bid Protest Regulations.

9. A copy of this Protest is being delivered by overnight mail to the Department of the Air Force, 314 W. Choctawhatchee Avenue, Suite 104, Eglin Air Force Base, Florida 32542.

Terrance R. Ketchel, Esq.
TERRANCE R. KETCHEL, P.A.
126 NE Eglin Parkway
Fort Walton Beach, FL 32548
Florida Bar No. 398152
Attorney for Protestor

TOTAL P.12

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPECTRUM SCIENCES AND SOFTWARE, INC., Plaintiff, | ) | |
| v. | ) | No. 04-1366C (Judge Allegra) |
| THE UNITED STATES, Defendant. | ) | |

DECLARATION OF THOMAS P. TURNER

In accordance with Title 28, United States Code, section 1746, I, Thomas P. Turner, a former employee of the United States Department of the Air Force ("Air Force"), make the following declaration with respect to the above-captioned case. I am aware that this declaration may be filed in the United States Court of Federal Claims and that this declaration is the legal equivalent of a statement under oath. I also realize that I may be called as a witness in this case to provide testimony on the information contained in this declaration.

1. I was employed by the Air Force from August 16, 1973 until March 1, 2002. My last position with the Air Force was as the 46th Test Wing Weapons Manager at Eglin Air Force Base, Florida. I had no involvement with the Munitions Assembly Conveyor ("MAC") in this position. From April, 1991, until February 1997, I was employed by the Air Force, MMHE Focal Point, as the Superintendent of Advanced Programs. As Superintendent of Advanced Programs in the MMHE Focal Point, I

was the program manager for the munitions-robotics loader, advanced test equipment, and the linkless 20 mm ammunition loading system. Although I was familiar with the MAC, I had no involvement with it in this position either. At no time during my employment with the Air Force did I see or learn about any designs or drawings for or related to the MAC. While employed by the Air Force I learned indirectly that Spectrum Sciences and Software, Inc. ("Spectrum") was working on improved designs for the MAC and its shipping and storage containers. However, I never received any specific information concerning the nature of this work. I had no involvement with the Cooperative Research and Development Agreement ("CRADA") between Spectrum and the Air Force. I have no knowledge concerning Spectrum's development of any particular improvements to the MAC, either before, during, or after, the CRADA. I have no recollection of ever attending any meeting or conference at which Spectrum presented information relating to the MAC.

2. I retired from the Air Force on March 1, 2002. On February 24, 2003 I became the sole proprietor of Weapons System Design and Manufacturing ("Weapons System"). Weapons System's purpose was to provide consulting services to corporations that were going to compete for Government programs, specifically related to weapons or munitions.

3. Weapons System was a consultant to D&D Machinery and

Sales, Inc. ("D&D"). D&D was one of several firms that previously manufactured the MAC, and D&D competed in the competition for the MAC II contract solicited by the Air Force in the spring of 2003.

4. On May 13, 2003, approximately two weeks after the Air Force issued the final Request for Proposal for the MAC II contract, I visited Beale Air Force Base in California, in an effort to gather information for D&D's upcoming proposal for the MAC II contract.

5. During my visit I met with and was escorted to the Munitions Storage Area by Master Sergeants ("MSgts.") Robert Clarke and Ron Morris. It was my understanding that MSgts. Clarke and Morris were allowed to provide me with unclassified information regarding the MAC.

6. We went to see a partially-assembled MAC that was set up in one of the maintenance buildings. It was my understanding that this partially-assembled MAC was used for training purposes. We went over the partially-assembled MAC thoroughly. I do not know who manufactured the MAC that I saw. The partially-assembled MAC that I saw at Beale Air Force Base was indistinguishable from the partially-assembled MAC that I saw at Industry Day at Eglin Air Force Base, one month earlier.

7. Although we discussed the MAC and its features, I did not see or learn about any designs or drawings for or related to

the MAC. I understood that the Government owned the drawings and designs for the MAC, and provided them to various contractors which built the MAC pursuant to contract. We simply discussed the MAC and its capabilities, as well as desired improvements to the MAC. To the best of my knowledge, the information I received was not proprietary to any firm.

8. On the same day that I visited Beale AFB, I wrote notes concerning my visit. Exhibit A. The next day, May 14, 2003, I typed a trip report memorializing my visit. Exhibit B. Neither my notes nor the trip report contain designs or drawings for the MAC or its related equipment. Exhibits A, B.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 26th day of April, 2005, at Pittsburgh, Pennsylvania.

Thomas P. Turner

Notarial Seal
Amy A. Kopec, Notary Public
Pine Twp., Allegheny County
My Commission Expires Oct. 17, 2005
Member, Pennsylvania Association of Notaries

Amy A. Kopec
Expires 10-17-2005
04-26-05

TO: D&D Machinery and Sales
Attn: Mr David Martinez

14 May 2003

FROM: Weapons System Design and Manufacturing
Thomas P. Turner

SUBJECT: Beale Air Force Base Trip Report

1. I arrived at the Air Force Combat Munitions Center (AFCOMC) on 13 May 03, 0730, and met with Major Meserve, the unit Commander, and SMSgt Potratz, the Noncommissioned Officer In Charge, in the unit conference room. Major Meserve expressed some reservations about my presence at the school asking questions about the MAC. He was concerned about possible conflict with the contract bid and protest by other contractors and delaying the program. I assured him what D&D was doing was legal and we were gathering information for our proposal design. He had his people call the MMHE Focal Point to ensure all was well and we were not in violation of any rules or laws. I explained that any contractor, if they wished to do so, could come out and gather information for their proposals. He accepted my explanation and then proceeded to provide me with anything I needed to get my information. I was escorted to the Munitions Storage Area and two MSgts, Bob Clark and Rob Morris, were assigned to provide any and all information on the MAC they could. A MAC was set up in one of their maintenance buildings and we went over it top to bottom. Additionally I was given a copy of a training CD used to train troops in the set up and use of the MAC. The following is what we came up with for areas of concern and improvement:

A. Trolley Assembly:

1. Need a method to secure bomb during torquing operations. Large bombs are a particular problem due to size. Currently the bombs are held physically by a person, or a bar is inserted through a turned bomb lug and rested on a bomb next to it. Sometimes a tie down strap is used to secure the bomb as well. The torque on the nose fuse well is 625ft lbs. +- 25 lbs.

2. Roller guide bearings on dolly are too small and do not contact the rails when the bomb is pushed from the nose or tail. This causes the bomb to bind on the rails and requires the ammo troop to push from the middle of the bomb. This is difficult and requires reaching over the rails and a lot of force to move a 2,000 lb bomb. It is awkward and can be a safety issue.

3. Current roller hole settings cannot be used in the wide position when building up the BLU-109 JDAM with version III strakes. The strakes are wider and contact the dolly. Currently the rollers are moved to the narrower MK-82 hole positions to raise the bomb up to allow the strakes room on the trolley. This is a safety issue as the large diameter bomb is now sitting in a narrower cradle making it less stable particularly when moving down the rails.

4. Trolleys need to be wider and have bumpers to prevent bombs from bumping into each other as they move down the rails. Ammo troops have been injured as a result of the close contact of weapons. Currently an empty trolley is placed between bombs to prevent contact. This creates more work and requires more needless effort by the troops.

B. Rails:

1. Legs on rail assemblies need an easier leveling method and need smaller increment adjustments. This is a major problem to the ammo troops when setting up on unleveled ground. If the rails are not aligned perfectly they will cause trolleys to bind and hit bumps as they roll. A bumper jack method maybe better.

2. Rails from different MAC sets from different manufactures do not line up all the time. The replacement rail strips on top of the assembly will not work with all rails even though they are the same part numbers.

3. Gaps between rails cause trolleys to bind. This can cause bombs to become unstable as they move down the rails.

4. It was suggested to add pneumatic hose reel along the MAC rails for the air tools. Hoses currently are tripped over and get in the way and damaged.

5. It was suggested to put the MAC ground wire in a reel to facilitate easier use and prevent damage to it.

6. Is it possible to delete grounds between rail sets? Currently each rail set has grounds and they are long and get in the way. They are grounded to painted surfaces and not really effective. If MAC is left unpainted grounds will be unnecessary between rails.

7. Air connections leak between rails. Is there a better air connector in use?

8. Trolley returns are difficult to adjust to get them working properly.

9. There are too many pins of different diameters used on the entire MAC. Can we get to one pin size and possibly eliminate some pins?

10. Need to improve locking handles used to secure the rails to one another.

C. Gantry Assembly:

1. Hose clips do not work. Hoses fall, kink, and bind. This is a major problem, as operations have to stop to resecure them.

2. Legs on gantry are specific to position and require additional time to sort out when assembly is done. Universal legs that can go into any position would ease assembly and reduce set-up time considerably.

3. Round spreader bars on ground are a major safety hazard. A flat spreader bar with a low profile would be much better.

4. Integrated Control Board interferes with beam during assembly of MAC. Improve design so clearances are correct and pieces do not conflict.

5. With heavy use the top spreader beam twists and warps out of shape to the extent it will require replacement. The design needs beefed up so this does not happen.

6. Again, the air hoses need secured in a better manner. The clamps do not do the job and slow down operations when needing resecured.

7. One suggestion not mentioned anywhere else was a way to erect and secure camo netting. MACs are typically covered with camo netting for deception and to provide shade for the troops. A way to simplify this operation would look good in the proposal.

8. A big need and one in the spec, is the need for at least a three-ton hoist. A hoist that could operate electrically, manually, and with air would be great and that is what they would like to have. What ever hoist is selected needs to have an improved manual operation gear ratio. A big problem now is whenever the air goes down and manual mode is used, it takes a long time to raise and lower bombs. This slows operations considerably.

D. Lighting:

1. The lighting was adequate according to the users, but, more lighting of the surrounding area would be very useful and reduce the need for the light-all units. Troops doing fuze prep and other tasks require additional lighting and this could be easily provided.

E. ICB:

1. ICB needs air dryers badly. Air dryers in other areas along the way would help too. The lines freezing up during build-up operations in freezing temperatures is a major problem and can bring the entire process to a halt.

2. Plastic handles on ICB unit breaks off and must be replaced. This is another problem that can slow or stop build-up operations.

F. Containers:

1. The new design containers work well and only one comment was offered. Stiffeners are being added to the interior walls of the container to increase strength. It may be a change in the design and a TCTO. The people I talked to were not sure. Need to check with item manager to see if it is a change to the drawing package.

G. Other Comments:

1. The assembly adjustment bar is an important and useful tool. It is vital to assembling and adjusting the MAC conveyors.

2. The triple bomb bar is dangerous and breaks hands and fingers when bombs clang together if you are not careful.

3. Pallet roller conveyors will not work with big bombs (MK-84s, BLU-109s) due to roller flex. The bombs will not push down the rollers and the rollers are very prone to rust and corrosion. Many times this assembly is cast aside and not used. It is not worth the effort to the troops.

4. The front part of the entire conveyor assembly will "walk" in the gantry assembly. This requires periodic stopping and returning the conveyor rails to a centered position. This could be corrected by securing the conveyor assemble to a new flat design spreader bar.

2. From the conversation I had with Major Meserve I deduced that no other contractors have been out to see him or his people and so far we are the only company doing this type of research for a proposal. I feel this may help us tremendously in our presentation. It shows we are concerned about user inputs and are paying attention to details. I feel if our proposal presentation covers all the spec requirements and rolls in information from this research we can win. A good relationship was established with the AFCOMC people and I was invited back, if needed, for more information. This could be a big plus down the road for D&D.

Thomas P. Turner
Weapons System Design and Manufacturing

MC-7 AIR COMPRESSOR

AFCOMAC 13 MAY 03

MSGT ROB CLARK
MSGT RON MORRIS

SUGGESTED IMPROVEMENTS / PROBLEM AREAS

DOLLY ASSEMBLY

1. BOMB TORQUING - BOMB TURNS 450 FT LBS +- 25
2. ROLLER GUIDES / BEARINGS BIND WHEN BOMB IS PUSHED FROM NOSE OR TAIL
3. ROLLER HOLE SETTINGS WILL NOT ALLOW BLU-109'S TO SIT IN WIDE SETTING. NEEDS TO RISE UP BOMB SO STRAKES CLEAR. NOW USING NARROW SETTINGS - SAFETY ISSUE
4. BEARINGS ARE NOT ENGAGING RAILS AS TROLLY MOVES
5. TROLLYS LONGER SO BOMBS DON'T BUMP. CURRENTLY PUTTING EMPTY TROLLY BETWEEN BOMBS.

RAIL ASSEMBLY

1. LEGS NEED TO LEVEL EASIER AND US SMALLER INCREMENTS
2. RAILS ON TOP DON'T LINE UP FROM DIFFERENT MANUFACTURES.
3. GAPS BETWEEN RAILS CAUSING TROLLYS TO BIND.
4. RAILS REPLACEMENT DIFFERENT ON DIFFERENT MANUFACTURES MACS.
5. PNEUMATIC HOSE REELS ON RAILS
6. GROUNDING REEL CABLE
7. DELETE RAIL ASSEMBLY GROUNDS?
8. AIR CONNECTIONS LEAK - BETTER WAY?
9. DOLLY RETURNS ARE DIFFICULT TO ADJUST TO WORK PROPERLY
10. PINS TO MANY DIAMETERS
11. IMPROVE LOCK DOWNS ON ASSEMBLY HANDLES.

S1014

GANTRY

1. HOSE CLIPS DON'T WORK, - HOSES KINK, FALL OUT
2. LEGS ARE SPECIFIC TO POSITION. UNIVERSAL LEG'S WOULD BE BIG HELP.
3. SPREADER BARS ARE TRIPPING HAZARD.
4. (ICB) INTERGRATER CONTROL BOARD INTERFERS WITH BEAM DURING ASSEMBLY (CHAFES ON BRACE)
5. TOP SPREADER BEAM TWISTS OUT OF SHAPE.
6. BETTER WAY TO ROUTE AND SECURE AIR HOSES
7. BETTER WAYS TO ERECT AND SECURE CAMO NETTING OVER ENTIRE MAC.
8. AT LEAST 3 TON HOIST WITH FASTER OPERATION SPEED.

LIGHTING

1. MORE LIGHTS FOR SURROUNDING AREAS.

ICB

1. NEEDS AIR DRYERS IN LINES.
2. FREEZES LINES TO HOISTS WHEN COLD
3. PLASTIC HANDLES BREAK ON ICB

HOISTS,

1. GEAR RATIO ON MANUAL HOIST POOR - NEEDS TO MOVE FURTHER FASTER.

CONTAINERS

1. NEW ONES WORK WELL
2. BRACING ADDED TO SIDEWALLS FOR RIGIDITY.

S1014

ASSEMBLY ADJUSTMENT BAR is GOOD + NEEDED FOR ASSEMBLY of CONVEYOR RAIL ASSEMBLY AND ADJUSTING LEGS ON GANTRY

TRIPLE BOMB BAR ALLOWS BOMBS TO CLANG TOGETHER AND BREAK BOMBS

PALLET ROLLER CONVEYORS WILL NOT WORK WITH BIG BOMBS.
LOCK UP + RUST + FLEX.
WILL NOT PUSH EASILY.

[CONVEYOR WILL WALK BUILDING HEAVY BOMBS INSIDE GANTRY.
FIX BY ATTACHING CONVEYOR TO FLAT PLATE SPREADER BAR]

VERSION III JDAM HAS BIGGER STRAKES

MAJ MESERVE
SMSGT. POTRATZ, MIKE

SPECS

DOD 6055.9 - STD

AFMAN 91-201

AFOSH STD 91-501

ANSI - B - 30. ?
MATERIAL ~~SAFETY~~ EQUIPMENT SAFETY STD.

S1014

MAC II SEC. 3 NOTES

* JDAM GBU-31 V3b STRAKES

3.1.2.b TRANSPORT TRAILERS/ TOW VEHICLES
C/W NO PROBLEMS

3.1.2.c FACILITIES
C/W NO PROBLEMS
CAN MEET ORIGINAL SPEC REQ.

3.1.2.d ELECTRICAL POWER SOURCE
NEED FOUR EXTRA PLUGS

[illegible] ADD ADDITIONAL LIGHTING ON GANTRY
LIGHTING FOOTPRINT DIAGRAM

3.1.2.e COMPRESSED AIR SOURCE
ACCESS DOORS ON ICB

SEALS ON AIR LINES.
NO PROBLEMS RUNNING TOOLS

3.1.2.f MOBILITY
NO PROBLEMS WITH TRANSPORT

3.1.2.G SHIPPING & STORAGE
IMPROVE CONTAINER DESIGN

3.2.1.1 LOADING AND UNLOADING SYS.
DOLLY MODS (JDAM V3 STRAKE)

3.2.1.2 MUNITIONS ASSEMBLY/DISASSEMBLY
Dolly BUMPERS.
625 +- 25 TORQUE

S1014

3.2.1.3 MAC II Assembly/Disassembly
Improve design with universal legs and supports.
Dunnage will drive disassembly process and container markings.
Foam dunnage?

3.2.1.4 Unimproved surface & leveling
1 size pin on entire unit
Rail jack leg adjustments
Show hardware example
1/2" drive
Fixes rail strip alignment
Fix walking of conveyor

3.2.1.5 Lighting
Model lighting
Add gantry area light
Eliminate additional light alls.
Cuts mobility requirement

3.2.1.6 Temporary Storage Area
Bigger better galvinized roller pallet
Roller lubrication
Bearing ~ sealed rust resistant

3.2.1.7 Arming wire assembly
Anti-backlash on dispenser

3.2.1.8 Tool trays
1/2" lip on tray
Folding legs on tray
Mount on rail side

S1014

3.2.2.1 WEIGHT - READ SPEC
GO TO ALUMINIUM GANTRYS

3.2.3 SERVICE LIFE
BEARINGS - VENDOR
HOISTS - VENDOR
CONVEYOR - VENDOR
LIGHTS - VENDOR
HOSES - VENDOR - DAYCO?
REELS - VENDOR
OILERS - VENDOR

3.2.3.1 MAINTAINABILITY & RELIABILITY
SERVICE LIFE INFO
HOIST WORST CASE
FCR - MODULAR COMPONENTS EASY TO CHANGE.

3.2.4 ENVIRONMENTAL OPERATIONAL CONDITIONS
VENDOR INFO

3.2.5 SAFETY FACTORS & PROOF LOADS
Yes

3.3.1 MATERIALS, PROCESS, CORROSION RESISTANCE
NO PAINT

3.3.1.1 METALS
NO PROBLEMS ALL ALUMINIUM

3.3.1.2 DISSIMILAR METAL
STANDARD ANTI-CORROSSION PROCEDURES

3.3.1.3 STANDARD & COMMERCIAL PARTS
NO PROBLEMS

3.3.3. INTERCHANGEABILITY
WEAR STRIPS. DIAGRAM/PICTURE OF DESIGN. PICTURE OF TESTS.

S1014

3.3.4. SAFETY
SHOW NEW DESIGN FOR HOSE RETENTION

3.3.4.1 GROUNDING
ONE GROUND POINT RAAC
ONE ON ICB ON A REEL

3.4 PERSONNEL
NO NEW TRAINING
SAME NUMBERS & SKILL LEVEL
ICB CONFIGURATION - EASIER
MODULAR CONSTRUCTION.

S1014