**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| SPECTRUM SCIENCES AND SOFTWARE, INC. | * | |
| Plaintiff, | * | No. 04-1366C<br>(Judge Allegra) |
| v. | * | |
| THE UNITED STATES | * | |
| Defendant. | * | |

**SECOND AMENDED COMPLAINT**

COMES NOW, Plaintiff Spectrum Sciences and Software, Inc. ("Spectrum" or "Plaintiff"), by and through its undersigned attorney, and sues the United States, and as grounds therefore, hereby alleges:

**THE PARTIES**

1. Plaintiff Spectrum is a Florida corporation with its principal place of business at 91 Hill Avenue, Ft. Walton Beach, Florida 32548.

2. Defendant The United States, as represented by the Department of the Air Force, Air Armament Center, is located at Eglin Air Force Base, Florida ("USAF" or "Government").

3. Spectrum performs work for government and private customers. Spectrum and its predecessors have employed personnel with over 100 years experience manufacturing and maintaining munitions support equipment for the United States defense establishment. Spectrum's staff and personnel include individuals with extensive expertise in munitions handling, design, development and deployment, as well as highly trained scientists, engineers and technicians whose background and experience are

relevant to the munitions handling and support equipment fields, including specifically the Munitions Assembly Conveyor ("MAC") (previously named "RAMS" for Rapid Assembly of Munitions System).

## JURISDICTION

4. This is an action for damages for breach of an express contract, namely a Cooperative Research and Development Agreement dated October 14, 2000 ("CRADA"), between Spectrum and the USAF, and for breach of an implied in fact contract associated with an Unsolicited Proposal submitted by Spectrum to the USAF in February 2003. The jurisdiction of the United States Court of Federal Claims is conferred by the Tucker Act, 28 U.S.C. Section 1491.

## FACTUAL BACKGROUND

### The MAC

5. The MAC is an extensive, sizable product used by the Government in the final assembly of munitions. Variations of the MAC (and before it the RAMS) have been in use for many years.

6. As munitions and Government needs evolved, the MAC became increasingly outdated.

7. Spectrum, aware of the operational problems with the MAC, began extensive investigations to upgrade and improve the MAC in the late-1990s. As part of its effort, Spectrum prepared a laboratory to conduct research and development and manufacture MAC improvement prototypes. Some of the items Spectrum identified as needing improvements or upgrades included (but were not limited to) the:

a. Gantry - The original MAC was built to handle MK-82, 500 pound bombs with conical fins. The stated bomb buildup rate of one bomb per minute in the Technical Order was based on this size bomb. No other size bombs could be built at that sustained rate. As newer, precision guided munitions were developed, some with some bomb and guidance kits weighing in excess of 2800 pounds each, the original MAC gantry could not support even two of these bombs at once, and the hoist could not lift them;

b. Hoist Trolley - The original MAC had manual trolleys that had to be pulled into position up or down the gantry by hand. These manual trolleys were not only extremely tiring to use, but also dangerous;

c. Torque bar - The original requirement for the MAC was for 500 pound bombs with conical fins. This fin was attached with set-screws, and did not require that the bomb be held in place during tightening. However, modern ordinance relies heavily on laser guidance packages. These packages require installation of a collar (called the forward adapter) that must be tightened to a torque of 600-700 foot-pounds. The collar is radially aligned with the bomb, so the bomb has a tendency to rotate instead of tighten;

d. Lighting - The lighting provided with the original MAC was inadequate;

e. Hoist - After even moderate wear and tear, especially in cold weather, the original MAC's hoist could only lift one bomb at a time, slowing production rates. At temperatures below zero degrees Fahrenheit, the hoist

developed ice crystals internally, and cut the seals causing catastrophic failure. The original hoist also used oil that was environmentally unfriendly. The hoist also was difficult to support logistically;

f. Dolly Stops - The original MAC had a rudimentary stop to prevent bomb dollies from inadvertently rolling off the rail conveyor. It would prevent bombs from going over the edge at very slow speeds, but not when pushed with authority as often happened when the rail conveyor was not completely level;

g. Interface Control Board - The interface control board supplied with the original MAC needed modernizing to make it more useful, efficient and user friendly, both in the electrical and pneumatic systems. It also required a system to prevent freeze-up;

8. For a period of approximately one year prior to the execution of the CRADA, Spectrum engaged in substantial design, development and manufacturing of a full scale, operational laboratory test MAC for the purpose of improving the original MAC.

9. Benefiting from its extensive experience and intellectual capital, and prior to the execution of the CRADA, Spectrum established and developed new replacement part procurement protocols for the original MAC.

10. Benefiting from its extensive experience and intellectual capital, and prior to the execution of the CRADA, Spectrum was uniquely involved in designing and making major modifications and improvements to integral components of the original MAC, which modifications and improvements constituted trade secrets and the

intellectual property of Spectrum at the time Spectrum and the USAF entered into the CRADA, including (but not limited to) the following:

a. the MAC's gantry design was improved to provide higher weight capacity to the hoist component of the MAC for the newer, precision guided munitions which are substantially heavier than past munitions;

b. the MAC's powered hoist trolley system was automated to allow the MAC to be used more efficiently when the unit is in less than optimal settings and to reduce the strain on human operators by replacing them with automation;

c. a torque bar was designed and introduced to improve the Airmen's capability to add the necessary components for today's high technology munitions;

d. additional lighting was designed and added to the MAC to help illuminate the entire MAC area of operation to include not only the assembly area but also the staging area all around the MAC;

e. a more powerful, dependable, more easily repaired hoist was introduced to increase the MAC's loading capabilities for weight, speed, and number of munitions, and improved its operation in less than hospitable environments;

f. light shipping and storage containers were designed and manufactured for the MAC in order to properly and safely transport the new lighting described in (d.) above;

g. dolly stops were redesigned and added to the MAC's conveyor system to prevent falloff of munitions as they reached the terminal end of the system, especially when the unit was setup on uneven terrain; and,

h. The MAC's air handling system was upgraded including the interface control board to increase electrical power, and adding 3/4 inch airlines throughout to improve the pneumatic operation of the entire system.

11. Spectrum expended substantial sums of money for research and development to design, modify and improve the MAC prior to entering into the CRADA.

12. Prior to entering into the CRADA, Spectrum installed a MAC laboratory demonstration area within its manufacturing facility to provide the capability to visualize and test improvements to the current munitions support systems as well as to demonstrate new concepts and designs for munitions handling and support equipment.

13. Prior to entering into the CRADA, Spectrum demonstrated the modifications and improvements that it made to the original MAC to USAF Air Armament Center personnel who visited Spectrum's laboratory to view and assess the improvements. This demonstration of the MAC modifications and improvements to the USAF, which included Spectrum's trade secrets and intellectual property, was made under circumstances where Spectrum and the USAF agreed and understood that such disclosure of Spectrum's prototype, trade secrets, and intellectual property was made in strictest confidence.

14. As a direct and immediate result of the substantial research and development and the favorable improvements made by Spectrum on the original MAC,

the USAF Air Armament Center requested Spectrum to enter into a CRADA with the USAF, which the parties did in October 2000, a copy of which has previously been provided to the Court and the Government, pursuant to 15 U.S.C. Section 3710a (as amended) and Air Force Instruction 61-302.

15. The Air Armament Center Munitions Material Handling Equipment ("MMHE") Focal Point was the primary USAF point of contact for Spectrum under the CRADA.

16. The purpose of the CRADA was to further refine the research, development, design, and testing of the important improvements to the MAC some of which already had been substantially undertaken by Spectrum.

17. Paragraph 5.1.1 of Appendix A of the CRADA expressly acknowledges and agrees that prior to the CRADA Spectrum had engaged in substantial design and development of a product line of munitions handling equipment and that Spectrum specifically claimed intellectual property rights relating to Spectrum's existing product line and design work related to the MAC.

18. Spectrum's intellectual property expressly referenced in Paragraph 5.1.1 of Appendix A of the CRADA includes the following:

a. Modification of the gantry to 6,000 pounds load limit;

b. The braking system on the rail conveyor;

c. Improvements to the air handling system including the interface control board to increase electrical power and to the airlines throughout the system to enhance pneumatic operations;

d. Modification to the rail conveyor for torque of guided bomb units;

e. The development of an electric hoist with powered trolley;

f. The new lighting system; and

g. A working table utilizing the container lid.

19. Spectrum developed the intellectual property referenced in Paragraph 5.1.1 of Appendix A of the CRADA prior to entering into the CRADA.

20. Because of the acknowledged presence of proprietary information, CRADA paragraph 7.1 expressly provides that the "PROPRIETARY INFORMATION shall not be disclosed by the receiving party except under a written agreement of confidentiality to employees and contractors of the receiving party who have a need for information in connection with their duties UNDER this AGREEMENT."

21. Paragraph 7.1 of the CRADA also expressly provides that the Government shall not disclose any proprietary information except as developed under and in connection with the parties duties under the CRADA, and then only upon express consent provided in a separate writing. Spectrum never provided any such consent to the Government.

22. Section 7.2 of the CRADA further provides that any designs, technologies or integration of technologies developed solely by Spectrum under the CRADA is proprietary to Spectrum and solely owned by Spectrum.

23. Over the next two years, Spectrum performed its obligations under the CRADA.

24. Pursuant to Section 7.1 of Appendix A of the CRADA, on or about August 15, 2002, Spectrum submitted to the USAF a Final Report of Completion for all the requirements identified in the CRADA.

25. Following submission of the Final Report of Completion of the CRADA, the USAF sought to purchase Spectrum's rights in the MAC, including a complete set of drawings of the redesigned MAC. Spectrum refused the USAF's overtures to purchase Spectrum's rights in the redesigned MAC because the USAF offer was inadequate to compensate Spectrum for its total investment in redesigning the MAC and in light of potential licensing opportunities with other government military entities.

**The MAC II Draft RFP And Final RFP**

26. After the USAF failed to purchase the rights to the redesigned MAC from Spectrum, the USAF (unbeknownst to Spectrum) commenced internal development of a solicitation for a so called MAC II system, designed to replace the MAC.

27. The USAF (again without the knowledge or consent of Spectrum) used proprietary information provided by Spectrum - including information related to the items that the CRADA specifically acknowledges as pre-existing proprietary information - to develop its MAC II acquisition strategy and solicitation.

28. Many of the USAF individuals to whom the USAF disseminated the CRADA information had no involvement with the CRADA or need to know Spectrum's proprietary information provided to the USAF under the CRADA.

29. No efforts were taken to protect Spectrum's proprietary CRADA information as part of the MAC II acquisition process. To the contrary, Spectrum's proprietary CRADA information was openly shared and used by the USAF.

30. On or about March 25, 2003, the USAF publicly issued draft Solicitation No. F08635-03-R-0077 (the "Draft RFP") for the MAC II (without prior review by or advance notice to Spectrum). The Draft RFP was (in a number of critical respects) based on and revealed Spectrum's proprietary information provided to the USAF under the protections of the CRADA. The USAF disclosed and widely disseminated the Draft RFP to third parties, including competitors of Spectrum. (Spectrum previously has provided the Court and the USAF with relevant portions of the Draft RFP.)

31. Spectrum immediately objected to the Draft RFP.

32. In or about May 2003, the USAF issued the final version of Solicitation No. F08635-03-R-0077 (the "Final RFP") for the design and production of the MAC II. Although modified in several respects from the Draft RFP, the Final RFP also was (in a number of critical respects) based on and revealed Spectrum's proprietary information provided to the USAF under the protections of the CRADA. The USAF disclosed and widely disseminated the Final RFP to third parties, including competitors of Spectrum. (Spectrum previously has provided the Court and the USAF with relevant portions of the Final RFP.)

33. Spectrum likewise objected the Final RFP.

34. The Draft RFP and Final RFP were based on, contained, or released Spectrum proprietary information protected under the CRADA or otherwise and related to (among other things):

- MAC Loading and Unloading (e.g., by requiring the powering of all movements and utilizing working strength requirements developed by Spectrum);
- MAC Munition Assembly/Disassembly (e.g., by requiring that the MAC allow for the torquing during munitions assembly to 625 foot-pounds plus or minus 25 foot-pounds and by requiring assembly and disassembly by "15 Air Force personnel, within 60 minutes using only a forklift, minimum hand tools, and no stand alone special tools");
- Lighting (e.g., by requiring lighting levels comparable to Spectrum's levels, by specifying the Spectrum suggested lighting color, and by using the Spectrum recommended restart time);
- Temporary Storage Area (e.g., by requiring that "the MAC shall have a minimum storage area prior to assembly and shall be capable of storing six 2,000 pound class munitions pallets double-stacked at one time. . . .")
- Tool Trays (by including associated dimensions and placement comparable to Spectrum);
- Service Life (e.g., by including a Spectrum selected 30 year service life requirement); and
- Safety (e.g., by including Spectrum's tubing trolley concept).

35. The Government did not allow Spectrum to review the Draft RFP or Final RFP prior to issuing the documents publicly.

36. Notwithstanding (and without waiving) its objections and in an effort to mitigate its damages, Spectrum competed for the contract under the Final RFP.

37. In September 2003, the USAF awarded the Contract under the Final RFP to D&D Machinery & Sales, Inc.

38. Without utilizing Spectrum's intellectual property and proprietary information relating to the redesigned MAC, the Government would have been unable to produce the specifications contained in the Draft RFP and Final RFP for the design and production of a MAC II.

39. Absent the improper releases of Spectrum's intellectual property and proprietary information, Spectrum would have received the Contract award for the MAC II and enjoyed a better competitive position in other MAC sales.

**The Unsolicited Proposal**

40. Following the submittal by Spectrum of its Final Report of Completion of the CRADA, the USAF indicated its willingness to accept an unsolicited proposal from Spectrum for a 6,000 pound capacity MAC. The USAF did not advise Spectrum that it had a plan to conduct a competitive procurement for such an item.

41. In response, on or about February 24, 2003, Spectrum submitted to the USAF an Unsolicited Proposal to build a Combat Munitions Assembly Conveyor ("C-MAC"), which proposal was dated February 19, 2003 (the "Unsolicited Proposal").

42. Spectrum's Unsolicited Proposal disclosed extensive trade secrets and proprietary information of Spectrum, including trade secrets and proprietary information developed by Spectrum following the submittal of the Final Report under the CRADA. The Unsolicited Proposal also included a printed and prominent restrictive legend which prohibited the use or disclosure by the Government of Spectrum's trade secrets and proprietary information for any purpose other than the Government's evaluation of the Unsolicited Proposal.

43. Despite that the USAF apparently was actively preparing a MAC II draft RFP, it did not immediately return the Spectrum Unsolicited Proposal.

44. On or about March 24, 2003, the USAF notified Spectrum that the USAF would not accept Spectrum's Unsolicited Proposal because the USAF had instituted an acquisition program to acquire a MAC II. This was the first time that the Government informed Spectrum that it was preparing an acquisition program for a MAC or similar system.

**Other Releases And Mishandlings Of Spectrum's Proprietary Information And Post-Dispute Matters**

45. SMSgt. Daniel T. Mank ("Mank") worked for the USAF at MMHE Focal Point as the superintendent during Spectrum's development of the MAC prior to the CRADA and during the testing and verification of combat capability during the performance of the CRADA. In such official capacity, Mank had access to the confidential and proprietary information developed by Spectrum prior to the CRADA alleged and was intimately aware of Spectrum's design, development and testing of the MAC prior to and during the performance of the CRADA.

46. Upon information and belief, the USAF never had Mank sign a confidentiality agreement related to the CRADA.

47. Upon Mank's retirement from the USAF, Mank also participated in advising a competitor of Spectrum which apparently competed under the Final RFP.

48. CMSgt. Tom Turner ("Turner") worked for the USAF at MMHE Focal Point during the period in which the USAF was evaluating the possibility of entering into the CRADA with Spectrum. In such official capacity, Turner had access to the proprietary information developed by Spectrum prior to the CRADA. Turner also continued to be involved with the Government's evaluation and application of the Spectrum's improvements to the MAC during the performance of the CRADA after he was transferred to the 46th test wing at Eglin AFB. In such official capacity, Turner visited Spectrum's laboratory on several occasions, received briefings and observed all the improvements that Spectrum developed on the MAC, and otherwise had access to Spectrum's confidential and proprietary information developed by Spectrum prior to the CRADA.

49. Upon information and belief, the USAF never had Turner sign a confidentiality agreement related to the CRADA.

50. Upon Turner's retirement from the USAF, Turner provided MAC related consulting services to D&D Machinery & Sales, Inc., a competitor of Spectrum. The USAF ultimately awarded D&D Machinery & Sales, Inc. the contract under the Final RFP. Spectrum was the next best value proposal under the solicitation.

51. USAF personnel knew that Turner and Mank, while employed by the USAF, had gained knowledge of Spectrum's development of the improvements to the MAC prior to and during the performance of the CRADA and in their official capacity with the USAF. The USAF took no action to protect Spectrum's information.

52. Spectrum attempted to resolve its CRADA dispute with the USAF under Section 8.4 of the CRADA by communicating with the USAF officials on several occasions, and upon failing to resolve this dispute, Spectrum requested that the UNIT (as defined in the CRADA) refer the dispute to the REVIEWING OFFICIAL (as defined in the CRADA), but the UNIT failed to refer the dispute to the REVIEWING OFFICIAL, thereby frustrating and exhausting Spectrum's administrative remedies under the CRADA.

53. Spectrum has satisfied all conditions precedent to filing this action.

## CAUSES OF ACTION

### Count I
### Breach of Express Contract

54. Spectrum hereby incorporates, by reference and as if fully set forth herein, the allegations contained in paragraphs 1-53 of this Second Amended Complaint.

55. The USAF and Spectrum entered a valid, binding, and enforceable written contract, the CRADA.

56. Spectrum performed its obligations under the CRADA.

57. The USAF breached its obligations under the CRADA.

58. The USAF's independent and material breaches include, but are not limited to:

- Using Spectrum proprietary information obtained under and in connection with the CRADA in the development of the Draft RFP and Final RFP without the consent or approval of Spectrum;
- Disclosing Spectrum proprietary information obtained under and in connection with the CRADA to USAF individuals who did not have a need for the information under the CRADA (and, indeed, in some cases had no involvement at all with the CRADA);
- Failing to obtain written agreements of confidentiality from its employees that were provided Spectrum's CRADA related proprietary information, a failure that ultimately resulted in at least two USAF individuals who had access to Spectrum proprietary CRADA information assisting competitors under the Draft RFP and Final RFP and otherwise contributed to the improper releases by the USAF outlined herein;
- Failing to confer and consult with Spectrum (and to allow for the review of the Draft RFP and Final RFP) prior to the public use and release of Spectrum proprietary information provided in connection with the CRADA and results of work under the CRADA;
- Failing to protect Spectrum's proprietary information as required under the CRADA by issuing a Draft RFP and a Final RFP and otherwise conducting an Industry Day that in numerous critical respects was based on, incorporated, and released Spectrum proprietary information provided to the USAF under the protections of the CRADA;

- Misappropriating and misusing Spectrum's CRADA protected trade secrets and proprietary information relating to the MAC, by publicly releasing information related to the following: (i) Loading and Unloading systems (e.g., by including a Solicitation specification requiring the powering of all movements - a concept based in whole or in part on Spectrum's proprietary information recognized and protected under the CRADA); (ii) Munition Assembly/Disassembly (e.g., by including a Solicitation specification requiring that the MAC allow for the torquing during munitions assembly to 625 foot-pounds plus or minus 25 foot-pounds and by requiring assembly and disassembly by "15 Air Force personnel, within 60 minutes using only a forklift, minimum hand tools, and no stand alone special tools" both of which the USAF based in whole or in part on Spectrum's proprietary information recognized and protected under the CRADA); (iii) Lighting (e.g., by including Solicitation specifications requiring particular lighting levels, a particular lighting color, and a specific system restart time all of which the USAF based in whole or in part on Spectrum's proprietary information recognized and protected under the CRADA); (iv) Temporary Storage Area (e.g., by including a Solicitation specification requiring that "the MAC shall have a minimum storage area prior to assembly and shall be capable of storing six 2,000 pound class munitions pallets double-stacked at one time. . . ." which the USAF based in whole or in part on Spectrum's proprietary information protected under the CRADA); (vi) Service Life (e.g., by including a

Solicitation specification using a 30 year service life requirement which was based in whole or in part on Spectrum's proprietary information protected under the CRADA); and (vii) Safety (e.g., by including Solicitation provision revealing a tubing trolley concept which was based in whole or in part on Spectrum's proprietary information recognized and protected under the CRADA).

59. By reason of the conduct of the Government alleged herein, the Government without license or right improperly disclosed Spectrum proprietary information protected under the CRADA.

60. All of the foregoing breaches by the Government of its obligations under the CRADA have caused irreparable harm and severe financial damage to Spectrum in an amount not less than Three and One Half Million Dollars ($3,500,000.00).

WHEREAS, Plaintiff prays the Court to enter judgment in favor of Plaintiff for monetary damages against the United States in an amount not less than Three and One Half Million Dollars ($3,500,000.00), and to further award Plaintiff all costs, fees, expenses and attorney's fees as allowed by the Equal Access to Justice Act, 28 U.S.C. Sec. 2412, and other applicable law, and such other and further relief as the Court may deem appropriate.

**Count II**
**Breach of Implied In Fact Contract**

61. Spectrum hereby incorporates, by reference and as if fully set forth herein, its allegations contained in paragraphs 1-53 of this Second Amended Complaint.

62. Pursuant to the FAR and USAF direction, Spectrum submitted an Unsolicited Proposal to the USAF in February 2003.

63. Spectrum's Unsolicited Proposal contained Spectrum proprietary information and trade secrets to which the USAF had no right or license.

64. An implied in fact contract was created when Spectrum submitted its Unsolicited Proposal to the Government, which imposed on the Government an obligation to maintain the confidentiality of Spectrum's trade secrets and proprietary information contained in the Unsolicited Proposal.

65. The Unsolicited Proposal contained the trade secrets and proprietary information that were developed by Spectrum before it entered into the CRADA with the Government and related to the following:

a. Modification of the gantry to upgrade to a 6,000 pounds load limit;

b. The dolly brakes on the rail conveyor;

c. Improvements to the air handling system including the interface control board to increase electrical power, and 3/4 inch airlines throughout to enhance pneumatic operations;

d. Modification to the rail conveyor to allow proper torque of bombs;

e. The development of an electric hoist with powered trolley;

f. A working table utilizing attachments to shipping container lid: and

g. A new lighting system.

66. The Unsolicited Proposal also contained the following trade secrets and proprietary information relating to the MAC that were developed by Spectrum after the completion of the CRADA:

a. Rail Conveyor Dolly; and

b. Tool holding tray.

67. The USAF accepted and purported to review Spectrum's Unsolicited Proposal for the MAC for a full month while the USAF, without informing Spectrum of its true intentions and inclinations, was preparing to issue a public Solicitation for the manufacture of the MAC II.

68. The USAF through the creation and release of the Draft RFP and the Final RFP breached its implied contract with Spectrum and improperly utilized and disclosed Spectrum's Unsolicited Proposal based intellectual property and trade secrets.

69. As a direct and immediate result of the Government's breach of its obligations to maintain the confidentiality of the trade secrets and proprietary information contained in Spectrum's Unsolicited Proposal, the Government has irreparably harmed Spectrum and caused severe financial damage to Spectrum in an amount not less than Three and One Half Million Dollars ($3,500,000.00).

WHEREFORE, Plaintiff prays the Court to enter judgment in favor of Plaintiff for monetary damages against the United States in an amount not less than Three and One Half Million Dollars ($3,500,000.00) and to further award Plaintiff all costs, fees, expenses and attorney's fees as allowed by the Equal Access to Justice Act, 28 U.S.C. Sec. 2412, and other applicable law, and such other and further relief as the Court may deem appropriate.

Respectfully submitted,

ARNOLD & PORTER LLP

s/ Craig A. Holman

Craig A. Holman
555 Twelfth Street, N.W.
Washington, D.C. 20004-1206
Phone: (202) 942-5722/Fax: (202) 942-5999
Counsel to Spectrum Sciences and Software, Inc.